

**CORPORATION SERVICE COMPANY**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Beth Krause<br>Fiserv, Inc.<br>255 Fiserv Drive<br>Brookfield, WI 53008-0979 |
| **Copy of transmittal only provided to:** | Suzanne Benevenga<br>Michael Gordan |

| | |
|---|---|
| **Entity:** | Fiserv Solutions, Inc.<br>Entity ID Number 0665553 |
| **Entity Served:** | Fiserv Solutions, Inc. |
| **Title of Action:** | Peoples Bank of The South vs. Fiserv Solutions, Inc. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Campbell County Chancery Court, Tennessee |
| **Case/Reference No:** | 7CH1-2013-CV-101 |
| **Jurisdiction Served:** | Tennessee |
| **Date Served on CSC:** | 12/20/2013 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | C. Mark Troutman<br>423-566-6001 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

# IN THE CHANCERY COURT FOR CAMPBELL COUNTY, TENNESSEE

**DEFENDANTS COPY**

PEOPLES BANK OF THE SOUTH
    **Plaintiff,** )
                        )
**v.**                   )   No. *7CN1-2013-CV-101*
                        )
**FISERV SOLUTIONS, INC.** )
    **Defendant.** )

## SUMMONS

TO THE ABOVE-NAMED DEFENDANT(S):

    You are hereby summoned and required to serve upon C. MARK TROUTMAN, plaintiff's attorney, whose address is 124 Independence Lane, P.O. Box 757, LaFollette, TN 37766, an answer to the complaint herewith served upon you within 30 days after service of this summons and complaint upon you, exclusive of the day of service. You will file the original with the Court. If you fail to do so, judgment by default can be taken against you for the relief demanded in the complaint.

    Issued and tested this 17th day of December , 2013.

                                   Clerk
                                   Deputy Clerk

### NOTICE

**TO THE DEFENDANT(S):**

    Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. This list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family and trunks or other receptacle necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

### SERVICE INFORMATION

To the process server: Defendant(s), FISERV Solutions, Inc., c/o Prentice-Hall Corporation System, Inc., Its Registered Agent, 2908 Poston Ave., Nashville, TN 37203-1312.

### RETURN

I received this summons on the _____ day of _____, 2013.

I hereby certify and return that on the _____ day of _____, 2013.

(    ) served this summons and complaint on the defendant in the following manner:

(    ) failed to serve this summons within 30 days after its issuance because:

_____



ADA
FOR ASSISTANCE CALL
423-562-2520

## IN THE CHANCERY COURT FOR CAMPBELL COUNTY, TENNESSEE

PEOPLES BANK OF THE SOUTH )
    Plaintiff, )
 )
v. )   No. _7 CN/-2013 -
 )   CV-101
FISERV SOLUTIONS, INC. )
    Defendant. )

### COMPLAINT

Comes Peoples Bank of the South, by counsel, and for its cause of action against the Defendant would say as follows:

### THE PARTIES

1. The Plaintiff, Peoples Bank of the South, is a Tennessee banking corporation with its principal offices in Campbell County, Tennessee.

2. The Defendant, Fiserv Solutions, Inc., is a Wisconsin Corporation doing business in Tennessee. Its registered agent for service of process is the Prentice-Hall Corporation System, Inc., 2908 Poston Ave., Nashville, TN 37203-1312.

### JURISDICTION AND VENUE

3. As will be further set forth below, the cause of actions in favor of the Plaintiff arise under two written agreements, with multiple addendums, relating to data processing of customer and other information on behalf of the Plaintiff. As a result of Defendant's business activities in the State of Tennessee, jurisdiction exists in this matter

4. The causes action set forth herein arise largely out of the "de-conversion" services due under the various contracts upon the termination of the various agreements. Per the terms of those contracts, the services were due to the Plaintiff, whose principal offices are in Campbell County, Tennessee. As a result, venue is proper in this Court pursuant to T.C.A. §20-4-104(1).

1

## COUNT ONE

5. On or about July 26, 2007, Peoples entered into a data processing agreement with Financial Data Technology Corporation. The initial term of the agreement was for a five year term beginning on October 1, 2007. Attached hereto as Exhibit One is a true and exact copy of such Agreement, hereinafter referred to as the "Fidata Agreement."

6. During the term of the Fidata Agreement, Financial Data Technology Corporation was to render various data processing services to the Plaintiff relating to various accounts maintained by Plaintiff's customers.

7. The Fidata Agreement also provided for the "de-conversion" of the Plaintiff's data in the event the Fidata Agreement was terminated for any reason. In particular, the Fidata Agreement provides as follows:

3. DECONVERSION CONSIDERATIONS

   a. Upon termination of this agreement, whether by reason of expiration, non renewal, or termination under Section 1 of the agreement, Customer may obtain from process irrelevant data files and records for the purpose of De-conversion to an alternative data processing system by a machine-readable media appear.
   b. The processor hereby agrees to provide reasonable and customary levels of transition assistance if the customer desires to convert to other automation alternatives.
   c. Acceptance is provided in Section 3, (D), the De-conversion activities constitutes services that create fees payable to the processor. Such fees are enumerated in Schedule A-De-conversion Fee Schedule.

8. In July of 2012, the data processor, Financial Data Technology Corporation, filed a Bankruptcy Petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee.

9. In connection with such Bankruptcy proceedings, the defendant entered into an asset to purchase agreement acquiring certain contracts and other assets of Financial Data Technology

2

Corporation, including the Fidata Agreement attached hereto as Exhibit 1. Attached hereto collectively as Exhibit 2 are true and exact copies of the Asset Purchase Agreement by and between the defendant and Financial Data Technology Corporation and the Court's Order approving the same.

10. In accordance with the terms of the Asset Purchase Agreement and the Court's Order approving the same, the defendant assumed all of the obligations of Financial Data Technology Corporation arising under the contract attached hereto as Exhibit 1 that arose after the closing date of the Asset Purchase Agreement.

11. Upon information and belief, the closing date for the Asset Purchase Agreement attached hereto as Exhibit 2 was sometime in September, 2012 and thereafter, the defendant begin performing under the Fidata Agreement.

12. Prior to the closing date, the defendant's representatives contacted the plaintiff's officers and advised them of the assumption of the contract.

13. Thereafter, the plaintiff and the defendant performed in accordance with the terms of the Fidata Agreement.

14. Prior to the above described assumption, by letter dated February 29, 2012, the plaintiff provided notice to the defendant's predecessor that it was not going to automatically renew the Fidata Agreement beyond the October 1, 2012 contractual termination date. Attached hereto as Exhibit Three is a true and exact copy of said letter. The plaintiff proposed that the parties embark upon a month to month contractual relationship as it had previously been advised of potential assignment and assumption by the defendant.

3

15. After October 1, 2012, the parties continued to perform under the Fidata Agreement. The defendant continued to render services and submitted invoices pursuant to the Fidata Agreement and the plaintiff paid the invoices.

16. Thereafter, the plaintiff advised the defendant that it was changing data processing firms effective in June of 2013. At that point, the parties commenced the "de-conversion" process and the discussion of the return of the plaintiff's data to it. The plaintiff later extended the conversion date to July, 2013, primarily due to the defendant's delay in returning data to the Plaintiff.

17. In March, 2013, the defendant began submitting service requests and invoices to the plaintiff for various items the defendant claimed were due, including, but not limited to, "de-conversion" services under the Fidata Agreement and under additional agreements as will be later discussed herein. As to the data processing and "de-conversion" services due under the Fidata Agreement, the defendant submitted an invoice to the plaintiff that was many times the amount expressly set forth in the Fidata Agreement, in particularly the Schedule A attached to the agreement.

18. The defendant refused to perform any "de-conversion" services and return the plaintiff's data to it without payment in advance of the fees that it requested. The plaintiff protested the amounts and sought to require the defendant to comply with the parties' agreements, but the defendant failed and refused to do so.

19. The information possessed by the defendant was confidential and critical information pertaining to the plaintiff's customers and their accounts and the plaintiff could not conduct business without material injury without such information. Having no choice and in essence being held hostage by the defendant's actions wrongfully withholding the plaintiff's

4

data, the plaintiff paid the exorbitant, excessive, and baseless fees under protest and with full reservation of all rights.

20. The defendant breached the Fidata Agreement by charging fees greatly in excess of a clear and unambiguous amounts set forth in the agreement by wrongfully refusing to return the data without the payment of the wrongful amounts, and by attempting to delay the conversion to the new data processing system. As a result of the defendant's breach of the Fidata Agreement, the plaintiff is entitled to a Judgment against the Defendant for an amount of no less than $158,700.00 less legitimate charges per the Fidata Agreement pursuant to this Count One.

## COUNT TWO

21. In addition to the Fidata Agreement, by contract accepted September 30, 2008, the plaintiff and the defendant entered into an electronic transaction services agreement entitled "Fiserv EFT" agreement. Attached hereto as Exhibit Four is a true and exact copy of the Fiserv EFT Agreement

22. Pursuant to the Fiserv EFT agreement, the defendant agreed to provide access to its electronic transaction services for the plaintiff and its customers and the defendant agreed to provide processing services to the plaintiff for such transactions. The term of the Fiserv EFT agreement was for a period of time ending on the last day of the 65th month after the effective date of the contract.

23. By letter dated January 23, 2013, the plaintiff advised the defendant that it was electing to terminate Fiserv EFT agreement prior to the expiration of the term. Attached hereto as Exhibit Five is a true and exact copy of said letter. The Plaintiff acknowledges that such gave arise to early termination fees which it has paid in full to the defendant.

5

24. Like the Fidata Agreement, the Fiserv EFT Agreement contained provisions providing for the conversion services. In particularly the Fiserv EFT Agreement provides:

"Upon termination or cancellation of this agreement, Fiserv EFT agrees to provide magnetic paid copies of the client's data files and Fiserv EFT's possession at a cost equal to Fiserv EST's then published rates. In addition, Fiserv EFT and the client will each assist the other party in an orderly termination of this agreement and a transfer of all assets hereof, tangible or intangible as may be necessary for the orderly, non destructive business continuation of Fiserv EFT and the client."

25. After the receipt of the Notice of the Termination, the defendant submitted service request documents setting forth the termination and de-conversions fees a claim due and payable by the plaintiff. Such amounts were greatly in access amounts anticipated by the plaintiff as represented initially by the defendant's representatives. When questioned about such amounts and the published rates, the defendant advised the plaintiff that the rates are not published and that they were just the rates that the defendant had elected to charge. Defendants could never provide any basis for such charges and refused to return the plaintiff's data unless the charges were paid in full.

26. Again, the defendant possessed critical customer information belonging to the plaintiff. Again, having no choice, the defendant paid the exorbitant fees in advance under protest and with reservation of rights.

27. The defendant has breached the Fiserv EFT contract by charging fees in excess of amounts provided for in the contract or in excess of reasonable and customary amounts and the plaintiff is entitled to the return of all such fees. Accordingly, the plaintiff is entitled to a judgment against Fiserv in the amount of $11,884.07 pursuant to this account.

## COUNT THREE

28. The allegations as set forth in paragraph 1-27 above are re-alleged and adopted and incorporated herein by reference.

6

29. Prior to the assumption of the Fidata Agreement by the defendant, certain data processing software was provided to the plaintiff by Financial Data Technology Corporation through licenses with the defendant.

30. Prior to the assumption of the Fidata Agreement by the defendant, the plaintiff was charged annual licensing fees and paid the same.

31. After or immediately before the defendant assumed the Fidata Agreement, the defendant's representatives advised the plaintiff that as a result of its assumption of the Fidata Agreement, the plaintiff would no longer have to pay licensing fees.

32. After the plaintiff notified the defendant that it was terminating the parties' agreements as set forth in Counts One and Two above and contrary to the representations by the defendant's representatives, the defendant submitted annual software licensing fees to the plaintiff, several of which extended beyond the termination of the contracts.

33. As it did with the plaintiff's data, the defendant refused to provide any "de-conversion" services under either of the above referenced contacts until the plaintiff paid the software licensing fees.

34. The charging of the annual software fees by the defendant and refusing to release data and otherwise perform services until the payment of those fees were made constitutes breach of the agreement between the parties that there would be no such licensing fees and the plaintiff is entitled to a judgment against the defendant for the amount of $31,277.85 for all fees paid. Alternatively, the plaintiff is entitled to a refund of licensing fees beyond the termination under the agreements referenced in Counts One or Two above.

## COUNT FOUR

7

35. The allegations set forth in paragraph 1-34 above are re-alleged and adopted and incorporated herein by referenced.

36. As set forth above, after the plaintiff notified the defendant of the termination of the agreements, the defendant began submitting "Service Requests" and requiring payment in advance for de-conversion and other services.

37. One such Service Request included a $10,000.00 fee for a particular contract that actually required the defendant to pay periodic funds to the plaintiff.

38. However, upon questioning by the plaintiff, the defendant's representatives admitted that the plaintiff never signed the agreement which defendant claimed entitled it to this $10,000.00 fee. Instead, the defendant sent the plaintiff a specimen agreement signed only by defendant that also did not provide for any such termination fee. Prior to receipt of this specimen, plaintiff was unaware of any such agreement or its purported terms.

39. Again, as with the other items, the defendant refused to provide any contractually obligated de-conversion services or return the plaintiff's data until this $10,000.00 fee was paid. And again, in order to receive the data and services, plaintiff made the payment under protest and with a reservation of all rights.

40. Plaintiff is entitled a judgment in the amount of $10,000.00 for the return of the funds for which there was absolutely no basis for the defendant to extort out of the plaintiff.

## COUNT FIVE

41. The allegations set forth in paragraph 1-40 above are re-alleged and adopted and incorporated herein by referenced.

42. In accordance with Tennessee law, the covenant of good faith and fair dealing applies to all the contracts as set forth above. As a result, the plaintiff is entitled to a reasonable

8

expectation that its data would be returned and that the defendant would perform de-conversion services clearly provided for under the agreements for the fees as set forth in the agreements. Plaintiff relied upon these contractual provisions in making its decision to terminate or not renew these agreements.

43. As set forth above, the defendant has failed to act in good faith and in a commercially reasonable manner.

44. As set forth above, the defendant's conduct herein by holding the plaintiff's data hostage until it paid all fees demanded by the defendant constitute violations of the contracts and a breach of the defendant's duties of good faith. As a result, the plaintiff is entitled to a judgment against the defendant for return of all fees paid to the defendant as set forth above in the total amount of $201,861.92.

WHEREFORE, PLAINTIFFS PRAYS AS FOLLOWS:

1. That the Complaint would be served upon the defendant requiring it to answer in accordance with Tennessee Rules of Civil Procedure;

2. That upon trial of this matter, the plaintiff be awarded a judgment against the defendant in the amounts set forth above;

3. That the plaintiff recover its costs, including reasonable attorney fees;

4. That the cost of this cause all be taxed to the defendant and that the plaintiff be awarded discretionary cost; and

5. That the plaintiff have and recover further relief to which it may be entitled.

PEOPLES BANK OF THE SOUTH

9

BY: _____ ITS Attorney

TROUTMAN & TROUTMAN, PC

By: _____
C. Mark Troutman (BPR# 01172)

Post Office Box 757
LaFollette, Tennessee 37766
(423) 566-6001
Attorneys for Plaintiff

## COST BOND

We acknowledge ourselves as surety for all costs and taxes in this case in accordance with Tenn.

Code Ann. § 20-12-120.

PRINCIPAL:

PEOPLES BANK OF THE SOUTH

By: _____

SURETY:

TROUTMAN & TROUTMAN, PC

By: _____
C. Mark Troutman (BPR# 01172)

10

**FINANCIAL DATA TECHNOLOGY CORPORATION**
**233 BEDFORD WAY**
**FRANKLIN, TENNESSEE 37064**

<u>**SERVICES AGREEMENT**</u>

This Services Agreement (the "Agreement") is between FINANCIAL DATA TECHNOLOGY CORPORATION, Franklin, Tennessee (the "Processor") and PEOPLES BANK OF THE SOUTH, LaFollette, Tennessee (the "Customer"). The Processor agrees to perform data processing services as defined in the attached schedules in accordance with and subject to the terms and conditions of this Agreement and the additional schedules attached hereto.

1.     TERM AND TERMINATION.

   a.     The initial term of this Agreement shall be for five (5) years beginning on October 1, 2007 (the "Term"). The parties to this Agreement may mutually agree to the renewal of this Agreement.

   b.     In the event Customer wishes to discontinue this Agreement, Customer agrees to provide Processor notice of non-renewal at least one hundred (180) days prior to the expiration of the term except as provided below.

   c.     Processor or Customer may immediately give notice of its desire to terminate this Agreement pursuant to a written termination notice ("Termination Notice") in the event that (i) either party becomes the subject of any proceeding under the United States Bankruptcy Code; or (ii) if any substantial part of the other party's property becomes subject to levy, seizure, attachment, or sale by a creditor or governmental agency, whether pursuant to receivership proceedings or otherwise.

   d.     Processor and Customer further have the right to unilaterally terminate this Agreement in the event that any material breach of the Agreement is not cured within ninety (90) days following written notice of breach. Such written notice shall state with reasonable particularity and detail the nature of the claimed breach. If the breach is not cured within the 90-day period, the harmed party may send a Termination Notice to the breaching party.

   e.     In the event that either Customer or Processor gives notice of its intention to terminate this Agreement pursuant to this Section 1, the Agreement shall terminate 180 days following the date of the Termination Notice, or such earlier date if the de-conversion activities as described in Section 3 are complete.

2.     REMEDIES. In the event Customer chooses to discontinue Processor's Services, Customer shall provide one hundred eighty (180) days written notice to Processor of its intent to terminate this Agreement. In such event Customer shall continue to be liable for 80% of the remaining term monthly fees of the original five-year term using previous three-month average as the fee basis unless (i) Customer terminates this Agreement as a result of Processor's failure to

2007 Core LaFollette doc

provide the Services described in this Agreement or (ii) because of a material breach of this Agreement by Processor. If this Agreement is terminated for either reason, Customer shall not be responsible for any additional fees or any incidental costs or expenses. A party in breach of this Agreement agrees to reimburse the other party for any expenses, including reasonable attorneys' fees, that such party incurs in enforcing its remedies for breach under this section.

3. DECONVERSION CONSIDERATIONS.

    a. Upon termination of this Agreement, whether for reason of expiration, non-renewal, or termination under <u>Section 1</u> of the Agreement, Customer may obtain from Processor relevant data files and records for the purpose of de-conversion to an alternative data processing system by a machine-readable media.

    b. Processor hereby agrees to provide reasonable and customary levels of transition assistance if Customer decides to convert to other automation alternatives.

    c. Except as provided in <u>Section 3(d)</u>, the de-conversion activities constitute services that create fees payable to Processor. Such fees are enumerated in <u>Schedule A-De-conversion Fee Schedule</u>.

    d. Customer may not be required to pay any part of the deconversion fees or charges provided for in this Section in the event this Agreement is terminated as a result of Processor's material breach of the Agreement.

4. CHARGES. Charges shall be at the rates specified in the attached Schedules for the Services listed. The rates for any additional branch offices of the Customer opened by the Customer will follow the same pricing Schedules for the same Services used by the Customer at its other branches.

5. PAYMENT. Processor shall deliver to Customer an invoice for the data processing services performed by the Processor by the tenth (10th) day of each month during the Term. Payment will be due upon receipt of the invoice. A five percent (5%) late fee will be charged for any payment received after the twentieth (20th) day of the month. Collection costs, including reasonable legal fees, may also be assessed against the Customer.

6. REPRESENTATIONS AND WARRANTIES OF PROCESSOR. Processor represents and warrants to Customer that:

    a. Processor will comply with the provisions of this Agreement;

    b. The Services will conform to the Specifications as may be set out in the Schedules attached to this Agreement;

    c. Processor will perform Customer's work accurately and in accordance with the provisions of this Agreement provided Customer supplies accurate data and

2007 Core LaFollette doc

information and follows the procedures described in Processor's documentation, notices and advices;

d. Processor's personnel will exercise due care in providing the Services in accordance with industry standards;

e. Processor's performance hereunder will comply in all material respects with all applicable federal and state laws and all applicable regulatory requirements that are in existence during the Term;

f. Processor holds all requisite licenses and/or ownership rights to the software and systems that it uses or provides to Customer to perform the services hereunder;

g. Processor has no contractual or other legal obligations that would prevent Processor from entering into this Agreement;

h. Processor has the requisite corporate and legal authority to execute, deliver and perform this Agreement; and

i. No changes that the Processor may make in its security policy and procedures, operations or software will have or cause to occur a detrimental impact on Customer's procedures, reports and/or business practices.

j. THE WARRANTIES PROVIDED HEREIN BY PROCESSOR ARE THE ONLY WARRANTIES MADE BY PROCESSOR. PROCESSOR DOES NOT MAKE AND CUSTOMER HEREBY EXPRESSLY WAIVES ALL OTHER WARRANTIES, INCLUDING WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR ANY PARTICULAR PURPOSE. THE STATED EXPRESS WARRANTIES ARE IN LIEU OF ALL LIABILITIES OR OBLIGATIONS OF PROCESSOR FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE DELIVERY, USE, OR PERFORMANCE OF SERVICES.

7. REPRESENTATIONS AND WARRANTIES OF CUSTOMER. Customer represents and warrants as follows:

a. No contractual or legal obligations exist that would prevent Customer from entering into this Agreement;

b. Customer will, during the Term, comply with all applicable regulatory requirements; and

c. Customer has the requisite corporate and legal authority to execute, deliver and perform this Agreement.

8. EFT SERVICES AND THIRD PARTY PROVIDERS. Processor offers two providers for electronic funds transfer ("EFT") processing to include automatic teller machine ("ATM") terminal driving, ATM authorizations, ATM transaction processing, ATM system reports, and

2007 Core LaFollette doc

EFT processing for Visa check authorizations and processing. Processor makes no representations or warranties regarding the services provided by third-party providers.

9. DELIVERY OF SOURCE MATERIAL, DATA, AND REPORTS.

a. The delivery of source material and input data shall be as directed by Customer and at Customer's expense. Customer accepts all responsibility and liability for material and data in transit. All material and data delivered to Processor for processing, including electronically-transmitted input data, must be complete and correct and must be received at the Data Center (location as defined herein) by 6:00 P.M., Central Time. Customer agrees to handle arrangements for the return of processed material. All transportation costs incurred shall be at Customer's expense. Electronically-transmitted output will be available to remotely-processed banks by 8:00 A.M. Central Time on the banking day next following the day the material was received by Processor.

b. Processor shall notify Customer of all system changes affecting input preparation, processing procedures and reports. Processor shall in no event be responsible for faulty output attributable to erroneous input regardless of who prepared the erroneous input, or for Customer's failure to comply with the terms and conditions of this Agreement.

10. SOFTWARE CHANGES/ENHANCEMENTS. Processor will from time to time implement new or modified software systems to provide enhanced services, new products and/or compliance with regulatory requirements. Customer agrees to accept such changes or conversions to new software systems. Processor agrees that pricing considerations shall be in line with industry standards.

11. REGULATORY AGENCIES. The provisions of this Agreement are subject to such modifications, changes, and additions as may be required from time to time because of regulations or rulings by any governmental agency having authority over Processor and/or Customer. The performance of all services specified in this Agreement shall be subject to regulation and examination by the Federal Deposit Insurance Corporation and the Tennessee Department of Financial Institutions and/or by such other regulatory agencies as shall have binding legal authority to regulate and/or examine Customer, to the same extent as if such services were performed by Customer on its own premises. See Schedule E – Rule 13 Agreement.

12. CONFIDENTIALITY.

a. Processor shall, in connection with the furnishing of services under this Agreement, use reasonable care, consistent with good industry practices, to prevent access by unauthorized persons to Customer's proprietary and confidential information or data. To protect against unauthorized usage, Processor and Customer agree that all confidential information, including but not limited to customer records, shall be used only for the purpose of providing the contracted services under this Agreement. If such information is publicly available, Processor shall bear no responsibility for its disclosure, inadvertent or otherwise. Processor and Customer agree that each party shall take all actions necessary and proper to comply with the Gramm-Leach-Bliley Act of 1999, as such may be amended from time to time, as well as other

applicable state and federal laws and regulations relative to the privacy of Customer's client and customer information

      b.      Processor shall immediately disclose to Customer any breach of security that results in any unauthorized intrusion into the Processor's systems that may materially affect Customer or its customers. Processor shall immediately disclose to Customer any such intrusion, the effect on Customer, and the corrective action taken to respond to the intrusion

13.     DOCUMENTATION AND PROGRAM OWNERSHIP.    All documentation, materials and programs used in providing data processing services including any special programs developed from specifications of Customer shall be confidential and proprietary possession of Processor. Customer agrees to use Processor's data processing services solely for its own internal use and benefit and not for resale or other transfer or disposition to, use by, or for the benefit of any other person or organization.

14.     PROCESSING ERRORS AND OMISSIONS.     In the event of a processing error or omission by Processor, Processor will credit Customer's account in an amount equal to the price paid for that particular computer run or processing in which the error occurred and from which the liability results. In no event, however, shall the liability of Processor arising out of such error or omission or the use of the product or said services exceed the price paid for the computer run or processing in which the error or omission occurred. Processor shall not be liable for errors unless notified within thirty (30) banking days of the date of the error occurred or the date of the erroneous output. Processor shall use all commercially reasonable efforts to ensure that such processing errors and omissions do not occur.

15.     PROCESSING PRIORITIES / EMERGENCY BACKUP / RECORDS PROTECTION.
        Processor shall manage processing priorities and shall maintain backup of its processing systems, including without limitation hardware, software, environmental support, and documented procedures. Emergency backup and records protection provisions shall be maintained in compliance with requirements dictated by regulatory authorities and industry standards.

16.     ONLINE AVAILABILITY AND OTHER MATTERS

    a    Processor will make every reasonable effort to have online services to include Inquiry and File maintenance to core applications (that shall include Portfolio, Demand Deposit Accounts, Savings Accounts, Certificate of Deposit Accounts, and Loan Account systems) during the following available hours:

b. <u>On-Line Availability</u>              <u>Schedule</u>

   7:30A.M. – 6:00P.M.              Monday

   7:30A.M. – 6:00P.M.              Tuesday

   7:30A.M. – 6:00P.M.              Wednesday

   7:30A.M. – 6:00P.M.              Thursday

   7:30A.M. – 6:00P.M.              Friday

   7:30A.M. – 2:00P.M.              Saturday

c. The General Ledger System will be available for Inquiry, File Maintenance and System On-line Proof Block building 9:00 A.M. – 5:00 P.M Monday through Friday and 9:00A.M. – 1:00P.M on Saturday.

d. The Processor assures at least ninety-five (95%) on-line availability of the processing time each month in accordance with the schedule provided above.

e. The Processor will perform system updates nightly for the Customer, Monday through Friday, excluding Federal Reserve holidays. Customer may contract with the Processor for holiday processing at the daily rate of $300.00 to provide Inquiry and Update. Saturday's work will be posted or updated during Monday's nightly update Although processing will not occur on Saturdays, the on-line system will be available to the Customer, so that regular business may be conducted.

f. Processor will use every effort to respond to Customer's questions within an average response time of two (2) hours after the Processor is contacted at its Customer Support Department.

g. Processor agrees that the following services and/or software products that are offered, supported, and/or sold by Processor, acting on the Processor's behalf or as an agent for another vendor, will have on-line availability in accordance with the standards as described below:

<u>III Modules</u>

EIM (Exception Item Module)          8:00A.M. – 11:30A.M. Weekdays
                                     8:00A.M. - 9:00A.M. Saturdays

SHS (Shareholder Accounting)         8:00A.M. – 5:00P.M. Weekdays
                                     8:00A.M. – 1:00P.M. Saturdays

BAS (Bond Accounting                 8:00 A.M. – 4:30P.M.Mon-Thurs
CRS (Check Reconciliation)           8:00A.M. – 5:00P.M. Friday

During the update process to SHS, the module is disabled. The Processor will exercise due care not to disable the SHS program while an institution is assessing its master files. Updates are generally performed on the day requested.

AP (Accounts Payable)                     8:00A.M. – 4:30P.M. Weekdays
                                          8:00A.M. – 1:00P.M. Saturdays

17.    LIMITATION OF LIABILITY.    Customer agrees that Processor assumes no liability or responsibility in the event of any errors or loss or destruction of property that may occur as a result of the services rendered and that Processor shall not be liable for any claim for damages except as specifically provided by the other provisions of this Agreement. In no event shall either party be liable for incidental, indirect, punitive, exemplary, special or consequential damages arising from the provision of services hereunder. In the performance of services under this Agreement, Processor shall exercise reasonable care in handling of information and data, and the media (tapes, diskettes, CD-ROMs and other material) on which such information and data are delivered or transmitted by Customer. In the event that any information, data or media is lost, destroyed or impaired, Processor's liability shall be limited to replacing or repairing the items lost, destroyed or damaged. Neither party shall be liable for any loss or damage claimed to have resulted from conditions or causes beyond its reasonable control, including but not limited to labor disputes, fire, theft, government regulation, acts of terror, acts of war, power failures, acts of God, malfunctions or failure of equipment, or transportation delays.

18.    INDEMNIFICATION.    Customer agrees to indemnify and hold Processor harmless from all loss, liability, cost, damages and expense (including reasonable attorneys' fees) to which Processor may be subjected or that may be incurred in connection with any claim that may arise out of or as a result of this Agreement, except for claims based upon the gross negligence or intentional misconduct of Processor or except as otherwise specifically provided herein.

19.    AUDIT RESPONSIBILITIES.    Audit responsibilities for the functions for which processing is performed at Customer locations shall remain the responsibility of Customer.

20.    CUSTOMER SERVICE CALLS.    Processor shall have a customer service representative visit Customer's main office location, unless notified by Customer to visit elsewhere, a minimum of one (1) time each calendar quarter, unless deemed unnecessary by Customer for a given time period.

21.    NON-SOLICITATION OF EMPLOYEES: During the Term and for a period of twelve (12) months thereafter, without prior written consent of the other, neither the Processor nor the Customer will offer employment to or otherwise employ any person employed by the other if the person was involved with the Services provided under this Agreement.

22.    THIRD PARTY AND SELF-AUDITS.    Processor shall annually obtain third party audits of Processor's operation, along with an auditor's cover letter. Processor shall bear all costs of such audits. Processor shall provide to Customer at no charge its annual audited financial statements and information and Statement of Audit Standards-70 (SAS-70). Customer

may obtain additional third party audits at Customer's expense in addition to Processor's annual audit

23.  INSURANCE.  Processor agrees to provide adequate insurance coverage appropriate for a data processing service bureau, including without limitation employee fidelity insurance; EDP equipment and supplies replacement and repair insurance; business interruption insurance; errors and omissions insurance; and extended blanket bond coverage for Processor's employees

24.  ESCROW OF SOFTWARE AND PROGRAMMING.  Processor and Customer recognize and acknowledge that Processor uses software that is licensed by Information Technology, Inc. ("ITI").  The ITI software, its modifications, and updated programming are held pursuant to a custody agreement at West Gate Bank, 1204 West O Street, Lincoln, Nebraska 68528.

25   DISASTER RECOVERY.

    a.  Processor maintains a disaster recovery plan (the "Plan") with respect to each of the services provided by Processor to Customer.  For purposes of this Agreement, "Disaster" shall mean any unplanned interruption of the operations of or inaccessibility to the Processor's service center in which Processor, using reasonable judgment, requires relocation of processing to a recovery location.  Processor shall notify Customer as soon as possible after Processor deems a services outage to be a Disaster.  Processor shall move the processing of the Customer's standard services to a recovery location as expeditiously as possible and shall coordinate the cut-over to back-up telecommunication facilities with appropriate carrier.

    b.  Customer shall maintain adequate records of all transactions during the period of service interruption and shall have personnel available to assist Processor in implementing the switchover to the recovery location.  During a Disaster, optional or on-request services shall be provided by Processor only to the extent adequate capacity exists at the recovery location and only after stabilizing the provision of base services.

    c.  Processor shall work with Customer to establish a plan for alternative communications in the event of a Disaster.

    d.  Processor shall test the Plan periodically.  Customer agrees to participate in and assist Processor with such tests, if requested by Processor.  Upon request Processor agrees to make such test results available to Customer, Customer's and/or Processor's regulators, third-party auditors, and insurance underwriters.

    e.  Processor shall release to Customer information necessary to allow Customer to develop a disaster recovery plan that operates in concert with the Plan, and Customer agrees to develop such a disaster recovery plan with respect to its own internal operations and equipment.

f       Customer understands and agrees that the Plan is designed to minimize but not eliminate risks associated with a Disaster affecting Processor's service center. Processor does not warrant that the services to be provided under this Agreement will be uninterrupted or error-free in the event of a Disaster. Customer shall be responsible for adopting a disaster recovery plan relating to Disasters affecting Customer's facilities and for securing business interruption insurance or other insurance necessary for the Customer's protection.

26.   NETWORK SECURITY.   Customer's local area network ("LAN"), including without limitation, Customer's data communication lines and Customer's routers and other data communications equipment located at the Customer's locations (such as CSU/DSUs and firewalls, that permit access to Processor's wide area network), are Customer's property, and as such, Customer is responsible for the security of its LAN. Processor shall be solely responsible for Processor's LAN security.

27.   ON-LINE RESPONSE.   On-line response time is a direct function of all system components from Customer's internal network and the data communication line speed to Processor's host computer. If requested by Customer, Processor, as an additional service performed at its standard rates, will assist Customer in analyzing an acceptable and satisfactory response time.

28.   OPERATIONAL CHANGES.   Processor shall notify Customer of any system changes that will affect Customer's operating procedures, reports, etc. Processor shall provide Customer with reasonable notice of any change in routine operating procedures. Processor shall notify Customer in writing of any enhancements or new releases of the ITI software not less than two (2) weeks prior to the implementation of such changes.

29.   OWNERSHIP.   The parties agree that Customer is the legal owner of all data and records relative to itself that may be in the possession of Processor and that such data and records may be obtained by Customer via machine-readable media for a reasonable charge determined by Processor, as provided in Schedule A – De-Conversion Fees of this Agreement. Processor is the owner of all programs and documentation.

30.   ASSIGNMENT.   The parties agree that the assignment of the contracted services shall be prohibited without the prior written consent of both parties. In any case, the request for a consent agreement by both parties to the assignment of the contracted services shall be made no sooner than ninety (90) days prior to the effect of the assignment sought.

31.   SEVERABILITY.   If any part of this Agreement is held to be void as against public policy, illegal, or unenforceable for any reason, the portions of this Agreement not held invalid shall continue to be valid and binding upon the parties hereto.

32.   ENTIRE AGREEMENT.   This Agreement, with its Schedules A, B, C, and D, constitutes the entire agreement between the parties hereto relating to the services herein. This

Agreement may not be changed or modified except in writing signed by the duly authorized representatives of the parties.

33. **APPLICABLE LAW.** This Agreement shall be construed and governed under the statutory laws, regulations, and procedural provisions of the State of Tennessee.

34. **DATA CENTER LOCATION.** Source material shall be delivered to Processor at the following address unless Processor notifies Customer of a different location:

> 233 Bedford Way
> Franklin, Tennessee 37064
> 615-790-0026 (telephone)

35. **COUNTERPARTS.** This Agreement may be executed in counterparts and shall be deemed to have become effective when and only when both parties shall have signed the Agreement. All such counterparts shall be deemed to constitute but one and the same instrument.

36. **CAPTIONS.** The captions used in this Agreement are for convenience only and are not to be construed as part of this Agreement and shall not be construed as defining or limiting in any way the scope of the provisions hereof.

37. **ENFORCEMENT.** No waiver by either party of its rights to enforce any provision hereof after default by the other party shall be deemed a waiver of such party's right to enforce each and every provision hereof upon a subsequent default by the other party.

**IN WITNESS HEREOF,** the Parties hereto have executed this Agreement in duplicate.

CUSTOMER: PEOPLES BANK OF THE SOUTH

BY: _(signature)_                              WITNESS: _(signature)_

TITLE: PRESIDENT

DATE: 7-26-07

PROCESSOR: FINANCIAL DATA TECHNOLOGY CORPORATION

BY: _(signature)_                              WITNESS: _(signature)_

TITLE: President

DATE: 7-26-2007

## SCHEDULE A

### ITI CORE APPLICATIONS-MONTHLY FEES

## Peoples Bank of the South

**LaFollette, Tennessee**

### Core processing fee schedule

| Description | | | Unit Price Open Accounts | | Monthly Minimum | |
|---|---|---|---|---|---|---|
| Demand Deposit Accounts | | | $ | 0.450 | $ | 250.00 |
| Savings Accounts | | | $ | 0.450 | $ | 250.00 |
| Certificate of Deposit Accounts | | | $ | 0.450 | $ | 250.00 |
| Retirement Accounts, included above as SAV or COD | | | | | | |
| Commercial & Consumer Loans | | | $ | 0.450 | $ | 250.00 |
| Financial General Ledger | | | $ | 0.200 | $ | 250.00 |
| Central Information System | | | $ | - | $ | 250.00 |
| Closed Account Addenda's | $ | 0.04 | | | | |
| Special Reports | $ | 10.00 | Customer may have up to 25 reports @ no add'l charge | | | |
| (per Smart report, Backdated G/L or System Report) | | | | | | |
| Communication Device Support-- | $ | 3.00 | | | | |
| Connections w/ Premier, after 25 connections monthly fee is $3 00 per connection | | | | | | |

### Conversion Support Fee

| | | |
|---|---|---|
| Demand Deposit | $2,500 | plus $ 25 per account converted |
| Savings | $2,500 | plus $.25/acct & $.05/transaction |
| Certificates | $2,500 | plus $.25/acct & $.05/transaction |
| Loans (per Loan System) | $3,500 | plus $.35/account converted |
| ATM Card | $1,500 | plus $.25 per card converted |
| Safe Deposit Box to SDB | $2,500 | plus $.25 per box converted |
| Conversion Support Fee | $5,000 | One Individual for 3 Days |
| | $20,000 | plus related account & transaction fees |

Additional ITI personnel are $960/day plus expenses. We recommend 2 additional individuals
Conversion costs for acccounts and transactions is based on the actual number of accounts converted
Fi-DATA fees are limited to the Processor's out of pocket expenses during the time of conversion.
**ITI CONVERSION FEES ARE NOT APPLICABLE for Current Customers.**

### De-Conversion fee Schedule

| | | | |
|---|---|---|---|
| Demand Deposit | $500.00 | plus | $.20 per account |
| Savings | $500.00 | plus | $.20 per account |
| Certificates | $500.00 | plus | $.20 per account |
| IRA's | $500.00 | plus | $.20 per account |
| Loans | $500.00 | plus | $.20 per account |

Any additional applications, such as general ledger accounting, etc. will be additional cost of $500
Incidental requests, such as standard reports, etc. will be billed at $50 per report.

## SCHEDULE B
### ITI Modules and Other Fi-DATA Services

| ITI Modules | | Price |
|---|---|---|
| Accounts Payable | $ | - |
| Application Server Fee | $ | 245.00 |
| ATM Online Realtime | $ | 250.00 |
| Child Support Module | $ | 75.00 |
| Credit Reporting, per agency | $ | 50.00 |
| Deposit Document Scanning | $ | 200.00 |
| Director COLD & Admin | $ | 575.00 |
| Exception Item Module | $ | - |
| Intervoice Telephone Banking | $ | 400.00 |
| OFAC Reporting | $ | 175.00 |
| Paperless Item Module | $ | 87.50 |
| *plus $10 per file and .02 per item* | | |
| Gulfpak Interface | $ | 300.00 |
| Premier Platform | $ | 300.00 |
| Premier Focus - Ipay Interface | $ | 100.00 |
| Premier Insight Teller | $ | 500.00 |
| PRIME Weekly & Month end | $ | 575.00 |
| Remote Print | $ | - |
| Retirement Reporting Module | $ | - |
| Statement and Notice Downloads | $ | 200.00 |
| Safe Deposit Box Module | $ | 175.00 |

**Any new Modules** not listed above will be based on account cost provided at time of order. Any new banking products or services will be priced to the Bank at the time of offering.

**SCHEDULE C**

TO DATA PROCESSING AGREEMENT BETWEEN
FINANCIAL DATA TECHNOLOGY CORPORATION AND

Peoples Bank of the South
106 W. Central Avenue
LaFollette, TN 37766

(1) **INCORPORATION BY REFERENCE:** This schedule C is incorporated by reference into the Service Agreement between Financial Data Technology Corporation ("Processor") and **Peoples Bank of the South, LaFollette, Tennessee** ("Customer") dated the same date as the SERVICES AGREEMENT, (The Service Agreement") and is subject to all of the terms and conditions set forth therein unless otherwise specifically addressed herein

(2) **SCOPE OF SERVICES:** The services ("Service") to be performed hereunder by Processor shall consist of:

    (a) Receiving and processing electronic items captured as "Branch Capture" over the counter work including checks and other proof documents,

    (b) Receiving and processing electronic items received as inbound cash letters from the Federal Reserve Bank or the Correspondent Bank of the Customer's choice,

    (c) Preparation and Delivery of Electronic Transit Cash Letter that is forwarded to the Federal Reserve Bank or the Correspondent Bank of the Customer's choice,

    (d) Preparation and Delivery of Electronic Return Cash Letter that is forwarded to the Federal Reserve Bank or the Correspondent Bank of the Customer's choice,

    (e) Interim storage of imaged proof documents on Fi-DATA San Array for viewing and research via the Director system,

(3) **CHARGES:** Customer shall pay Processor a fee of $.0175 per branch capture item processed, .0175 per inclearing item, $.02 per transit item for cash letter preparation, $15 per transit cash letter delivery, $15 per inclearing cash letter delivery, $2.00 per return item for cash letter preparation, and $5.00 per return cash letter delivery. Customer shall pay Processor a fee of $.005 per item for online archive

(4) **TERM AND DISCONTINUANCE OF SERVICE:** The initial term of this Schedule C shall be for five years, beginning on same date as The Service Agreement, but shall in no event run longer that the Service Agreement. Renewal of the Schedule C must be discussed and approved by the by the Processor and Customer. In the event Customer should choose to discontinue the Services. Customer must provide (180) days written notice to Processor. If customer terminates the Schedule C prior to Termination, Customer will be responsible for 80% of the remaining term of this Schedule C, using the average of the last three month's invoices to determine the Early Termination Fee. Customer acknowledges that such Early Termination Fee is for the purpose of compensating Processor for its expected losses due to early termination and does not constitute a penalty. Customer has an option to terminate agreement one time without penalty with 180 days written notice prior to end of fifth year (from the original service agreement date).

The parties have executed this Schedule C to the Service Agreement through their authorized representatives.

Financial Data Technology Corporation

By _Jean Ramsey_

Print Name: _Jean Ramsey_

Title: _President_

Witness: _[signature]_

Date: _7-26-2007_


Peoples Bank of the South
106 W. Central Avenue
LaFollette, TN 37766

By _[signature]_

Print Name: _DAVID REYNOLDS_

Title: _Pres._

Witness: _[signature]_

Date: _7-26-2007_

# SCHEDULE D
## Fees for Ancillary Services
## AUDIT CONFIRMATION
Base Fee of $450.00 plus $.02 per confirmation includes:

- Confirmations for each application
- Confirmation Report for each application
- Rerun of the Balance Reference Journal for each application

We request a 10-day notice for audit confirmations.

Second copies of confirmations:  $50.00 Base Fee plus $.01 per confirmation.

All reports are printed at Fidata and delivered to the bank via standard mail unless the bank has requested overnight or priority shipment.

Expedite Fee of $200.00 applies to any confirmations run without a 10-day prior notice.

End of Month Fee of $200.00 applies to confirmation requests for the end of the month date.  EOM requests will be processed by the third of the month.

## PULL FILE REQUESTS
$50.00 Pull File Fee includes writing the pull file, creating ASCII file, and downloading the file to a PC for transmission to the company.  Shipping files via diskette or tape will incur an additional charge based on the method of shipment requested.

## PRINTING OF SPECIAL REPORTS
Special report fee of $25.00 covers the first 100 pages of the report.  Additional pages are charged at $10.00 per 100 pages. Reports can be shipped regular mail or overnight at the customer's request.  Shipping costs are billed to the customer at our out of pocket cost.

## LABELS
Labels will be produced for a Fee of $75.00 plus $.05 cents per label.  The fee includes our setup and printing.  Labels can be shipped regular mail or overnight at the customer's request.  Shipping costs are billed to the customer at our out of pocket cost.

## MASS CHANGES
The Base Fee is $150 and $.05 per account for the first pass.  Each additional pass costs $25.00.  For $10.00 we will verify the accuracy and completeness of the mass change by creating and reviewing a Smart report if requested by the customer

## SET UP FOR NEW BRANCH
The charge for changes to the general ledger and other system specifications to accommodate branch accounting and data processing for a new branch is $1,000.  This charge includes the system changes to accommodate the new branch loan and deposit products, changes required to the general ledger chart of accounts for the branch and changes to integration, the existing FMSR, the FMS report writer to accommodate the new branch.

# SCHEDULE E

## AGREEMENT

This AGREEMENT entered into as of the 26 day of July, 2007, between Peoples Bank of South (the "Bank") and **FINANCIAL DATA TECHNOLOGY CORPORATION**, the provider of Data Processing Services (the "Servicer").

### WITNESSETH

WHEREAS, the Bank is a state chartered financial institution being organized under the laws of the State of Tennessee and subject to the jurisdiction of the Commissioner of Financial Institutions, State of Tennessee; and

WHEREAS, Servicer is a provider of Data Processing Services and desires to provide said services to the Bank; and

WHEREAS, Tennessee Code Annotated Section 45-2-616 provides that a financial institution chartered by the State of Tennessee may preserve its records with any person who agrees in writing to submit its operations to the examination of the Commissioner;

NOW, THEREFORE, in consideration of the foregoing, the terms and conditions set forth herein, and any other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### I

The Servicer agrees that pursuant to Tennessee Code Annotated, Section 45-2-616, upon entering into a contract to provide data processing services to the Bank, it will subject itself to the law of State of Tennessee and rules and regulations promulgated by the Department of Financial Institutions. This includes allowing the Commissioner of Financial Institutions or his agents to examine the operation of the data processing center and retain copies of the magnetic tapes containing records of the financial institution for a reasonable period of time.

IN WITNESS WHEREOF, the Bank and the Servicer have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

PEOPLES BANK OF THE SOUTH

By: David Reynolds, President

FINANCIAL DATA TECHNOLOGY CORPORATION

By: Jean Ramsey, President and CEO

## ADDENDUM FOR
## INTERNET SERVICES

### For Consumer Internet Banking Services, "Premier E-Commerce"

THIS INTERNET SERVICES ADDENDUM ("Agreement") is made and entered into by and between Financial Data Technology Corporation ("Fi-DATA") and the customer identified on the signature page as (the "Customer").

### Background

Fi-DATA and Customer have entered into an agreement whereby, in consideration for payments to Fi-DATA, Fi-DATA has agreed to provide data processing and certain other services to Customer with respect to Customer's clients' bank accounts (the "Service Agreement"). In addition to the services provided by Fi-DATA under the Service Agreement, Customer desires that Fi-DATA provide additional internet and security services as further described in this Agreement.

### Agreement

NOW THEREFORE, in consideration of the promises and covenants contained in this Agreement, Fi-DATA and Customer agree as follows:

1      DEFINED TERMS. In addition to the terms defined elsewhere in this Agreement, the terms defined in Exhibit 1.0 shall have the meanings set forth therein.

2.     SERVICES. Fi-DATA shall provide to Customer services as described on the attached Exhibit 2.0 (the "Services") as such Services may change over time as described herein. Customer agrees that Fi-DATA will not provide customer service or technical support for End Users of the Services, but that all service and support inquiries should be routed through Customer. Customer agrees that Fi-DATA may amend and otherwise modify the terms and conditions of its Services upon thirty (30) days general notice; provided, however, that the fees for the Services will not change during the Term.

3.     CUSTOMER OBLIGATIONS.

(a)     Acceptable Use Policy. Customer is responsible for its own Content and that of any of its End Users (including any Content hosted by Customer or any End User on behalf of third parties, irrespective of whether such hosting is permitted pursuant to this Agreement). Customer acknowledges that it has read and agrees to be bound by Fi-DATA's Acceptable Use Policy attached hereto as Exhibit 3.(a) (the "AUP"). Without limiting the foregoing, Customer may only use the Services for lawful purposes. Customer acknowledges that Service is not intended for use in connection with unauthorized mail relaying, spamming or other unwanted unsolicited communications. The potential consequences of violating the AUP are described in the AUP, but include filtering, blocking, or removing Content, and suspension or termination of the Services. A violation of the AUP or unlawful use is also a material breach of this Agreement.

(b) <u>Customer Responsible For Users</u>. If Customer has End Users using its Services, Customer must require any such End Users to agree to comply with Sections 3(a) above. Customer shall be responsible for the behavior of all End Users (whether employees, subcontractors or otherwise) as it relates to the Service, including any software and Content displayed and distributed by Customer or End Users, if any. If Customer or any End Users do not comply with Sections 3(a) above, Fi-DATA may, in its sole discretion, immediately suspend or terminate the provision of Services hereunder.

(c) <u>Customer's Content</u>. Customer is solely responsible for keeping copies of all Content it places on its Web site utilizing the Service. Fi-DATA shall have no responsibility or liability for any lost Content of Customer's, even if such loss Content results from the fault of Fi-DATA.

(d) <u>Security</u>. Fi-DATA assumes no responsibility for any encrypted data that is sent to, stored on, or retrieved off any Fi-DATA server utilized in the Service. Fi-DATA makes no claims or warranties regarding the viability, integrity or robustness of the encryption used by Fi-DATA in the Service. By using the secure server(s) available under the Service, Customer assumes the risk that the encryption algorithm may be broken, or not properly implemented, so that the data being transmitted is visible to others.

(e) <u>Cooperation</u>. Customer agrees to fully cooperate with Fi-DATA with respect to installation, operation and maintenance of the Services, including following any instructions provided to Customer for properly configuring machines for installation of the Services and any necessary Software.

4. FEES. Customer unconditionally agrees and promises to pay Fi-DATA, its successors and assigns, the fees for the selected Services as set forth on <u>Exhibit 4.0</u>. Charges set forth on <u>Exhibit 4.0</u> are exclusive of any taxes. Unless other provision of payment has been made with Fi-DATA, payment shall be made via the account information provided in the Customer's Fi-DATA Account (the "Customer Account"). Customer hereby authorizes Fi-DATA to receive payment of all fees due hereunder from Customer's Account and Customer agrees to pay the total amount of fees due to Fi-DATA hereunder. Customer waives any right to offset against the fees payable hereunder and to contest the charges applied to Customer Account for fees due in accordance with this Agreement. Customer agrees that Fi-DATA has a right to change the fees after expiration of the Term upon prior notice as set forth above, and the Customer agrees to pay such new rates upon continuation or renewal of this Agreement. Customer agrees to pay on a monthly basis, with payment due for each month's Service in advance. Customer shall be liable to pay for the full month's fee even if Service is terminated or suspended before the end of the month for any reason. Accounts with bills remaining unpaid seven days after the due date are liable for a $25.00 administrative surcharge and may have their Services suspended or terminated. If payment is returned or rejected, the Services may be suspended or terminated. Suspension or termination of Service does not relieve the Customer from its obligation to pay any and all fees, charges and costs due to Fi-DATA. Suspended Service may, in Fi-DATA's sole discretion, be resumed upon receipt of full payment of all amounts due and a reconnect charges as determined by Fi-DATA. Fi-DATA reserves the right to charge Customer

interest on past due amounts equal to an interest rate charge of 1.5% per month from the date of invoice, subject to the maximum rate permitted by law. Customer agrees to pay all costs of collection including attorney fees and collection agency fees incurred.

5. **WARRANTY DISCLAIMER. The Services provided by Fi-DATA and its subcontractors are provided as is, without warranty of any kind, including the implied warranties of merchantability and fitness for a particular purpose. In the event that Fi-DATA provides Customer with products in conjunction with the Services, for example third party hardware or software products, Fi-DATA also provides those products "as is" without warranty of any kind.** Customer acknowledges that Fi-DATA does not own or control all of the various telecommunications facilities to which it may provide access, except as those specifically identified as belonging to Fi-DATA. The Customer further understands that Fi-DATA may not own or control the circuit link to the Service servers or other networks, nor is Fi-DATA responsible for performance (or non-performance) within such networks or within non-Fi-DATA operated interconnection points between the Service and other networks. Neither Fi-DATA nor its subcontractors warrant any connection to, transmission over, nor results of, any software, network connection or facilities or equipment provided (or failed to be provided) under this Agreement. Customer is responsible for assessing its own computer and transmission network needs, hosting needs and the results to be obtained therefrom. Fi-DATA does not warrant that the Service will meet specific requirements or that the operation of the Service will be uninterrupted or error-free.

6. **LIMITATION OF LIABILITY. Customer agrees that neither Fi-DATA nor its subcontractors shall be liable for any loss of profits, loss of use, interruption of business, or any direct, indirect, incidental, punitive or consequential damages of any kind whether under this agreement or otherwise, even if Fi-DATA or its subcontractor has been advised of the possibility of such damages or was negligent. Without limiting the generality of the foregoing, neither Fi-DATA nor its subcontractors shall be liable to Customer for any lost business, potential business, or any other foreseeable or unforeseeable loss to customer as a result of the Services not operating properly for any period of time. To the extent allowed by law, Fi-DATA's and each of its subcontractors' maximum liability to Customer arising from or relating to this agreement shall be limited to the amount the Customer paid for the service that gave rise to the liability. Some states do not allow limitation of liability, so the foregoing language may not apply to Customer.**

7. TERM AND TERMINATION

   (a) <u>Duration</u>. Unless terminated earlier as provided elsewhere in this Agreement, Fi-DATA will continue to provide the Services until the expiration of the Services Agreement. In the event the Service continues past the expiration of the Term, except as the parties may otherwise agree in writing, it shall continue with a like term and exist coterminous with the renewal term of the Service Agreement. Otherwise the Customer may terminate services after the expiration of the Service Agreement with ninety (90) days prior notice provided in writing.

   (b) <u>Termination for Breach</u>. Either party may terminate this Agreement if the other party is in material breach of any term of this Agreement and fails to remedy such

breach within ninety (90) days after written notice of such breach. Without limiting the generality of the foregoing, failure to make any payment to Fi-DATA when due is a material breach of this Agreement by Customer. No prior notice period is required for Fi-DATA to suspend or terminate this Agreement, Fi-DATA will invoice Customer for the remainder of the Term, if not already paid for, and Customer will pay such invoice.

8.    INDEMNITY. Fi-DATA does not control the Content of information passing through its equipment. The Customer agrees to indemnify and hold Fi-DATA, its officers, employees, directors, affiliates, and its subcontractors harmless against any claim, actions or demands relating to or arising out of (i) any Content or software displayed, distributed or otherwise disseminated by the Customer and/or its customers and/or users in any way connected to or through the Services, (ii) Fi-DATA's registration and maintenance of Customer's selected domain name(s), if any, (iii) gross negligence or willful misconduct resulting in personal injury or property damage; (iv) misuse of the Services by Customer or End Users; (v) failure by Customer or End Users to comply with applicable law; failure by Customer to comply with the terms of this Agreement; (vi) any claim of libel, violation of privacy, unfair competition or infringement of intellectual property rights caused by Customer; and (vii) any other malicious act or act in violation of any laws committed by Customer and/or its users using the Services, including without limitation any malicious or unlawful act affecting any computer, network equipment or internet service.

9.    USE OF INFORMATION

      (a)    All documentation, technical information, Software, business information, proposals for new Services or other materials that are disclosed by either party to the other in the course of performing this Agreement shall be considered proprietary information ("Information") of the disclosing party, provided such information is in written or other tangible form that is clearly marked as "proprietary" or "confidential", or is disclosed orally and is both identified as proprietary or confidential at the time of disclosure and summarized in a writing so marked within 15 business days following the oral disclosure. This Agreement shall be deemed to be Fi-DATA Information.

      (b)    Each party's Information shall, for a period of 3 years following its disclosure (except in the case of Software, for an indefinite period): (i)be held in confidence; (ii) be used only for purposes of performing this Agreement and using the Services; and, (iii) not be disclosed except to the receiving party's employees, agents and contractors having a need-to-know(provided that such agents and contractors are not direct Fi-DATA competitors and agree in writing to use and disclosure restrictions as restrictive as this Article 9, or to the extent required by law (provided that prompt advance notice is provided to the disclosing party to the extent practicable).

      (c)    The restrictions in Section 9 (b) shall not apply to any information that: (i) is independently developed by the receiving party; or (ii) is lawfully received by the receiving party free of any obligation to keep it confidential; or (iii)

becomes generally available to the public other than by breach of this Agreement

    (d)    Customer authorizes Fi-DATA to: (i) monitor and record calls and transmissions using the Services and calls or transmissions to Fi-DATA concerning the Services in order to detect fraud, check quality and operate, maintain and repair the Services; and (ii) disclose such information to the extent Fi-DATA deems it is legally required.

10.    PUBLICITY AND MARKS

    (a)    No public statements or announcements relating to this Agreement shall be issued by either party without the prior written consent of the other party

    (b)    Each party agrees not to display or use, in advertising or otherwise, any of the other party's trade names, logos, trademarks, service marks or other indicia of origin (collectively "Marks") without the other party's prior written consent, provided that such consent may be revoked at any time.

11.    SOFTWARE

    (a)    Fi-DATA grants Customer a personal, non-transferable and non-exclusive license (without the right to sublicense) to use, in object code form, all software and associated written and electronic documentation and data furnished pursuant to the Services (collectively, the "Software"), solely in connection with the Services and solely in accordance with applicable written and electronic documentation. Customer will refrain from taking any steps to reverse assemble, reverse compile or otherwise derive a source code version of the Software. The Software shall at all times remain the sole and exclusive property of Fi-DATA or its suppliers. "Third-Party Software" means Software that bears a copyright notice of a third party.

    (b)    Customer shall not copy or download the Software, except to the extent expressly provided otherwise in the applicable documentation for the Service or in a writing signed by Fi-DATA. Any copy must contain the same copyright notices and proprietary markings as the original Software.

    (c)    Customer shall ensure that its employees and Users comply with the terms and conditions of this Article 9.

    (d)    The term of the license granted hereunder shall be coterminous with this Agreement

    (e)    Customer agrees to comply with any additional restrictions that are provided with any Third-Party Software

12.    **GENERAL PROVISIONS.**

    (a)    <u>Independent Contractors</u>. The relationship of Fi-DATA and Customer established by this Agreement is that of independent contractors, and nothing contained in this Agreement will be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow either party to create or assume any obligation on behalf of the other

for any purpose whatsoever. All financial and other obligations associated with a party's business are the sole responsibility of that party.

(b) Governing Law; Jurisdiction; Venue. This Agreement will be governed by and construed under the laws of the State of Tennessee without reference to conflict of laws principles. For any disputes arising out of this Agreement, the parties irrevocably consent to the personal and exclusive jurisdiction of, and venue in, the state or federal courts within Nashville, Tennessee.

(c) Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both parties.

(d) Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if it is sent by personal hand delivery, overnight delivery by nationally recognized carriers, or confirmed facsimile or other electronic transmission, and addressed to the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

(e) Force Majeure. Nonperformance of either party will be excused to the extent that performance is rendered impossible by storm, lockout or other labor trouble, riot, war, rebellion, strike, fire, flood, accident or other act of God, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the control and not caused by the gross negligence or willful misconduct of the non-performing party.

(f) Non-Assignability; Change of Control. Except as expressly provided herein, this Agreement may not be assigned or transferred, nor may any right or obligation hereunder be assigned or delegated, to a third party by either party without the prior written consent of the other party hereto.

(g) Modification; Waiver. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged, and the waiver of any breach or default will not constitute a waiver of any other right hereunder or any subsequent breach or default.

(h) Headings. The headings to the sections and subsections of this Agreement are included merely for convenience of reference and will not affect the meaning of the language included therein.

(i) Severability. In the event that it is determined by a court of competent jurisdiction as part of a final non-appealable ruling, government action or binding arbitration, that any provision of this Agreement (or part thereof) is invalid, illegal, or otherwise unenforceable, such provision will be enforced as nearly as possible in accordance with the stated intention of

the parties, while the remainder of this Agreement will remain in full force and effect and bind the parties according to its terms. To the extent any provision (or part thereof) cannot be enforced in accordance with the stated intentions of the parties, such provision (or part thereof) will be deemed not to be a part of this Agreement.

(j)     Counterparts; Facsimile Signatures.   This Agreement may be executed by exchange of signature pages by facsimile and/or in any number of counterparts, each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date last written below.

**PEOPLES BANK OF THE SOUTH**

By: _____

Print Name: _DAVID REYNOLDS_

Title: _PRESIDENT 1-26-2007_

**Financial Data Technology Corporation**

By: _____

Print Name: _Jean Ramsey_

Title: _President 7-26-2007_

# EXHIBIT 1.0

## DEFINED TERMS

"Content" shall be deemed to include the materials and information to be made available or displayed (including, without limitation, text, graphics, art, animation, software, photographs, video, music, advertisements, other audio and visual assets) on or through the Web Sites, including, without limitation the Contents of any third party contributions to bulletin boards, chat forums, or other communications services, transaction services, or information services incorporated into the Web Sites;

"Effective Date" means the date of the Agreement as indicated by the last party to sign the signature page;

"End Users" means anyone who uses the Services, whether or not such use is with the permission of Customer. End Users shall include, without limitation, Customer's clients and employees.

"Web Sites" shall mean any Internet sites for which any Web Site Services are being used hereunder, including, without limitation, any Web Site containing a Service HyperLink

# EXHIBIT 2.0

## DESCRIPTION OF SERVICES

### Rights & Responsibilities of Both Parties

Fi-DATA shall provide the following Services to Customer provide the Customer's end users and employees (as designated by Customer) with access to the Internet Banking Services for e-Commerce Internet Banking Services;

1.  **SECURITY SERVICES.**

(a)    The Internet access shall be provided via the protection of the Symantec Gateway Security Device software installed on a server configured with RAID 5 disk system. The Fi-DATA firewall shall be monitored for unauthorized attempts to access the system on a 24 X 7 basis utilizing a server installed with Intrusion Detection Software and configured to send e-mail and/or pager alerts to the Fi-DATA "Incidence Response Team ". The "Incidence Response Team" shall have the authority to temporarily deny Internet services in the event the system is attacked until such time as the security system has been properly stabilized. Fi-DATA will not unreasonably deny service.

(b)    Periodic and regular testing through the employment of Network Vulnerability Software shall additionally protect the security system protecting the web server. The result of these tests will be made available to the subscribing Customers. The results of the vulnerability tests may be reviewed by the third party auditing firm providing the audit function for the data center during the course of their routine audit procedures,

(c)    Fi-DATA shall maintain up-to-date maintenance agreements with the software vendors providing the above-described products and shall be responsible for the installation and upgrading of the products to the manufacturer's recommendations. Fi-DATA shall maintain adequate staffing of employees sufficiently trained and competent to enforce the data center's security procedures and controls.

2.    **FI-DATA SHALL PROVIDE INTERNET BASED e-COMMERCE CONSUMER INTERNET BANKING SERVICES AS FOLLOWS:**

(a)    <u>Disbursements</u>. The e-Commerce Consumer Internet Banking Services covered by this agreement will be offered in a real time environment for permitting authorized employees of the bank to initiate disbursements in the form of internal transfers, in the form of a debit to one of the end user's accounts at the bank and a credit to another account of the end user at the bank, whether that account is a depository account or a loan account of the bank. The establishment of the various accounts that the banks' customers may have access to is determined in accordance with the wishes of the bank employees authorized

to make these determinations. The establishment of the system security rights to grant end users access to the Internet Banking and services and the determination of which accounts those end users will have access to is the under the sole discretion of the management of the bank

(b)     Stop Payment Orders. Internet Banking services include the ability for authorized end users/customers of the bank to initiate stop payment requests against outstanding items from their accounts. Whether the Bank chooses to initiate the stop payment services available in the Internet Banking Application is determined by bank management. Those decisions may change from time to time at the discretion of the bank. Fi-DATA's liability is limited to processing the input of the stop payment orders as handled in the software application. The final determination to return any item is in the sole discretion of the bank and its authorized employees

(c)     Inquiry Services. Additional inquiry services include display of transaction history, transaction search capability and display of images of checks written that have paid against the accounts of the corporate client and the display of text statements for up to three months.

## 3.     TRANSACTION APPROVAL & RESPONSIBILITIES

(a)     Software controls govern end user rights and permissions allowed as related to system input of requests for disbursements, including internal transfers or any other disbursement services that may be added to the software at a later date. Software controls provide for bank approval of disbursements and stop payments. The bank is solely responsible for the input into the software appropriate controls for the types and kinds of transactions. These decisions and determinations are established at the discretion of the bank management.

(b).    Fi-DATA's obligation under this section is to process the transactions on behalf of the bank and the bank customers.

(c.)    Fi-DATA shall have no liability to review, approve, verify, edit, correct, amend, cancel or reverse entries received for processing via the delivery from the software by the agreed upon deadlines. Transfers established by the end users prior to 4 PM for the same day's business will be processed during that night's update posting and processing.

## EXHIBIT 3(a)

## ACCEPTABLE USE POLICY

### Policy Introduction

Fi-DATA has published this Acceptable Use Policy as part of our overall effort to provide high quality, reliable service to our customers; protect the privacy and security of our customers, systems, and networks; encourage responsible use of Fi-DATA's and other ISPs' resources; and comply with applicable laws. This Policy describes the types of uses of the Fi-DATA IP Network which are contrary to our objectives and which are, therefore, prohibited. To achieve our objectives, Fi-DATA may in its sole discretion determine whether a use of the Fi-DATA IP Network is a violation of this Policy. While it is not Fi-DATA's intent to monitor, control, or censor communications on the Fi-DATA IP Network, when we become aware of a violation of this Policy, we may take such action as we deem appropriate to address the violation, as referenced below.

This Policy applies to all customers of Fi-DATA's IP services, and to all other users of the Fi-DATA IP Network. This Policy supplements, but does not supersede, the contracts that customers have with Fi-DATA; if such a contract restricts a use of the Fi-DATA IP Network that is not addressed in this Policy, the contract will govern with respect to such use.

### Prohibited Uses

Uses of the Fi-DATA IP Network described below are prohibited under this Policy. These descriptions are guidelines and are not intended to be exhaustive.

#### Illegal/Criminal Activity

The Fi-DATA IP Network may not be used in connection with criminal or civil violations of state, federal, or international laws, regulations, or other government requirements. Such violations include theft or infringement of copyrights, trademarks, trade secrets, or other types of intellectual property; fraud; forgery; theft or misappropriation of funds, credit cards, or personal information; and threats of physical harm or harassment.

#### Security Violations

The Fi-DATA IP Network may not be used in connection with attempts - whether or not successful - to violate the security of a network, service, or other system. Examples of prohibited activities include hacking, cracking into, monitoring, or using systems without authorization; scanning ports; conducting denial of service attacks; and distributing viruses or other harmful software.

Fi-DATA customers are responsible for maintaining the basic security of their systems to prevent their use by others in a manner that violates this Policy. Examples include improperly securing a mail server so that it may be used by others to distribute spam, and improperly securing an FTP server so that it may be used by others to illegally distribute licensed software.

Customers are responsible for taking corrective actions on vulnerable or exploited systems to prevent continued abuse.

### Threats

The Fi-DATA IP Network may not be used to transmit materials of a threatening nature, including threats of death or physical harm, harassment, libel, and defamation.

### Offensive Materials

The Fi-DATA IP Network may not be used for the distribution of offensive materials, including obscene, pornographic, indecent, and hateful materials.

### Indirect Access

A violation of this Policy by someone having only indirect access to the Fi-DATA IP Network through a customer or other user will be considered a violation by the customer or other user, whether or not with the knowledge or consent of the customer or other user. As an example, down stream providers are responsible for the actions of customers to whom they provide services operating on the Fi-DATA IP Network. Fi-DATA will address and attempt to resolve complaints about the actions of customers of down stream providers with the down stream provider.

## Consequences

Violations of this Policy may result in a demand for immediate removal of offending material, immediate temporary or permanent filtering, blocked access, suspension or termination of service, or other action appropriate to the violation, as determined by Fi-DATA in its sole discretion. When feasible, it is Fi-DATA's preference to give notice so that violations may be addressed voluntarily; however, Fi-DATA reserves the right to act without notice when necessary, as determined by Fi-DATA in its sole discretion. Fi-DATA may involve, and will cooperate with, law enforcement if criminal activity is suspected. Violators may also be subject to civil or criminal liability under applicable law. Refunds or credits are not issued in connection with actions taken for violations of this Policy.

## Incident Reporting

Any complaints regarding violations of this Policy should be directed to gdodd@Fi-DATA.com Where possible, include details that would assist Fi-DATA in investigating and resolving the complaint (i.e. expanded headers and a copy of the offending transmission).

## Contact Information

Please contact the Fi-DATA abuse desk by sending email to gdodd@Fi-DATA com

## Revisions to this Policy

Fi-DATA may modify this Policy at any time, effective when distributed to Fi-DATA clients. Notice may also be provided via electronic mail or regular mail.

## EXHIBIT 4.0

## PRICING AND SERVICES

Monthly Amount

| | |
|---|---|
| Per Account Fee | $.07 / acct   - $300 minimum |
| Per User Fee | $1.50 / user - $200 minimum |
| Device Print User Fee | $.20 / user |

# ADDENDUM FOR
# INTERNET ACCESS SERVICES

THIS INTERNET ACCESS ADDENDUM ("Agreement") is made and entered into by and between Financial Data Technology Corporation ("Fi-DATA") and the customer identified below (the "Customer"):

Customer Name: PEOPLES NATIONAL BANK

State of Organization: TENNESSEE

Address: 106 S TENNESSEE AVENUE

Phone: (423) 562-3364

Fax: (423) 562-3529

Designated Contact: _____*Chris Cooper*_____

## Background

Fi-DATA and Customer have entered into an agreement whereby, in consideration for payments to Fi-DATA, Fi-DATA has agreed to provide data processing and certain other services to Customer with respect to Customer's clients' bank accounts (the "Service Agreement"). In addition to the services provided by Fi-DATA under the Service Agreement, Customer desires that Fi-DATA provide additional internet access and security services related to that internet connectivity as further described in this Agreement. This agreement only covers Internet Access Services and Internet Security Services related exclusively to that access. It does not address Internet Banking Services. Internet Banking Applications, such as e-Commerce for consumer internet banking and e-Corp for corporate cash management services are covered under separate agreements.

## Agreement

NOW THEREFORE, in consideration of the promises and covenants contained in this Agreement, Fi-DATA and Customer agree as follows:

1.  DEFINED TERMS. In addition to the terms defined elsewhere in this Agreement, the terms defined in Exhibit 1.0 shall have the meanings set forth therein.

2.  SERVICES. Fi-DATA shall provide to Customer the services selected by Customer as indicated on Exhibit 4.0 as such services are described on the attached Exhibit 2.0 (the "Services") as such Services may change over time as described herein. Customer agrees that Fi-DATA will not provide customer service or technical support for End Users of the Services, but that all service and support inquiries should be routed to Fi-DATA only through Customer's Designated Contact as set forth above. Customer agrees that Fi-

N JAL 337940 v5
821394-0002 03/07/2001

DATA may amend and otherwise modify the terms and conditions of its Services upon thirty (30) days general notice; provided, however, that the fees for the Services will not change during the Term; however, if any such change materially and adversely impacts the level of Service to Customer, Customer may terminate this Agreement upon thirty (30) days prior notice. Notwithstanding anything in this Section 2 to the contrary, Fi-DATA reserves the right, in its sole and absolute discretion, to temporarily halt provision of the Services in order to perform maintenance, repair, testing, upgrades or enhancements to the Services. Fi-DATA will make a good faith effort to notify Customer before the Services will be unavailable; however, Fi-DATA may halt the Services at any time without notice.

3.   CUSTOMER OBLIGATIONS.

(a)   Customer Responsible For Users. Customer shall be responsible for the behavior of all End Users (whether employees, subcontractors or otherwise) as it relates to the Service, including any software and Content displayed and distributed by Customer or End Users, if any.

(b)   Security. Fi-DATA makes no claims or warranties regarding the viability, integrity or robustness of any of the security features or third-party software used by Fi-DATA in connection with the Service. By using the Service, Customer assumes the risk that any data transmitted through the Service may be viewed or intercepted by others.

(c)   Cooperation. Customer agrees to fully cooperate with Fi-DATA with respect to installation, operation and maintenance of the Services, including:

(i)    following any instructions provided to Customer for properly configuring machines for installation of the Services and any necessary Software;

(ii)   not using the Service to commit any illegal or libelous act;

(iii)  not use the Service to send any unsolicited e-mail messages (also known as "spamming")

(iv)  not use the Services to gain access to any third party system or network operated by, or on behalf of Fi-DATA or any of its other customers;

(v)   only accessing the Internet via the Services provided by Fi-DATA, except that dial-up access shall be permitted only as back up in the event that the Services are unavailable and only with at least industry standard security controls in place to prevent unauthorized access to Fi-DATA or other third party systems; and

(vi)  complying with any current and future security policies and procedures provided to Customer by Fi-DATA or any regulatory authority.

4.   FEES. Customer unconditionally agrees and promises to pay Fi-DATA, its successors and assigns, the fees for the selected Services as set forth on Exhibit 4.0. Charges set forth on Exhibit 4.0 are exclusive of any taxes. Unless other provision of payment has been made with Fi-DATA, payment shall be made via the account information provided in the Customer's Fi-DATA Account (the "Customer Account"). Customer hereby authorizes Fi-DATA to receive payment of all fees due hereunder from Customer's

2

Case 3:14-cv-01104   Document 1-1   Filed 01/14/14   Page 43 of 114 PageID #: 46

Account, and Customer agrees to pay the total amount of fees due to Fi-DATA hereunder. Customer waives any right to offset against the fees payable hereunder and to contest the charges applied to Customer Account for fees due in accordance with this Agreement. Customer agrees that Fi-DATA has a right to change the fees after expiration of the Term upon prior notice as set forth above, and the Customer agrees to pay such new rates upon continuation or renewal of this Agreement. Unless Customer has agreed to pay for the year in advance, Customer agrees to pay on a monthly basis, with payment due for each month's Service in advance. Payment for first month will include prorated charges for the current month in addition to the advance charges for the following month. Customer shall be liable to pay for the full month's fee even if Service is terminated or suspended before the end of the month for any reason. Accounts with bills remaining unpaid seven days after the due date are liable for a $25.00 administrative surcharge and may have their Services suspended or terminated. If payment is returned or rejected, the Services may be suspended or terminated. Suspension or termination of Service does not relieve the Customer from its obligation to pay any and all fees, charges and costs due to Fi-DATA. Suspended Service may, in Fi-DATA's sole discretion, be resumed upon receipt of full payment of all amounts due and a reconnect charges as determined by Fi-DATA. Fi-DATA reserves the right to charge Customer interest on past due amounts equal to an interest rate charge of 1.5% per month from the date of invoice, subject to the maximum rate permitted by law. Customer agrees to pay all costs of collection including attorney fees and collection agency fees incurred.

5.   WARRANTY DISCLAIMER. **The Services provided by Fi-DATA and its subcontractors hereunder are provided as is, without warranty of any kind, including the implied warranties of merchantability, fitness for a particular purpose, merchantability for computer programs and informational content. In the event that Fi-DATA provides Customer with products in conjunction with the Services, for example third party hardware or software products, Fi-DATA also provides those products "as is" without warranty of any kind.** Customer acknowledges that Fi-DATA does not own or control all of the various telecommunications facilities to which it may provide access, except as those specifically identified as belonging to Fi-DATA. The Customer further understands that Fi-DATA may not own or control the circuit link to the Service servers or other networks, nor is Fi-DATA responsible for performance (or non-performance) within such networks or within non-Fi-DATA operated interconnection points between the Service and other networks. Neither Fi-DATA nor its subcontractors warrant any connection to, transmission over, nor results of, any software, network connection or facilities or equipment provided (or failed to be provided) under this Agreement. Customer is responsible for assessing its own computer and transmission network needs, hosting needs and the results to be obtained therefrom. Fi-DATA does not warrant that the Service will meet specific requirements or that the operation of the Service will be uninterrupted or error-free.

6.   LIMITATION OF LIABILITY. **Customer agrees that neither Fi-DATA nor its subcontractors shall be liable for any loss of profits, loss of use, interruption of business, or any direct, indirect, incidental, punitive or consequential damages of any kind whether under this agreement or otherwise, even if Fi-DATA or its subcontractor has been advised of the possibility of such damages or was negligent. Without limiting the generality of the foregoing, neither Fi-DATA nor its**

3

N JAL 337940 v5
821394-0002 03/07/2001

subcontractors shall be liable to Customer for any lost business, potential business, or any other foreseeable or unforeseeable loss to customer as a result of the Services not operating properly for any period of time. To the extent allowed by law, Fi-DATA's and each of its subcontractors' maximum liability to Customer arising from or relating to this agreement shall be limited to the amount the Customer paid for the service that gave rise to the liability. Some states do not allow limitation of liability, so the foregoing language may not apply to Customer.

7. TERM AND TERMINATION

    (a)   Duration. Unless terminated earlier as provided elsewhere in this Agreement, Fi-DATA will continue to provide the Services until the expiration of this Agreement. In the event the Service continues past the expiration of the Term of the client institution's Service Agreement, except as the parties may otherwise agree in writing, it shall continue only on a month-to-month basis, with either party having the right to terminate the Service at any time upon thirty (30) days prior written notice. During any such extended Service period Customer will pay Fi-DATA monthly in advance according to then current Fi-DATA rates in effect at that time.

    (b)   Voluntary Termination. Fi-DATA may terminate this Agreement at any time upon 120 days written notice to Customer. Effective on or at any time after the end of the applicable Term, except as the parties may otherwise agree, the Service may be terminated by either party for any reason upon thirty (30) days prior written notice.

    (c)   Termination for Breach. Either party may terminate this Agreement if the other party is in material breach of any term of this Agreement and fails to remedy such breach within ninety (90) days after written notice of such breach. Without limiting the generality of the foregoing, failure to make any payment to Fi-DATA when due is a material breach of this Agreement by Customer. Notwithstanding anything in this paragraph 7(c) to the contrary, Fi-DATA may suspend or terminate the Services immediately and without prior notice for a failure by Customer to fulfill any of its obligations under paragraph 3(c) (Cooperation) or for a failure by Customer to comply with Fi-DATA's security policies or procedures.

8. INDEMNITY. Fi-DATA does not control the Content of information passing through its equipment. The Customer agrees to indemnify and hold Fi-DATA, its officers, employees, directors, affiliates, and its subcontractors harmless against any claim, actions or demands relating to or arising out of (i) any Content or software displayed, distributed or otherwise disseminated by the Customer and/or its customers and/or users in any way connected to or through the Services, (ii) Fi-DATA's registration and maintenance of Customer's selected domain name(s), if any, (iii) gross negligence or willful misconduct resulting in personal injury or property damage; (iv) misuse of the Services by Customer or End Users; (v) failure by Customer or End Users to comply with applicable law; failure by Customer to comply with the terms of this Agreement; (vi) any claim of libel, violation of privacy, unfair competition or infringement of intellectual property rights caused by Customer; and (vii) any other malicious act or act in violation of any laws

4

Case 3:14-cv-01104   Document 1-1   Filed 01/14/14   Page 45 of 114 PageID #: 48

committed by Customer and/or its users using the Services, including without limitation any malicious or unlawful act affecting any computer, network equipment or internet service This Section 8 shall apply notwithstanding Customer's election to use Fi-DATA's Internet "content-blocking" feature, as described on Exhibit 2.0, as part of the Services. Fi-DATA makes no representation or warranty with respect to the performance or functionality of the "content-blocking" feature.

9. USE OF INFORMATION

    (a)    All documentation, technical information, Software, business information, proposals for new Services or other materials that are disclosed by either party to the other in the course of performing this Agreement shall be considered proprietary information ("Information") of the disclosing party, provided such information is in written or other tangible form that is clearly marked as "proprietary" or "confidential", or is disclosed orally and is both identified as proprietary or confidential at the time of disclosure and summarized in a writing so marked within 15 business days following the oral disclosure. This Agreement shall be deemed to be Fi-DATA Information.

    (b)    Each party's Information shall, for a period of 3 years following its disclosure (except in the case of Software, for an indefinite period): (i)be held in confidence; (ii) be used only for purposes of performing this Agreement and using the Services; and, (iii) not be disclosed except to the receiving party's employees, agents and contractors having a need-to-know(provided that such agents and contractors are not direct Fi-DATA competitors and agree in writing to use and disclosure restrictions as restrictive as this Article 9, or to the extent required by law (provided that prompt advance notice is provided to the disclosing party to the extent practicable).

    (c)    The restrictions in Section 9(b) shall not apply to any information that: (i) is independently developed by the receiving party; or (ii) is lawfully received by the receiving party free of any obligation to keep it confidential; or (iii) becomes generally available to the public other than by breach of this Agreement.

    (d)    Customer authorizes Fi-DATA to: (i) monitor and record calls and transmissions using the Services and calls or transmissions to Fi-DATA concerning the Services in order to detect fraud, check quality and operate, maintain and repair the Services; and (ii) disclose such information to the extent Fi-DATA deems it is legally required.

10. PUBLICITY AND MARKS

    (a)    No public statements or announcements relating to this Agreement shall be issued by either party without the prior written consent of the other party

    (b)    Each party agrees not to display or use, in advertising or otherwise, any of the other party's trade names, logos, trademarks, service marks or other indicia of origin (collectively "Marks") without the other party's prior written consent, provided that such consent may be revoked at any time.

11. SOFTWARE. Customer agrees to comply with any terms and conditions related to any third-party software used in conjunction with the Services and provided to Customer.

5

N IAL 337940 v5
821394-0002 03/07/2001

Case 3:14-cv-01104   Document 1-1   Filed 01/14/14   Page 46 of 114 PageID #: 49

12. GENERAL PROVISIONS

(a) <u>Independent Contractors</u>. The relationship of Fi-DATA and Customer established by this Agreement is that of independent contractors, and nothing contained in this Agreement will be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow either party to create or assume any obligation on behalf of the other for any purpose whatsoever. All financial and other obligations associated with a party's business are the sole responsibility of that party.

(b) <u>Governing Law; Jurisdiction; Venue</u>. This Agreement will be governed by and construed under the laws of the State of Tennessee without reference to conflict of laws principles. For any disputes arising out of this Agreement, the parties irrevocably consent to the personal and exclusive jurisdiction of, and venue in, the state or federal courts within Nashville, Tennessee.

(c) <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both parties.

(d) <u>Notices</u>. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if it is sent by personal hand delivery, overnight delivery by nationally recognized carriers, or confirmed facsimile or other electronic transmission, and addressed to the intended recipient as set forth on Exhibit 4.0. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other party notice in the manner herein set forth.

(e) <u>Force Majeure</u>. Nonperformance of either party will be excused to the extent that performance is rendered impossible by storm, lockout or other labor trouble, riot, war, rebellion, strike, fire, flood, accident or other act of God, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the control and not caused by the gross negligence or willful misconduct of the non-performing party.

(f) <u>Non-Assignability; Change of Control</u>. Except as expressly provided herein, this Agreement may not be assigned or transferred, nor may any right or obligation hereunder be assigned or delegated, to a third party by either party without the prior written consent of the other party hereto.

(g) <u>Modification; Waiver</u>. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged, and the waiver of any breach or default will not constitute a waiver of any other right hereunder or any subsequent breach or default.

6

N JAL 337940 v5
821394-0002 03/07/2001

Case 3:14-cv-01104   Document 1-1   Filed 01/14/14   Page 47 of 114 PageID #: 50

**EXHIBIT 2.0**

## DESCRIPTION OF SERVICES

Fi-DATA shall provide the following Services to Customer:

- provide the Customer's employees (as designated by Customer) with access to the Internet for web browsing;

- provide scanning for virus detection on in-bound and outbound SMTP (e-mail) with the authority to clean, reject or quarantine infected attachments and/or messages; (this process may include viewing e-mail messages when deemed necessary for security reasons);

- provide scanning of FTP protocol for inbound and outbound files for virus infection;

- provide scanning for HTTP, web traffic scanning, to provide protection against hostile Java, JavaScript, and ActiveX users; and

- provide content blocking of websites designated by the Customer as being offensive or undesirable for access by the Customer's employees.

The Internet access shall be provided via the protection of the Symantec Gateway Security Firewall software installed on a server configured with RAID disk subsystem. A hot spare, fully functional router shall additionally back up the server and router providing the Internet connectivity. The Fi-DATA firewall shall be monitored for unauthorized attempts to access the system on a 24 X 7 basis utilizing a server installed with Intrusion Detection Software and configured to send e-mail and/or pager alerts to the Fi-DATA "Incidence Response Team." The "Incidence Response Team" shall have the authority to temporarily deny Internet services in the event the system is attacked until such time as the security system has been properly stabilized. Fi-DATA will not unreasonably deny service.

Periodic and regular testing through the employment of Network Vulnerability Software shall additionally protect the security system providing the Internet access. The result of these tests will be made available to the subscribing Customers. The results of the vulnerability tests will be reviewed by the auditing firm providing the audit function for the data center during the course of their routine audit procedures,

Fi-DATA shall maintain up-to-date maintenance agreements with the software vendors providing the above-described products and shall be responsible for the installation and upgrading of the products to the manufacturer's recommendations. Fi-DATA shall maintain adequate staffing of employees sufficiently trained and competent to enforce the data center's security procedures and controls.

N JAL 337940 v5
821394-0002 03/07/2001

**EXHIBIT 4.0**

---

## Internet Access through FiData's Firewall Monitored 24 x 7

*Banks subscribing to this service will utilize their Fi-DATA connection to access the Internet for Web browsing and internet e-mail. The Symantec EnterpriseFirewall and ancillary security products are state of the art for security.*

*The internet access is protected first by the Firewall, then by the Intrusion detection software and is kept safe by daily review and monthly auditing. This program is only slightly more expensive than ISP services but is vastly more valuable. Let us take care of this important regulatory concern for you.*

| Service | Pricing Criteria | Pricing Level | Level Descriptions | Monthly Fees |
|---------|---------|---------|---------|---------|
| **Internet Access** | # of PCs | I | 1-2 Users | 100 |
| **(Browsing)** | | II | 3-5 Users | 225 |
| | | III | 6-10Users | 275 |
| | | IV | 11-20 Users | 375 |
| | | V | 21-50 Users | 500 |
| | | VI | 51-100 Users | 750 |
| | | VII | >100 Users | Call for Quote |
| **Internet E-Mail** | # of PCs | I | I-2 Users | 10 |
| | | II | 3-5 Users | 25 |
| | | III | 6-10 Users | 50 |
| | | IV | 11-20 Users | 100 |
| | | V | 21-50 Users | 250 |
| | | VI | 51-100 Users | 500 |
| | | VII | >100 Users Per User | 5 |
| **Anti-Virus** | # of PC's | I | 1-10 PC's | 20 |
| **Scanning** | | II | 11-20 PC's | 40 |
| | | III | 21-50 PC's | 100 |
| | | IV | 51-100 PC's | 200 |
| | | V | > 100 PC's per PC | 1.75 |

**Anti-Virus Support Services:**

> **Services related to the updating of Anti-Virus Solution**
> ***WEB-SHIELD E-APPLIANCE***          $35 per Workstation-One Time Charge
> Server and Software behind firewall scans all data packets entering the network via the HTTP, FTP, SMTP and POP-3 firewall ports before it enters the Wide Area Network.
> Scanning for viruses includes e-mail attachments, executables, documents,etc.
> Fi-DATA provides Internet Access management reports for employee activity.

N JAL 337940 v5
821394-0002 03/07/2001

Contract Addendum
Premier Insight Teller


The Peoples National Bank
106 W Central Avenue
LaFollette, TN 37766


One Time Fees

Fi-DATA Installation Fee                    $12,500.00

Monthly Fees
Fi-DATA Monthly Fee                         $500.00


Contract Addendum term shall run coterminous with the bank's Service Agreement.

Signed this 27th day of December, 2006, by

David Reynolds, President                    Jean Ramsey, President
The Peoples National Bank                    Financial Data Technology Corp
106 W Central Avenue                         233 Bedford Way
LaFollette, TN 37766                         Franklin TN 37067

## Data Processing Agreement
## Contract Addendum – Remote Card Management

### Description of Services

Processor will complete testing, certification, daily processing and delivery of a data file of all card maintenance transactions processed on the host system to Fiserv EFT.

| Schedule of Fees | One-time | Monthly |
|---|---|---|
| Implementation Fee | 3,750.00 | |
| RCM Monthly Processing Fee, per core account | | 0.015 |

**FINANCIAL DATA TECHNOLOGY CORPORATION**

DATED: 9-19-2008

BY: _Jean Ramsey_

PRINTED: Jean Ramsey

TITLE: President

**PEOPLES BANK OF THE SOUTH**

DATED: 9-12-08

BY: _Chris M Cooper_

PRINTED: Chris M Cooper

TITLE: AVP

| FOR OFFICE USE ONLY | | | |
|---|---|---|---|
| IMPLEMENTATION DATE: | | ONE TIME FEES INVOICED: | |
| ASSIGNED TO: | | MONTHLY FEES INVOICED: | |
| COMPLETED: | | PASS THRU CHARGES INVOICED: | |

## Data Processing Agreement
## Contract Addendum - Business Contingency VPN Connectivity

**Description of Services**

Fi-DATA allows the institution to have a VPN Firewall to Firewall connection to its Business Contigency network.

| Schedule of Fees | One-time | Monthly |
|---|---|---|
| Business Contingency VPN Connectivity | | 150.00 |

## FINANCIAL DATA TECHNOLOGY CORPORATION

DATED: _____

BY: _____

PRINTED: _____

TITLE: _____

## PEOPLES BANK OF THE SOUTH

DATED: 3-20-09

BY: *Chris M. Cooper*

PRINTED: *Chris M. Cooper*

TITLE: *AVP*

FOR OFFICE USE ONLY

IMPLEMENTATION DATE: _____     ONE TIME FEES INVOICED: _____

ASSIGNED TO: _____     MONTHLY FEES INVOICED: _____

COMPLETED: _____     PASS THRU CHARGES INVOICED: _____

## Data Processing Agreement
## Contract Addendum - Business Contingency VPN Connectivity

**Description of Services**

Fi-DATA allows the institution to have a VPN Firewall to Firewall connection to its Business Contigency network.

| Schedule of Fees | One-time | Monthly |
|---|---|---|
| Business Contingency VPN Connectivity | | 150.00 |

**FINANCIAL DATA TECHNOLOGY CORPORATION**

DATED: *3-25-09*

BY: *Jean Ramsey*

PRINTED: *Jean Ramsey*

TITLE: *President*

**PEOPLES BANK OF THE SOUTH**

DATED: *3-20-09*

BY: *Chris M Cooper*

PRINTED: *Chris M. Cooper*

TITLE: *Avp*

| FOR OFFICE USE ONLY | | | |
|---|---|---|---|
| IMPLEMENTATION DATE: | | ONE TIME FEES INVOICED: | |
| ASSIGNED TO: | | MONTHLY FEES INVOICED: | |
| COMPLETED: | | PASS THRU CHARGES INVOICED: | |

2013 DEC 17 PM 2: 46

WILLIAM F. ARCHER
CLERK & MASTER
FILED

# EXHIBIT TWO

Marian F. Harrison
US Bankruptcy Judge

Dated: 09/14/12

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **IN RE:** ) | |
| ) | **CASE NO. 3:11-bk-11792** |
| **CITIZENS CORPORATION, et al.** ) | **CHAPTER 11** |
| ) | **JUDGE MARIAN F. HARRISON** |
| **Debtors.** ) | **JOINTLY ADMINISTERED** |

---

## ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, (II) APPROVING FORM AND MANNER OF NOTICE OF SALE, AND (III) GRANTING RELATED RELIEF

---

This matter came before the Court on September 7, 2012 upon the motion of Financial Data Technology Corporation (the "Debtor" or "Fi-Data") for the entry of an order: (i) authorizing the sale of certain of its assets which are used in the operation of its business, free and clear of liens, claims, encumbrances and interests of any kind in accordance with the terms set forth in the Asset Purchase Agreement between the Debtor and Fiserv Solutions, Inc. ("Buyer"), as purchaser, attached as <u>Exhibit A</u> hereto (the "Asset Purchase Agreement"); (ii) lifting the 14-day stay of the order provided by Rule 6004; (iii) approving the form and manner of notice of sale; and (iv) granting such other relief as the Court deems appropriate and just (the "Sale Motion"). Due and proper notice having been given, and after due deliberation and sufficient cause appearing therefore, the Court hereby makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT/CONCLUSIONS OF LAW

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052,[1] made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      Proper, timely, adequate and sufficient notice of the Sale Motion and the hearing on the Sale Motion (the "Sale Hearing") has been provided in accordance with sections 102(1) and 363(b) of the United States Bankruptcy Code, 11 U.S.C. *et seq.* (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, the local rules of this Court, and the procedural due process requirements of the United States Constitution. No other or further notice of the Sale Hearing or of the entry of this Order is necessary.

D.      A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including, without limitation: (i) all parties who filed requests for notices under Bankruptcy Rule 9010(b); (ii) the proposed buyer; (iii) the Debtor's twenty largest unsecured creditors; (iv) Legends Bank, c/o its counsel, Daniel W. Small, 102 Duke Street, Ashland City, Tennessee 37015; Southern Hospitality Investments, Inc., c/o Nader Baydoun, Baydoun & Knight, PLLC, 424 Church Street, Suite 2650, Nashville, Tennessee 37219; Decatur County Bank, c/o Paul Jennings, Bass, Berry & Sims PLC, 150 Third Avenue South, Suite 2800, Nashville, Tennessee 37201; Capital Bank (fka GreenBank), c/o David M. Anthony, Bone McAllester, 511 Union Street, Suite 1600, Nashville,

---

[1] The Federal Rules of Bankruptcy Procedure shall be referred to herein as the "Bankruptcy Rules." Title 11 of the United States Code shall be referred to herein as the "Bankruptcy Code."

TN 37219, FDIC, as successor to Tennessee Commerce Bank, c/o John Hull, Leitner, Williams, Dooley & Napolitan, PLLC, 801 Broad Street, Third Floor, Pioneer Building, Chattanooga, TN 37402, and Community South Bank, c/o John L Farringer IV, Sherrard & Roe, 150 Third Avenue South, Suite 1100, Nashville, TN 37201; (v) the United States Trustee and (vi) all governmental taxing authorities who have, or as a result of the sale may have, claims, contingent or otherwise, against the Debtor.

E.     Debtor has presented ample evidence that the proposed sale constitutes the highest and best offer both in the sound exercise of the Debtor's business judgment and objectively and that the proposed sale maximizes the value of the Assets.[2]

F.     The purchase price to be paid by Buyer, as set forth in the Asset Purchase Agreement and amended in open Court, is fair, is in the best interest of Debtor's estate, and constitutes full and adequate consideration and reasonably equivalent value for the Assets.

G.     Buyer is not an insider, as that term is defined in section 101(31) of the Bankruptcy Code and the decisions thereunder. Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of sections 363(m) of the Bankruptcy Code with respect to all of the Assets to be purchased. The Asset Purchase Agreement was negotiated and entered into in good faith, based upon arm's-length bargaining and without collusion. There are no undisclosed deals or agreements between Buyer and Debtor, or any other party in interest. Neither Debtor nor Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) to the Asset Purchase Agreement.

---

[2] Unless defined herein, all capitalized terms shall have the meaning ascribed to them in the Sale Motion.

3

H.    Debtor has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the sale of the Assets has been duly and validly authorized by all necessary corporate authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement.  Gary Murphey, as Chapter 11 Trustee for Citizens Corporation, has full power and authority to execute and deliver, on behalf of Debtor, any and all agreements, instruments and other documents, and to take all actions on behalf of Debtor, he deems necessary or appropriate to effectuate the Asset Purchase Agreement or this Order.

I.    Debtor has advanced sound business reasons for seeking to enter into the Asset Purchase Agreement and to sell the Assets, as more fully set forth in the Sale Motion, and it is a reasonable exercise of Debtor's business judgment to sell the Assets and to execute and deliver the Asset Purchase Agreement to the Buyer.

J.    The terms and conditions of the Asset Purchase Agreement, including the modifications thereto announced in Court at the hearing, are fair and reasonable, and the transactions contemplated by the Asset Purchase Agreement, including the assumption and assignment of the leases and executory contracts, and the settlements and satisfactions referenced therein, are in the best interest of Debtor's creditors and bankruptcy estate.

K.    A valid business purpose exists for approval of the transactions contemplated by the Sale Motion pursuant to section 363(b) of the Bankruptcy Code.  The transfer of the Assets from Debtor to Buyer is a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person.

L.    The Assets are property of the estate under section 541 of the Bankruptcy Code. To the extent any of the Assets are owned by Southern Hospitality Investments, Inc. ("Southern

4

Hospitality") and/or are subject to leases between Debtor and Southern Hospitality, which leases and equipment were pledged to Community South Bank, Southern Hospitality, Decatur County Bank, Citizens Corporation and Community South Bank have consented and agreed to the transfer of whatever ownership interest each may have in those Assets to Fi-Data, who will transfer those Assets to Buyer.

M.     Buyer is not assuming and shall not be liable or otherwise responsible for any of the debts, liabilities or obligations of Debtor, except for "Assumed Liabilities" (as that term defined in the Asset Purchase Agreement). Debtor and Buyer do not have any common controlling shareholders or senior management. The Asset Purchase Agreement is being entered into in good faith and not to hinder, delay or defraud any creditors of Debtor. Debtor shall not in any way be liable or responsible for any liabilities, commitments or obligations in any way related to the Assets arising from and after the date of the closing of the transactions contemplated by the Asset Purchase Agreement (the "Closing Date"). Buyer is not merely a continuation of Debtor or its estate. There is no continuity of enterprise between Debtor and Buyer. Buyer is not a successor to Debtor or its estate, and the transactions contemplated in the Asset Purchase Agreement do not amount to, or otherwise constitute, a consolidation, merger or de facto merger of Buyer and Debtor or its estate.

N.     The sale of Assets on the terms provided in the Asset Purchase Agreement does not involve the transfer of personally identifiable information within the meaning of section 363(b)(1) of the Bankruptcy Code.

THEREFORE, BASED UPON THE FOREGOING, the Court ORDERS as follows:

1.     The relief requested in the Sale Motion is granted, as modified herein. Objections, if any, to the Sale Motion or to the relief granted herein that have not been

5

withdrawn, waived, settled, or otherwise resolved and all reservations of rights included in such objections, are overruled on the merits.

2. The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

4. The statutory predicates for the Sale Motion are sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

5. Based on the agreement of Buyer and Debtor and the evidence presented at the Sale Hearing, the Asset Purchase Agreement is hereby modified as follows:

(1) Section 10.3 of the Agreement is modified by deleting the phrase "For a period of up to 210 days following the Closing" and replacing it with "For a period of up to 210 days following the date on which Fi-Data filed its voluntary petition for relief under the Bankruptcy Code."

(2) Section 6.2.5. is added to the Agreement; it provides "Community South Bank, as agent for Citizens Corporation and Decatur County Bank, shall have transferred to Fi-Data all of its right, title and interest in and to the Assets subject to a lease with Southern Hospitality."

(3) Section 4.6(e) is added to the Agreement; it provides "Notwithstanding anything in this Agreement to the contrary, Gross Revenues shall not include any revenues received from Bank Independent of Sheffield, Alabama, Bank of Perry County, Tennessee, or any other customer that provides notice of termination of its Assumed

6

Contract after the date of the Sale Hearing and/or prior to the date that is sixty days after Closing."

      (4)     Section 6.26 is added to the Agreement; it provides "The Bankruptcy Court shall have entered an order extending the deadline for assuming or rejecting the lease of the Premises to the date that is 210 days after the date on which Fi-Data's voluntary petition was filed."

The Asset Purchase Agreement, as amended above, is hereby deemed assumed by Debtor pursuant to section 365(a) of the Bankruptcy Code.

      6.     The Asset Purchase Agreement, as amended above, and the transactions contemplated thereby shall be, and hereby are, approved, and Debtor is hereby authorized, empowered and directed to enter into, and to perform its obligations under, the Asset Purchase Agreement and to execute and perform such agreements or documents and take such other actions as are necessary or desirable to effectuate the terms of the Asset Purchase Agreement, as amended above.

      7.     Debtor shall be, and hereby is, authorized, empowered and directed, pursuant to section 363(b) of the Bankruptcy Code, to sell the Assets to Buyer in accordance with the terms and conditions of the Asset Purchase Agreement.

      8.     Pursuant to section 363(f) of the Bankruptcy Code, the sale of the Assets pursuant to the Asset Purchase Agreement and this Order shall be free and clear of any and all liens, claims, encumbrances, interests and liabilities of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, scheduled or unscheduled, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether

7

arising prior to or subsequent to the date on which Fi-Data filed its voluntary petition for relief under the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise, including without limitation, the claims of Community South Bank, Decatur County Bank and Southern Hospitality in the ESC Leases, and all workers' compensation claims and tort claims (collectively, "Liens and Encumbrances"). All Liens and Encumbrances on and in respect of the Assets shall attach to the proceeds of the sale.

9.     The secured claims of Tennessee Bank and Trust and Capital Bank, N.A. will be paid from the proceeds received from the Closing of the Asset Purchase Agreement.  The $300,000 due to Community South Bank and Decatur County Bank pursuant to the terms of the Order granting Debtors' Expedited Motion to Approve Compromise and Settlement shall also be paid from the proceeds received from the Closing of the Asset Purchase Agreement. Fi-Data may also pay, in its discretion, priority tax claims against Fi-Data, Fi-Data administrative claims arising in the ordinary course of Fi-Data's business including employee wages, and necessary closing costs related to the Asset Purchase Agreement, including without limitation amounts required to cure any defaults in the executory contracts and unexpired leases to be assumed and assigned or to satisfy any valid secured claims on any of the Assets being sold.  Absent further order of this Court, the remainder of sales proceeds received at Closing of the Asset Purchase Agreement will be held in a Fi-Data debtor-in-possession account.

10.     This Order shall be binding upon and govern the acts of all persons or entities, including without limitation, all filing agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law to accept, file, register or otherwise record or release any documents or instruments.

8

11. Subject to the closing of the transactions contemplated by the Asset Purchase Agreement, effective as of the Closing Date, the sale of the Assets by Debtor to Buyer shall constitute a legal, valid, and effective transfer of the Assets to Buyer, notwithstanding any requirement for approval or consent by any persons, and shall vest Buyer with all right, title and interest in and to the Assets, free and clear of all Liens and Encumbrances pursuant to section 363(f) of the Bankruptcy Code. All entities in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to Buyer on the Closing Date.

12. The sale of the Assets to Buyer under the Asset Purchase Agreement will constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and all applicable law.

13. The sale of Assets on the terms provided in the Asset Purchase Agreement does not involve the transfer of personally identifiable information, and the Debtor is not required to satisfy the requirements set forth in Section 363(b)(1) of the Bankruptcy Code governing the sale of personally identifiable information.

14. This Order and the Asset Purchase Agreement shall be binding upon, and shall inure to the benefit of, Debtor and Buyer, and their respective successors and assigns, including without limitation, any chapter 11 trustee hereinafter appointed for Debtor's estate or any trustee appointed in a chapter 7 case if this case is converted from chapter 11.

15. This Court shall retain exclusive jurisdiction to enforce the provisions of this Order, the Asset Purchase Agreement and any documents executed in connection with the Asset Purchase Agreement or this Order and to resolve any dispute concerning this Order, the Asset Purchase Agreement, any documents executed in connection with the Asset Purchase Agreement or this Order, or the rights and duties of the parties hereunder or thereunder or any issues relating

to this Order, the Asset Purchase Agreement, or any documents executed in connection with the Asset Purchase Agreement or this Order, including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and all issues and disputes arising in connection with the relief authorized herein.

16. The provisions of this Order are non-severable and mutually dependent.

17. Debtor and Buyer are free immediately to close under the Asset Purchase Agreement in accordance herewith. If Debtor and Buyer close under the Asset Purchase Agreement, Buyer shall be deemed to be acting in "good faith" and shall be entitled to the protection of section 363(m) of the Bankruptcy Code as to all aspects of the transactions provided for in the Asset Purchase Agreement and this Order.

18. The sale approved by this Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code and the Debtor's estate shall not be entitled to a judgment against Buyer under section 363(n) of the Bankruptcy Code.

19. Debtor and Buyer are authorized and empowered to take all actions (including any pro-rations, adjustments and similar items required by the Asset Purchase Agreement) and execute and deliver any and all documents and instruments that either Debtor or Buyer deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Order. Gary Murphey, as Chapter 11 Trustee for Citizens Corporation, is hereby authorized and directed, for and on behalf of Debtor, to execute and deliver any and all agreements, instruments and other documents, and to take all actions, he deems necessary or appropriate to effectuate the Asset Purchase Agreement or this Order.

20. To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to Debtor to the extent necessary, without further

10

order of the Court (a) to allow Buyer to give Debtor any notice provided for in the Asset Purchase Agreement, and (b) to allow Buyer to take any and all actions permitted by the Asset Purchase Agreement.

21. All persons and entities (i) holding any lien, claim, encumbrance, or interest in any of the Assets, (ii) that have filed a financing statement, mortgage, mechanic's lien, lis pendens, or other document or agreement evidencing any claim with respect to any of the Assets, or (iii) otherwise asserting any claim against the Assets shall, and hereby are directed to, execute and deliver to Debtor or its designated representative(s) any and all agreements, instruments and other documents necessary (or requested by Debtor or Buyer) to effectuate the transfer of the Assets to the Buyer free and clear of any and all Liens and Encumbrances, with all such releases to be held in escrow pending disbursement of funds from Closing of the amounts due to the holder of the Liens and Encumbrances. If any person or entity that has filed statements or other documents or agreements evidencing any lien, claim, encumbrance, or interest in any of the Assets does not deliver to the Debtor or Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of any lien, claim, encumbrance, or interest that the person or entity has or may assert with respect to any of the Assets, the Debtor and/or Buyer may execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to any of the Assets. Notwithstanding the foregoing, nothing in this paragraph, including the execution and delivery of an instrument or document releasing any lien, claim, encumbrance, or interest in the Assets, shall operate to waive, release or extinguish any lien,

11

claim, or interest that such party may have in the proceeds from the sale of the Assets under the Asset Purchase Agreement.

22.     Buyer is not a successor to Debtor or its estate by reason of any theory of law or equity, and the transactions contemplated in the Asset Purchase Agreement do not amount to, or otherwise constitute, a consolidation, merger or de facto merger of Buyer and Debtor or its estate. Buyer shall have no liability or responsibility for any debt, liability or other obligation of or claim against Debtor, other than for the "Assumed Liabilities" (as that term is defined in the Asset Purchase Agreement).

23.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or documents executed in connection with the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, Debtor and Buyer that the Asset Purchase Agreement, as amended herein, and any related agreements are authorized and approved in their entirety.

24.     The Asset Purchase Agreement and any related agreements may be modified, amended, or supplemented by agreement of Debtor and Buyer without further action of the Court; provided that any such modification, amendment, or supplement is not material and substantially conforms to and effectuates the Asset Purchase Agreement.

25.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the transaction contemplated by the Asset Purchase Agreement.

26.     Nothing contained in any plan of reorganization or plan of liquidation confirmed in Debtor's Chapter 11 case, in any order confirming such a plan, or in any other order of the Court shall conflict with or deviate from the terms of the Asset Purchase Agreement or this Order, and to the extent such provisions do conflict, then the terms of the Asset Purchase

12

Agreement and this Order control over such conflicting order or plan. As between Debtor and Buyer, to the extent this Order conflicts with the Asset Purchase Agreement, the Asset Purchase Agreement controls.

27. Notwithstanding Bankruptcy Rule 6004(h), this Order will take effect immediately upon entry.

IT IS SO ORDERED.

THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE.

Submitted for entry by:

**HARWELL HOWARD HYNE**
**GABBERT & MANNER, P.C.**

By:    /s/ Glenn B. Rose
       Glenn B. Rose
       Barbara D. Holmes
       David P. Cañas
       Tracy M. Lujan
       333 Commerce Street, Suite 1500
       Nashville, TN 37201
       Telephone: 615-256-0500
       Facsimile: 615-251-1058
       Email: gbr, bdh, dpc or tml@h3gm.com

Attorneys for Financial Data Technology Corporation
And Gary M. Murphey, trustee for Citizens Corporation

**BONE MCALLESTER NORTON PLLC**

By:    /s/ David M. Anthony (with permission)
       David M. Anthony, BPR No. 019951
       511 Union Street, Suite 1600
       Nashville, Tennessee 37219
       (615) 238-6321 Phone
       (615) 687- 5599 Facsimile
       Email for ECF: anthonybk@bonelaw.com

Attorneys for Capital Bank, N.A.

13

**GULLETT, SANFORD, ROBINSON & MARTIN, PLLC**

By:     /s/ G. Rhea Bucy (with permission)
        G. Rhea Bucy, BPR No. 2616
        Linda W. Knight, BPR No. 9205
        150 Third Avenue South, Suite 1700
        Nashville, TN 37201
        (615) 244-4994
        rbucy@gsrm.com; lknight@gsrm.com;
        bke@gsrm.com

Attorneys for David S. Myers

**SHERRARD & ROE, PLC**

By:     /s/ Michael G. Abelow (with permission)
        L. Webb Campbell II (No. 11238)
        John L. Farringer IV (No. 22783)
        Michael G. Abelow (No. 26710)
        150 3rd Avenue South, Suite 1100
        Nashville, TN 37201
        (615) 742-4200
        mabelow@sherrardroe.com

Attorneys for Community South Bank

**NEAL & HARWELL, PLC**

By:     /s/ James R. Kelley (with permission)
        James R. Kelley
        2000 One Nasvhille Place
        Nashville, TN 37219
        (615) 238-3520
        jkelley@nealharwell.com

Attorneys for Fiserv Solutions, Inc.

507148-02

14

This Order has Been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is made to be effective on July 31, 2012, by and between FISERV SOLUTIONS, INC., a Wisconsin corporation ("**Buyer**"), and FINANCIAL DATA TECHNOLOGY CORPORATION, a Tennessee corporation ("**Seller**").

Seller and Buyer agree that:

1.      Background, Purpose, and Consideration. Subject to the terms and conditions of this Agreement, Buyer has agreed to purchase and Seller has agreed to sell, transfer and assign to Buyer, free and clear of all security interests, liens, claims, encumbrances and interests as contemplated by section 363 of the United States Bankruptcy Code, 11 U.S.C. 101 *et seq.* (the "**Bankruptcy Code**"), all right, title and interest of Seller in those assets of Seller specified on Appendix 1 attached hereto (collectively, "**Assets**") and those contracts of Seller specified on Appendix 2 attached hereto (collectively, "**Assumed Contracts**"), effective as of Closing. For the sake of clarity, pursuant to Section 11 below, Buyer has agreed to return to Seller all Customer Accounts Receivable (including Customer Accounts Receivable Forms) collected in excess of Four Hundred Thousand Dollars ($400,000). The Assets and the Assumed Contracts are hereinafter referred to collectively as the "**Purchased Assets**". Seller expects to file a Chapter 11 bankruptcy proceeding in United States Bankruptcy Court for the Middle District of Tennessee (the "**Bankruptcy Court**") promptly after the execution of this Agreement, which bankruptcy filing shall not affect the obligations of Seller or Buyer under this Agreement. The consideration for this contract consists of the parties' respective representations, warranties, covenants and agreements contained in this document.

2.      Sale and Assignment. Seller hereby sells, assigns, and transfers to Buyer, free and clear of all security interests, liens, claims, encumbrances and interests as contemplated by section 363 of the Bankruptcy Code, all of the Purchased Assets, to be effective as of Closing, for the herein described Purchase Price.

3.      Assumed Contracts.

3.1      Buyer hereby assumes all of the obligations of Seller under the Assumed Contracts arising after the Closing Date that relate to the performance that would otherwise be due by Seller under the Assumed Contracts after the Closing Date but for the assignment of the Assumed Contracts to Buyer, other than obligations or liabilities that are the result of the breach of any of the Assumed Contracts prior to or on the Closing Date. The obligations assumed by Seller under the Assumed Contracts as provided in this section 3.1 are hereinafter referred to as the "**Assumed Liabilities.**" After Closing, Buyer agrees to continue to provide services to Seller's data processing Customers in accordance with the terms of such Assumed Contracts. Buyer also agrees to use commercially reasonable efforts to expand the services provided to the Customers after Closing. To the extent any amount is required to be paid to cure any defaults that exist as of the Closing Date under any Assumed Contract in order for Seller to assume such Assumed Contract and assign it to Buyer, Seller shall make all such payments and cure all such defaults in accordance with section 365 of the Bankruptcy Code.

1

3.2     Notwithstanding any other provision of this Agreement, Purchaser shall not, directly or indirectly, assume, be deemed to assume, or otherwise be responsible for, any liabilities, obligations, or commitments of Seller of any kind or nature, whether absolute or contingent, known or unknown, except for the Assumed Liabilities.

4.     <u>Purchase Price</u>. In addition to the assumption of the Assumed Liabilities by Buyer, Buyer shall pay a cash purchase price for the Purchased Assets (**"Purchase Price"**) to Seller as provided below, which Purchase Price shall be paid by wire transfer as specified in <u>Appendix 3</u> attached hereto:

4.1     One Million Dollars ($1,000,000.00) payable at the Closing (the **"Closing Payment"**);

4.2     Twenty Thousand Dollars ($20,000.00) payable on August 1, 2013;

4.3     Five Hundred Ten Thousand Dollars ($510,000.00) payable on August 1, 2014; and

4.4     Not later than September 30, 2015, a final payment equal to the Final Payment, calculated in accordance with section 4.6 below.

4.5     As used in this Agreement, reference to:

4.5.1     **"Affiliate"** means any entity that controls Buyer, is controlled by Buyer, or that is under common control with Buyer.

4.5.2     **"Closing"** means the closing and consummation of the transactions contemplated by this Agreement.

4.5.3     **"Consolidated Buyer"** means and includes Buyer and its present and future Affiliates.

4.5.4     **"Customer"** means any customer of Seller as of the Closing Date under one or more of the Assumed Contracts or that becomes a customer of Consolidated Buyer under a Referred Contract.

4.5.5     **"Customer Affiliate"** means any entity that controls a Customer, is controlled by a Customer, or that is under common control with a Customer.

4.5.6     **"Gross Revenues"** means gross revenues as understood within the meaning of Generally Accepted Accounting Principles in the United States of America. For purposes of this section 4, the term Gross Revenues includes all amounts accrued but not yet paid under (i) Assumed Contracts or Referred Contracts, including

2

renewals thereof, with a Customer or Customer Affiliate, and (ii) the FCB&T agreement.

4.5.7 **"Measurement Period"** is the period beginning on the Closing Date and ending on the third anniversary of the Closing Date.

4.5.8 **"Referred Contracts"** means and includes contracts between Consolidated Buyer and companies and financial institutions that (a) become a customer of Consolidated Buyer as a result of referrals or recommendations of one or more members of the Lender Group and (b) are not customers of Consolidated Buyer as of the Closing Date, as mutually agreed between Buyer and the then lead lender in the Lender Group.

4.6 The Final Payment shall be equal to one-third (1/3) of the sum of:

(a) the Gross Revenues attributable to the Assumed Contracts, as amended, during the Measurement Period *plus*

(b) the Gross Revenues attributable the First Community Bank and Trust (**"FCB&T"**) contract, including any amendments thereto, by and between FCB&T and Fiserv, during the Measurement Period *plus*

(c) the Gross Revenues attributable to the Referred Contracts, as amended, during the Measurement Period.

(d) For the sake of clarity, Gross Revenues attributable to Assumed Contracts and Referred Contracts include revenues from core processing services, as well as revenues from other products or services which Consolidated Buyer sells to an entity that is party to an Assumed Contract or a Referred Contract. Gross Revenues does not include contract termination fees. Any revenue related to the sales of hardware, or similar third party goods or services, to a Customer or Customer Affiliate shall be counted for purposes of the calculation above on a net basis rather than a gross basis.

4.7 Prior to the third anniversary of the Closing Date, Buyer shall not sell or assign the Assumed Contracts without the consent of the Lenders; provided, however, that Buyer may assign one or more Assumed Contracts to one or more of its Affiliates. Buyer shall not suffer or permit the cancellation of the Assumed Contracts except in accordance with their terms as of the Closing Date. For the sake of clarity, any payments owed or paid to Buyer under any Assumed Contract as of the date of cancellation shall be Gross Revenues.

3

4.8 Notwithstanding anything herein to the contrary, to the extent that any portion of the Gross Revenues due under the Assumed Contracts or the Referred Contracts has not been received by Buyer as of the time that the payment required by section 4.4 is due to be made to the Lender Group, then Buyer may, in its discretion, either (a) pay the full amount owed under section 4.4 as if such amount(s) had been received by Buyer, and keep the full amount of the receivable(s) when paid; or (b) adjust the amount of the cash payment to be made pursuant to section 4.4 and assign a portion of the uncollected account(s) receivable to the Lender Group.

5. Closing Deliveries.

   5.1 At Closing, Buyer shall deliver to Seller the following:

      5.1.1 The Closing Payment; and

      5.1.2 An assignment and assumption agreement in the form of Exhibit A attached hereto (the **"Assumption Agreement"**), duly executed by Buyer.

   5.2 At Closing, Seller shall deliver to Buyer the following:

      5.2.1 A bill of sale for the Purchased Assets in the form of Exhibit B attached hereto, duly executed by Seller;

      5.2.2 The Assumption Agreement, duly executed by Seller;

      5.2.3 A certified copy of the Approval Order; and

      5.2.4 Such other agreements and other documents as may be required to effectuate the transactions contemplated by this Agreement.

6. Conditions to Closing.

   6.1 Conditions to Buyer's and Seller's Obligations. The respective obligations of Buyer and Seller to effect the transactions contemplated by this Agreement, unless waived by both Buyer and Seller, shall be subject to all of the following conditions being satisfied as of Closing:

      6.1.1 No order, writ, injunction, judgment, or decree shall have been entered and be in effect that stays, restrains, enjoins, or invalidates, or otherwise materially adversely affects the transactions contemplated by this Agreement, and no action, suit, appeal, or other proceeding shall be pending or threatened that has a reasonable likelihood of resulting in any such order, writ, injunction, judgment, or decree; and

4

6.1.2  The Bankruptcy Court shall have entered the Approval Order (as defined herein).

6.2   Conditions to Buyer's Obligations. The obligations of Buyer to effect the transactions contemplated by this Agreement, unless waived by Buyer, shall be subject to all of the following conditions being satisfied as of Closing:

6.2.1   All representations and warranties of Seller in this Agreement shall be true, complete and correct in all respects when made and on and as of the Closing Date as if made on and as of the Closing Date;

6.2.2   Seller shall have made the deliveries required of it pursuant to section 5.2 hereof;

6.2.3   The business operated by Seller shall be in satisfactory condition to Buyer;

6.2.4   Seller shall have performed and complied with, in all material respects, all of the terms, covenants, obligations, and conditions in this Agreement to be performed or complied with by Seller on or before the Closing Date.

6.3   Conditions to Seller's Obligations. The obligations of Seller to effect the transactions contemplated by this Agreement, unless waived by Seller, shall be subject all of the following conditions being satisfied as of Closing:

6.3.1   All representations and warranties of Buyer in this Agreement shall be true, complete and correct in all respects when made and on and as of the Closing Date as if made on and as of the Closing Date;

6.3.2   Buyer shall have made the deliveries required of it pursuant to section 5.1 hereof; and

6.3.3   Buyer shall have performed and complied with, in all material respects, all of the terms, covenants, obligations, and conditions in this Agreement to be performed or complied with by Buyer on or before the Closing Date.

7.   Closing Date. The Closing shall be held within three days after entry of the Approval Order (as defined herein) or such other date as may be agreed by Buyer and Seller (the "**Closing Date**"). If the Approval Order has not been entered prior to September 17, 2012 (as adjusted to reflect any subsequent written agreement of the parties to extend such deadline, the

5

"**Outside Date**"), then any party not then in default under this Agreement may terminate this Agreement by written notice given at any time following such Outside Date.

8. Seller's Representations and Warranties. Seller represents and warrants to Buyer that:

8.1 Seller owns all of the right, title and interest in and to the Purchased Assets except as expressly stated to the contrary on Appendix 1 attached hereto.

8.2 Subject to the approval of the Bankruptcy Court, Seller has the requisite power and authority to execute and to deliver this Agreement and the other documents contemplated by this Agreement to be executed and delivered by Seller and to perform its obligations under such agreements and documents. The execution and delivery by Seller of this Agreement and the other documents contemplated by this Agreement to be executed and delivered by Seller, the performance by Seller of its obligations under such agreements and documents and the consummation by Seller of the transactions contemplated by such agreements and documents have been duly authorized by all necessary entity action on the part of Seller, and no other entity action on the part of Seller is necessary to authorize the execution and delivery of this Agreement or the other documents contemplated by this Agreement to be executed and delivered by Seller, or the consummation of the transactions contemplated by such agreements and documents. Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by Seller and constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. Subject to the approval of the Bankruptcy Court, each of the documents contemplated by this Agreement to be executed and delivered by Seller, when executed and delivered by Seller, shall constitute a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms.

8.3 Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee and has the requisite corporate power and authority to own, operate and lease the Purchased Assets and carry on its business as now conducted. Seller is duly licensed and qualified to do business in and is in good standing under the laws of each state or other jurisdiction where failure to do so would materially adversely affect Seller's business. Seller has no direct or indirect subsidiary and does not own any shares of capital stock or other securities of any other partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture, or other entity.

6

8.4     No maintenance outside the ordinary course of business is needed with respect to the tangible assets included in the Purchased Assets. The Purchased Assets and other assets owned, leased, occupied and/or operated by Seller, and the ownership, leasing, occupancy and/or operation thereof, are in compliance with all laws and zoning, and other ordinances, codes, rules and regulations. The tangible assets included in the Purchased Assets are in all respects in good condition and working order (reasonable wear and tear excepted) and are adequate, in quality and quantity, for the operation of Seller's business. The Purchased Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate Seller's business in the manner presently operated by Seller.

8.5     True, correct and complete copies of all Assumed Contracts (including all amendments thereto) have been provided to Buyer by Seller. All Assumed Contracts are legally valid and binding and in full force and effect with respect to Seller and, to Seller's knowledge, with respect to the other parties thereto. Except for defaults of Seller caused by Seller's bankruptcy filing, neither Seller nor, to Seller's knowledge, any of the other parties to any of the Assumed Contracts are in default or breach thereof, and Seller has no notice or knowledge of any claimed breach, or of the occurrence of any event which after the passage of time or the giving of notice or both would constitute a breach by any party to any Assumed Contract. None of the rights of Seller or Buyer under the Assumed Contracts will be impaired in any respect by the consummation of the transactions contemplated by this Agreement. Subject to the entry of the Approval Order, the Assumed Contracts are validly assignable and all of the rights of Seller thereunder will be enforceable by Buyer after Closing without the consent or agreement of any other party.

8.6     Except as set forth on Appendix 2, since December 31, 2011, no customer of Seller has canceled or otherwise terminated its relationship with Seller; to the knowledge of Seller, no customer of Seller plans, intends or has made any threat to cancel or otherwise terminate its relationship with Seller; and no customer of Seller has decreased materially its usage of Seller services. Seller is not involved in any dispute with any customer of or supplier to Seller.

8.7     Seller is not a party to or bound by any union collective bargaining agreements or other labor contracts. Seller is not a party to any pending arbitration or grievance proceeding or other claim relating to any labor contract nor, to Seller's knowledge, is any such action threatened and no set of facts would reasonably be expected to constitute a basis for any such action.

7

9.     **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that:

    9.1     Buyer has the financial capacity to pay the Purchase Price.

    9.2     Buyer has the good right and power to enter into and to perform this Agreement.

    9.3     The execution, delivery and performance by Buyer of this Agreement shall not contravene any law or any contractual restriction binding on or affecting Buyer or any of its properties and does not render Buyer insolvent.

    9.4     Except for the Approval Order, Buyer has obtained all corporate, legal and regulatory approvals that it needs to lawfully execute, deliver, and perform Buyer's obligations under this Agreement.

10.     **Seller's Covenants and Agreements.**

    10.1     Prior to the Closing, subject to the constraints imposed by Bankruptcy Code, Seller:

        (a)     will (i) conduct its business in accordance with past practices; (ii) perform and comply with all of the terms and conditions of the Assumed Contracts; (iii) use its commercially reasonable best efforts to maintain and enhance its client service as currently operated; (iv) use its commercially reasonable best efforts to maintain and preserve intact its business organization and its relationship with employees, customers, suppliers and other business relations; (v) will not engage in any practice, take any action, or enter into any transaction outside the ordinary course of business; and (vi) allow Buyer complete access to Seller's books and records, the Purchased Assets, Seller's places of business and Seller's employees.

        (b)     will not (i) make any material change in the way in which it conducts business; (ii) hire any new employee, enter into an employment contract with an existing employee, or make any change in its salaries, benefits, or internal operations, without the prior written consent of Buyer, which Buyer agrees not to withhold or delay unreasonably; (iii) enter into any contract that would be an Assumed Contract; (iv) make a material adverse change or modification to any existing Assumed Contract; (v) sell, lease, dispose of or otherwise distribute any portion of the Purchased Assets; (vi) take any action or omit to take any action which act or omission would have a material adverse effect on any of the

8

Purchased Assets or Seller's business; (vii) take or omit to take any action that would result in a breach of any of the representations, warranties, or covenants of Seller hereunder or in any of the agreements contemplated herein

10.2    Seller will, (a) prior to Closing, obtain an order from the Bankruptcy Court authorizing Seller to pay to its employees, at Closing, all pre-petition and post-petition bonuses and incentive payments owed to such employees as of the Closing Date (collectively, the "**Employee Bonuses**"); and (b) at Closing, pay the Employee Bonuses in full in good funds.

10.3    For a period of up to 210 days following the Closing (the "**Access Period**"), Seller shall provide to Buyer and each Affiliate, and their respective employees and agents (collectively, the "**Authorized Parties**") unrestricted access to the building and facilities located at 210 Jordan Road, Franklin, Tennessee 37067 (the "**Premises**") for the purpose of operating the business purchased by Buyer pursuant to this Agreement and storing, maintaining, operating, preserving, protecting and removing the Purchased Assets (the "**Authorized Activities**"). Each of the Authorized Parties shall be responsible for any actions such Authorized Party takes in the building and facilities. During the Access Period, the Authorized Parties shall have such access to the Premises and may conduct the Authorized Activities as often and at such times as the Authorized Parties deem necessary in their sole discretion. Commencing on the Closing Date, Buyer agrees to pay to Seller the amounts due under Seller's lease of the Premises during the Access Period; provided that (i) such amount shall not exceed $40,000 per month and (ii) it is expressly understood and agreed that the Authorized Parties are not assuming any of Seller's liabilities or obligations relating to such lease or the Premises, all of which liabilities and obligations shall remain the responsibility of Seller. From the date of this Agreement through the expiration of the Access Period, Seller shall make all rent and other payments required under its lease of the Premises (the "**Lease**") and otherwise comply with its obligations under Lease.

10.4    From and after the Closing, upon reasonable request, from time to time, Seller shall execute and deliver all documents, make all rightful oaths, testify in any proceedings and do all other acts which may be necessary or desirable in the opinion of Buyer to protect, defend or record the right, title or interest of Buyer in and to the Purchased Assets or to aid in the prosecution, defense or other litigation of such rights arising from such right, title or interest, all without further consideration. From and after the Closing, Seller will use reasonable efforts to assist in the transfer to Buyer of the ongoing operation of Seller's business.

9

11.     Buyer's Covenants and Agreements. Prior to the Closing, Buyer: (a) will take no action or issue any communication that would reasonably be expected to be damaging to Seller's business; (b) will use commercially reasonable efforts to cooperate with Seller to enable an orderly transition of Seller's business to Buyer and continued service to Customers post-Closing; (c) will not unreasonably withhold or delay any consent requested by Seller related to employment, contract, or operational matters; and (d) will not unduly interfere with the conduct of Seller's business and operations and will continue to allow Seller to use all intellectual property of Buyer currently used in Seller's business operations. From and after the Closing, Buyer will use commercially reasonable efforts to collect Customer Accounts Receivable (including Customer Accounts Receivable Forms), and will remit to Seller all Customer Accounts Receivable (including Customer Accounts Receivable Forms) collected in excess of Four Hundred Thousand Dollars ($400,000) as soon as reasonably practicable following the collection of the same.

12.     Employment and Release of Certain Employees. Buyer and Seller will cooperate to fully comply with all legal requirements concerning the termination of Seller's employee's by Seller and the hiring by Buyer of any of Seller's employees. The employees of Seller that Buyer intends to hire are identified on Appendix 4 attached hereto. Seller consents to Buyer entering into employment contracts with Seller's employees so long as such contracts are contingent upon the closing of the transactions contemplated by this Agreement. In order to ensure that Seller's employees are focused on on-going business operations, Seller shall use its best efforts to obtain in the Approval Order a release of any and all claims that Seller may have against its current officers actually employed by Seller as of the Closing Date.

13.     Chapter 11 Bankruptcy Proceedings.

13.1    Gary Murphey serves as the Chapter 11 Trustee in the Chapter 11 bankruptcy of Citizens Corporation, Seller's parent company ("**Parent**"), in the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division, Case No. 11-11792. Mr. Murphey, as Trustee of Parent (the "**Trustee**"), will act as debtor-in-possession for Seller in its anticipated bankruptcy case.

13.2    Promptly after execution of this Agreement, Seller shall seek to obtain Bankruptcy Court approval of the transactions described in this Agreement and will request entry of an order (the "**Approval Order**") by the Bankruptcy Court which (i) approves the sale, transfer and assignment of the Purchased Assets to Buyer, pursuant to section 363 of the Bankruptcy Code, on the terms and conditions set forth in this Agreement, (ii) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets within the meaning of Bankruptcy Code Section 363(m), (iii) states that the sale, transfer and assignment of the Purchased Assets to Buyer shall be free and clear of all security interests, liens, claims, interests and encumbrances (except as expressly provided in this Agreement), (iv) approves Seller's assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code,

10

conditioned only on the payment by Seller of any cure amounts due to the other parties to the Assumed Contracts; (v) finds that adequate notice has been given of the motion to approve the transactions contemplated by the Agreement and any hearing thereon, as required by rules 2002 and 6004 of the Federal Rule of Bankruptcy Procedure; (vi) finds that Buyer is not, and shall not be considered, a "successor" of the Debtor for purposes of successor liability doctrine and that Buyer shall not be liable for any debts, liabilities, or obligations of Seller, other than the Assumed Liabilities; (vii) lifts the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to permit the Debtor to execute and perform this Agreement, as well as any instruments, notices, waivers or other documents reasonably requested by Buyer in connection herewith, and authorizes and directs the Debtor to take any and all such actions reasonably requested by Seller; (ix) provides that such Approval Order shall be effective immediately upon its entry pursuant to Federal Rules of Bankruptcy Procedure 4001(a)(3) and 6004(h); (x) authorizes the Trustee, on behalf of Seller, to execute and deliver this Agreement and the other documents and agreements contemplated by this Agreement to be executed and delivered by Seller, and to execute and deliver such other agreements and documents and take such other action, as will be consistent with, and necessary or appropriate to, implement, effectuate, or consummate the sale, transfer and assignment of the Purchased Assets to Buyer as contemplated by this Agreement, all without further order of the Bankruptcy Court, and (xi) is in form and substance satisfactory to Buyer in its sole discretion. Buyer shall use reasonable efforts to cooperate with Seller in connection with Seller's efforts to obtain the Approval Order.

13.3    The Trustee has agreed that the Lender Group holds a valid, perfected security interest in all of the outstanding stock of Seller and that, therefore, all proceeds due to Parent as a result of the transactions contemplated by this Agreement shall be paid to Legends Bank, as the lead bank for the Lender Group for application against the Lender Group's allowed secured claim, which Trustee acknowledges to be not less than $18,500,000.00. The Approval Order shall also provide that the payments due Seller pursuant to sections 4.3 and 4.4 of this Agreement shall be made to Legends Bank, as the lead bank for the Lender Group for application to its secured claims against Parent; provided, however, that the Lender Group agrees that the amounts received shall first be used to pay any allowed, unpaid claims against Seller. In exchange for the receipt of all payments due to Parent and the payments due Seller pursuant to sections 4.3 and 4.4 of this Agreement, the Lender Group, other than the Receiver, agrees to support the sale to Buyer in accordance with the terms of this Agreement. As used herein, the term **"Lender Group"** means the Receiver, CedarStone Bank, Lebanon, Tennessee, Citizens Bank, Carthage, Tennessee, Community First Bank & Trust, Columbia, Tennessee, and Legends Bank, Clarksville, Tennessee; and the term **"Receiver"** means the

11

Federal Deposit Insurance Corporation as receiver of Tennessee Commerce Bank, Franklin, Tennessee. If the Approval Order does not provide for payment to the Lender Group of all amounts due to Parent from Seller, after the payment of allowed claims against Seller, as a result of the transactions contemplated by this Agreement or contains other provisions unacceptable to the Lender Group, the Lender Group reserves the right to object to such Approval Order and shall not be required to support this Agreement in such event.

14. General and Miscellaneous Terms and Conditions.

14.1 Sale and Conveyance. This Agreement shall bind and shall inure to the benefit of the heirs, successors, and assigns of the parties, and shall bind all persons who become bound by this Agreement. The parties expressly agree that no further assignments or delegations shall be permitted; provided, however, that Buyer may assign its rights under this Agreement to one or more Affiliates

14.2 Severability. Should any provision of this Agreement be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction, that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provisions of this Agreement.

14.3 Notices. Any notices required by this Agreement shall be deemed to be delivered (a) three business days after a record has been deposited in any United States postal box if postage is pre-paid, and the notice properly addressed to the intended recipient, (b) when received by facsimile, (c) when received by email, or (d) when personally delivered.

| If to Seller, to: | Financial Data Technology Corporation |
| | c/o Gary M. Murphey, Trustee |
| | Resurgence Financial Services, LLC |
| | 3330 Cumberland Blvd., Suite 500 |
| | Atlanta, Georgia 30339 |
| | Murphey@RFSLimited.com |
| | 404.886.9104 Telephone |

| With a copy to | Glenn B. Rose, Esq. |
| (which shall not be | Harwell Howard Hyne Gabbert & Manner, P.C. |
| considered notice): | 333 Commerce Street, Suite 1500 |
| | Nashville, Tennessee 37201 |
| | glenn.rose@h3gm.com |
| | 615.251.1071 Telephone |
| | 615.251.1059 Fax |

12

|                        |                                          |
|------------------------|------------------------------------------|
| If to Buyer, to:       | Fiserv, Inc.                             |
|                        | 255 Fiserv Drive                         |
|                        | Brookfield, WI 53045                     |
|                        | Attn: General Counsel                    |
|                        | 262.879.5532 Fax                         |
|                        |                                          |
| With a copy to         | Michael Jankowski, Esq.                  |
| (which shall not be    | Reinhart Boerner Van Deuren s.c.         |
| considered notice):    | 1000 North Water Street, Suite 1700      |
|                        | Milwaukee, WI 53202                      |
|                        | mjankowski@reinhartlaw.com               |
|                        | 414.298.8234 Telephone                   |
|                        | 414.298.8097 Fax                         |
|                        |                                          |
| If to Lender Group, to:| Legends Bank, Lead Lender                |
|                        | 310 North First Street                   |
|                        | Clarksville, Tennessee 37040             |
|                        | Attention: Thomas E. Bates, Jr., President |
|                        | tbates@legendsbank.com                   |
|                        | 931.572.1234 Telephone                   |
|                        | 931.648.9299 Fax                         |
|                        |                                          |
| With a copy to         | Daniel W. Small, Esq.                    |
| (which shall not be    | 102 Duke Street                          |
| considered notice):    | Ashland City, Tennessee 37015            |
|                        | dsmall@nashvillelaw.net                  |
|                        | 615.252.6000 Telephone                   |
|                        | 615.252.6001 Fax                         |

14.4    Third-Party Beneficiaries. There are no third-party beneficiaries of this Agreement other than the Lender Group to the extent expressly set forth herein. It is expressly agreed that the Lender Group is entitled to bring an action to declare, enforce, and defend the Buyer's payment obligations under this Agreement and the Lender Group shall have the benefit of all of Seller's rights in the event of a breach of Buyer's payment obligations under this Agreement. The Lender Group shall have the right, but not the obligation, to cure any default by Seller under this Agreement to the extent Seller would have the right to cure such default under the terms of this Agreement.

14.5    Captions, Headings, Etc. Section headings used this Agreement are for convenience only. They are not a part of this Agreement and shall not be used in construing it.

14.6    Governing Law. This Agreement is being executed and delivered and is intended to be performed in the State of Tennessee and shall be construed and enforced in accordance with the internal laws of the State of

13

Tennessee, without giving effect to the conflicts of laws principles of such jurisdiction.

15. Amendment, Waiver. Integration and Modifications.

15.1 This Agreement constitutes the entire agreement of Buyer and Seller concerning its subject matter. No amendment, waiver or modification of any provision of this Agreement shall be effective unless it is in writing and signed by Buyer and Seller, and no waiver of any provision of this Agreement, and no consent to any departure by any party from any of the terms hereof, shall be effective unless it is in writing and signed by both parties, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is expressly given.

15.2 No failure on the part of a party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the parties provided herein are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.

15.3 The following rules of construction shall apply to this Agreement: (a) "includes" and "including" are not limiting; (b) "or" is not exclusive; (c) reference to gender includes any gender; reference to plural includes the singular; and reference to the singular includes the plural; (d) "all" includes "any" and "any" includes "all;" (e) defined terms in the singular include the plural, and in the plural include the singular

15.4 Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

15.5 Each party agrees to execute any further documents, and to take any further actions, reasonably requested by the other party to evidence or perfect the rights granted herein or to effectuate the purposes of this Agreement.

16. Responsibility; Access to Records; Certification.

16.1 Buyer may assign its rights under this Agreement or transfer all or any portion of the Purchased Assets to one or more currently existing or newly formed Affiliates (each a "**Newco**").

14

16.2 Notwithstanding Buyer's assignment of its rights hereunder to, or the transfer of all or any portion of the Purchased Assets to, a Newco, Buyer shall remain responsible for the performance of the obligations under the Assumed Contracts and for the Referred Contracts and for the payment of the Purchase Price.

16.3 During the period commencing on the Closing Date and continuing through the date that is 60 days after the third anniversary of the Closing Date, Buyer shall provide to the Trustee and the lead bank for the Lender Group, which is currently Legends Bank, as well as the Receiver, reasonable access, during normal business hours and on not less than five days prior written notice to Buyer, to all such records of Buyer that may be reasonably necessary to determine and confirm that amount of the payment that is required by section 4.4 hereunder.

16.4 Within 60 days after the third anniversary of the Closing Date, the Chief Financial Officer of Buyer shall certify in writing to the Trustee and each member of the Lender Group, and any successor(s) thereof, the Gross Revenues described in Section 4.6 of this Agreement; and disclose in reasonable detail how such Gross Revenues were calculated.

16.5 During the period commencing on the Closing Date and continuing through the third anniversary of the Closing Date, on or before the end of the month following the end of each calendar quarter, Buyer shall provide to the Trustee and the Lender Group a reasonably detailed accounting of the Gross Revenues from the Assumed Contracts both year-to-date and for the most recent calendar quarter and shall separately report revenues from each Assumed Contract, unpaid amounts due from each Assumed Contract (if any), and any changes to the level of services with respect to any Assumed Contract(s).

16.6 All financial and other information provided by Buyer or its Affiliates to the Trustee, any member of the Lender Group, or the Receiver shall (a) be kept confidential by the recipient and not disclosed to any other individual, entity, or party and (b) be used by the recipient only for the purpose of confirming Buyer's performance of its obligations hereunder, and not for any other purposes whatsoever; provided, however, that any such recipient may disclose such information to the extent and only to the extent required under an order of a court of competent jurisdiction or a valid administrative or congressional subpoena.

17. <u>Breach and Attorneys Fees</u>. If any party shall be determined by a court or arbitration panel to be in material breach of this Agreement, then the other party shall be entitled to its attorneys' fees, out-of-pocket expenses, expenses of litigation or arbitration (including expert witness fees, filing fees, and discretionary costs), pre-judgment interest, and post-judgment interest.

15

18. Indemnification.

   18.1  Notwithstanding the Closing, and regardless of any investigation made at any time by or on behalf of Buyer or any information Buyer may have, Seller, on behalf of itself and its successors, hereby covenants and agrees to indemnify, defend and hold harmless Buyer and its Affiliates and their respective officers, directors and agents (each an **"Indemnified Person"**) from and against any claim, damage, liability, loss (which shall include any diminution in value), cost or expense (including, but not limited to, interest, penalties, costs of preparation and investigation and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (collectively, **"Losses"**) imposed on or incurred by any Indemnified Person, directly or indirectly, arising out of, resulting from, or relating to, any (a) inaccuracy in or breach of any representation or warranty of Seller pursuant to this Agreement in any respect, whether or not such Indemnified Person relied thereon or had knowledge thereof, including certificates, schedules and documents delivered pursuant hereto or (b) a failure of Seller to duly perform or observe any term, provision, covenant or agreement to be performed or observed by Seller pursuant to this Agreement or any agreements or other documents contemplated by this Agreement. The obligations of Purchaser to indemnify and hold Indemnified Persons harmless as described herein shall survive Closing and the consummation of the transactions contemplated by this Agreement.

   18.2  Without limiting any other manner of recovery, Buyer and each other Indemnified Person shall be entitled to recover any Losses actually incurred by Buyer or any other Indemnified Person for which indemnification is available under section 18.1 hereof by means of set off in good faith of any such Losses against any payments due Seller under sections 4.2, 4.3, or 4.4 hereof. In addition to the Seller, the Lender Group shall have the right, to the extent Seller has the right, to dispute any such claim or set off.

19. Appendices. All Appendices are incorporated into this Agreement by reference.

20. Dispute Resolution.

   20.1  Seller's Bankruptcy. For so long as Seller's bankruptcy case is pending, Buyer and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to (i) the interpretation and enforcement of this Agreement or any ancillary document executed pursuant to this Agreement, and (ii) the Purchased Assets, and the parties consent to and agree not to contest such exclusive jurisdiction.

16

20.2 <u>Arbitration</u>. Any controversy or claim between or among the parties hereto arising out of or relating in any manner to this Agreement occurring after the closing of Seller's bankruptcy case, including any claim based on or arising from any alleged tort, shall be resolved by mandatory binding arbitration in accordance with the Federal Arbitration Act (or if not applicable, the Uniform Arbitration Act in effect in the State of Tennessee or comparable Tennessee law), and the rules of practice and procedure for the arbitration of commercial disputes of the American Arbitration Association. Judgment upon any arbitration award may be entered in any court having jurisdiction. Any party to this Agreement may bring an action, including a summary or expedited proceedings, to compel arbitration of any controversy or claim to which this Agreement applies in any court having jurisdiction over such action, and/or to seek by restraining order, injunction, attachment, or comparable action to preserve its rights or interests pending arbitration. Such arbitration shall be held in Nashville, Tennessee. Any party shall be entitled to demand an arbitration panel of at least three impartial members if the aggregate of all amounts in dispute in the arbitration equal at least $25,000.

20.3 <u>Waiver of Trial by Jury</u>. By their signatures below, Buyer, the Lender Group and Seller waive any right to a trial by jury as to any matter related to this Agreement, the transactions described herein, and/or any matter related thereto. In addition, any party may demand mandatory binding arbitration in accordance with the terms of this instrument.

*[The remainder of this page has been intentionally left blank. Signature page follows.]*

17

The parties have signed this Agreement as of the day and year first above written in Nashville, Tennessee.

BUYER:

FISERV SOLUTIONS, INC.

By: _____
James W. Cox
Executive Vice President

SELLER:

FINANCIAL DATA TECHNOLOGY CORPORATION

By: _____
Gary Murphey
Trustee for Citizens Corporation,
the sole shareholder of Seller

18

To evidence the Lender Group's consent to this Agreement and to acknowledge its agreement to be bound by its obligations under this Agreement, and in recognition of the third-party beneficiary status granted to Lender Group herein, the Lead Bank signs for the Lender Group:

**LENDER GROUP:**

LEGENDS BANK, on behalf of itself and the Lender Group

By:

Name: Thomas E. Bates, Jr.

Title: President, Legends Bank

19

2013 DEC 17 PM 2: 46

WILLIAM F. ARCHER
CLERK & MASTER
FILED

# EXHIBIT THREE



*Copy*

P.O. Box 1221 • LaFollette, TN 37766 • Telephone: 423/562-4921 • Fax No: 423/566-2383

**Peoples Bank** OF THE SOUTH

February 29, 2012

Financial Data Technologies
ATTN: Jean Ramsey
P.O. Box 31389
Clarksville, TN 37040

Dear Jean,

This notice is to state that we do not wish that our contract automatically renew at expiration on October 1, 2012. At that time we would like to be on a month to month basis pending further notice from us, until we determine that Fidata is heading in a direction that agrees with our goals and objectives.

We appreciate the service Fidata has given us over the past 18 years, and sincerely hope that things turn around, and we can continue our valuable affiliation.

Sincerely,

David Reynolds, President
Peoples Bank of the South

DR/cc

WILLIAM F. ARCHER
CLERK & MASTER
FILED

2013 DEC 17  PM 2:45

# EXHIBIT FOUR

# FISERV EFT

# ELECTRONIC TRANSACTION SERVICES AGREEMENT

## With

# PEOPLES BANK OF THE SOUTH

000862

# TABLE OF CONTENTS

I.    DEFINITION OF TERMS

II.   FISERV EFT RESPONSIBILITIES

III.  CLIENT RESPONSIBILITIES

IV.   INSTALLATION AND CONVERSION

V.    DECONVERSION

VI.   TERMS AND CONDITIONS

VII.  ACCEPTANCE

      SCHEDULE A - EFT Services Profile

      SCHEDULE B - Estimate of Monthly Charges

By acceptance of this agreement, Fiserv Solutions, Inc. d/b/a Fiserv EFT, hereinafter referred to as "Fiserv EFT", agrees to provide the Electronic Transaction Services as set forth in this Agreement to **PEOPLES BANK OF THE SOUTH**, located at **106 W. Central Avenue, LaFollette Tennessee 37766**, hereinafter referred to as the "Client".

The following schedules are part of this Agreement and are incorporated fully into it by this reference:

SCHEDULE A - EFT Services Profile
SCHEDULE B - Estimate of Monthly Charges

## I. DEFINITION OF TERMS

A. <u>ATM</u> - An automated teller machine capable of completing certain transactions for those individuals with approved access via a security method.

B. <u>ATM Driving/Monitoring</u> - The process of providing an ATM with the on-line instructions necessary to process transactions and verifying equipment and telephone operability.

C. <u>Authorization Methods</u> - The operational environment that allows an electronic transaction to be processed against a cardholder's account. Fiserv EFT provides authorization via direct connect on-line host interface, or the batch update options of using a positive or negative file, or a positive file with balances.

D. <u>Card Management</u> - An automated system for plastic card ordering, PIN ordering, card re-issue tracking and "Hot Carding," accessible to Fiserv EFT Clients via On-line Terminal, Dial-up PC, or Batch Processing.

E. <u>Cardholder</u> - The Customer/Member of any Fiserv EFT Client who utilizes the services provided by Fiserv EFT and the Client to complete electronic transactions.

F. <u>Confidential Information</u> - All proprietary or confidential information of either party which is designated in writing as such, and the computer software, manuals and databases provided by Fiserv EFT or utilized by Fiserv EFT in connection with the provision of Electronic Transaction Services to the Client.

G. <u>Consumer Price Index</u> - The All Urban Consumers, All Items, Consumer Price Index for the Portland, Oregon Metropolitan Statistical Area.

H. <u>Data Center</u> - The location where Fiserv EFT maintains the equipment, support and documentation used to provide the Electronic Transaction Services.

I. <u>Electronic Transaction Services</u> - ATM/POS services, including ATM driving, gateway/switching service, regional and national network delivery, multiple transaction authorization methods, settlement, card management, management

reporting and other electronic transaction services as may be offered by Fiserv EFT, and the products (if any) related thereto that are provided by Fiserv EFT.

J.   Hourly Labor Rate - The published rate charged for time spent by Fiserv EFT performing services on behalf of the Client which are not provided under the charges specified in this Agreement.

K.   Networks - Those regional or national ATM/POS associations who provide electronic access to financial transactions for cardholders of member financial institutions.

L.   POS - Point-of-Sale.  The purchase of goods and services via an electronic process and secured plastic card which directly debits a cardholder's account.

## II.   FISERV EFT RESPONSIBILITIES

A.   System Availability; Support

1.  Fiserv EFT will provide access to its Electronic Transaction Services 24 hours a day, 365 days per year, except for planned downtime on certain Monday mornings between 2:00 a.m. and 4:00 a.m. that shall be reserved for scheduled maintenance.  The Client will be notified in advance of such downtime.

2.  If the Electronic Transaction Services are available less than 99 percent of any month (exclusive of planned downtime described in Section II.A.1.) as a result of an error or omission by Fiserv EFT, Fiserv EFT shall credit the monthly fee payable by Client for that month by an amount equal to 5% of the net monthly fees for processing services, excluding telecommunications charges and any pass-through fees from third parties.  If availability is less than 98 percent, Fiserv EFT shall credit the monthly fee by an additional 5% of net monthly fees for each percentage point reduction in System availability below 98%.  Client and Fiserv EFT agree that these reductions in fees constitute a reasonable and fair estimation of the damages arising to the Client from such non-availability of the Electronic Transaction Services during such time.  Fiserv EFT shall not be responsible for any delays or interruptions in the Electronic Transaction Services that may be caused by common carriers, or by other causes beyond Fiserv EFT's control.

3.  Client support assistance will be available during normal business hours, Monday through Friday, with the exception of the following holidays:  New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.  When a holiday falls on Saturday, Fiserv EFT will observe the preceding Friday; when a holiday falls on Sunday, Fiserv EFT will observe the following Monday.

4.  Network Control will continually monitor Networks and all devices connected to Fiserv EFT 24 hours per day, 365 days per year.  The staff of Fiserv EFT will be available via a toll-free number.

-4-

B. Processing

1. Access to Fiserv EFT's Electronic Transaction Services will be for transactions and inquiries described in the EFT Services Profile. Data submitted to Fiserv EFT must be in a form and format acceptable to Fiserv EFT.

2. Fiserv EFT will provide access to the Client, after the execution of appropriate on-line security measures, to allow the Client to perform Cardholder maintenance on its data files in the Fiserv EFT computer.

3. Fiserv EFT will provide monitoring, service and maintenance for equipment according to instructions supplied by the Client.

4. Fiserv EFT will provide its standard output reports to the Client for daily, weekly, monthly and annual transactions.

5. Fiserv EFT will make available to the Client all enhancements to the Electronic Transaction Services in exchange for the additional fees, if any, charged by Fiserv EFT for such enhancements.

C. Hardware and Datacommunications

1. Fiserv EFT will install the equipment outlined in the EFT Services Profile, and will coordinate with other third party vendors to effectively integrate the Client's data processing and ATM environments into the data processing and ATM environments of Fiserv EFT.

2. If any or all of the communication network should fail, Fiserv EFT, or Fiserv EFT's third party agents, will locate the problem and correct any malfunction not associated with equipment or circuits provided by common carriers. If the problem is located in the equipment or circuits of the common carriers, Fiserv EFT will contact the common carriers and request that the problem be corrected.

3. Maintenance fees incurred by Fiserv EFT for repairs caused by faulty electrical power, inadequate physical facilities, physical abuse, or other Client supplied or controlled factors will be reimbursed by the Client.

D. Training

Fiserv EFT may provide training to the Client's personnel on an ongoing basis after the completion of the installation process. Such ongoing training will be conducted at a designated Fiserv EFT facility, and will be provided to the Client at Fiserv EFT's then current rates.

E. Retention of Backup Records

Fiserv EFT will retain historical files at a location separate from the Data Center sufficient to recreate files for the most recent week and month-end. A daily transaction log of all Client transactions for the most recent ten business days will also be maintained at this off-site location.

F.  Changes in Output

Fiserv EFT may replace, discontinue or change the form of any report or other output whenever Fiserv EFT determines that it is necessary or desirable as a result of changes in existing laws or regulations or because of the continuing improvement of the Electronic Transaction Services provided.

G.  Regulatory Compliance

1.  The Client is solely responsible for ascertaining that its use of the Electronic Transaction Services complies with all applicable state and federal statutory and regulatory requirements. Fiserv EFT agrees, however, to monitor such applicable requirements, and to make changes in the Electronic Transaction Services as Fiserv EFT believes are necessary to bring the Electronic Transaction Services into compliance with such requirements.

2.  At the written request of the Client or a governmental regulatory authority of the Client, Fiserv EFT shall make output available to a governmental regulatory authority for purposes of audits and supervisory examinations of the Client. The Client shall pay Fiserv EFT its then current rate for any time devoted to such examination, audit, consulting or other similar related effort.

3.  By entering into this Agreement, Fiserv EFT agrees that the Office of Thrift Supervision, FDIC, or other regulatory agencies having authority over Client's operations shall have the authority and responsibility provided to the regulatory agencies pursuant to the Bank Service Corporation Act, 12 U.S.C. 1867(C) relating to service performed by contract or otherwise.

4.  On an annual basis, Fiserv EFT shall engage a qualified, independent auditing firm to review and evaluate its internal control environment, in accordance with relevant AICPA audit standards (a "SAS-70 Type II" Audit). Upon completion of the engagement, a copy of the service auditor's report shall be made available to Client at Fiserv EFT's then current rate.

## III.  CLIENT RESPONSIBILITIES

A.  Submission of Data

1.  The Client agrees to use its best efforts to enter, transmit or otherwise furnish new or updated Cardholder information in a current and timely fashion.

-6-

2. The Client agrees to send and receive transmissions within the timeframes outlined in the installation process.

B.    Data Review

The Client agrees to review, verify, audit and control dissemination of all output as it relates to this Agreement, initially during the certification and installation process and thereafter throughout the term of this Agreement.

C.    Security Administration

The extent and effectiveness of the Client's logical security administration program and access controls as they relate to this Agreement are the sole responsibility of the Client.

D.    Hardware

1. The Client will obtain written approval from Fiserv EFT prior to connecting any equipment to the datacommunication equipment provided by Fiserv EFT. Equipment, if any, connected to Fiserv EFT's system under this Agreement must be configured in a manner acceptable to Fiserv EFT. The Client agrees to pay Fiserv EFT for the testing and acceptance of such equipment by Fiserv EFT at the Hourly Labor Rate.

2. The Client shall at all reasonable times permit the authorized personnel of Fiserv EFT and the equipment manufacturers to have access to any Fiserv EFT owned or leased equipment provided under this Agreement, and shall permit removal of such equipment upon termination of this Agreement.

E.    Regulatory Compliance

1. The Client will maintain all necessary audit reports as may be required by any governmental regulatory authorities having jurisdiction over the Client or its business.

2. The Client is solely responsible for compliance with all state and federal statutory and regulatory requirements governing the Client and its business, including applicable disclosure requirements and reporting requirements to its Cardholders.

F.    Financial Responsibility for Cardholder Transactions and Network Fees

1. The Client hereby assumes exclusive financial responsibility for all debit transactions charged to the accounts of Client's Cardholders, including, but not limited to, counterfeit transactions and fraudulent transactions.

2. The Client shall be solely responsible for all Network fees, dues, assessments, sponsorship costs and other service fees related to the Network ATM/POS program(s) in which Client participates. Fiserv EFT shall pass through any such Network fees and expenses at cost.

G. <u>Training</u>

1. The Client shall be solely responsible for ensuring that:

(a) all of Client's employees and representatives obtain proper and sufficient training from Fiserv EFT and/or any applicable Network in connection with the operating rules and regulations of said Network(s) and the procedures described in Fiserv EFT's documentation; and

(b) all of Client's employees and representatives comply with the operating rules and regulations of all Network(s) in which Client participates and the procedures described in Fiserv EFT's documentation.

## IV. INSTALLATION AND CONVERSION

A. An installation schedule and calendar, including milestone dates, will be mutually agreed to and established between Fiserv EFT and the Client.

B. The Client will provide Fiserv EFT with test conversion data and actual conversion data in form and format acceptable to Fiserv EFT in accordance with the installation calendar and schedule as defined in Section IV.A.

C. The Client will be responsible for verifying the accuracy of test conversion output, and agrees to use its best efforts to verify the accuracy of the conversion output. The Client will notify Fiserv EFT immediately concerning any questions or errors discovered as a result of such verification.

D. The Client agrees to notify Fiserv EFT immediately of any questions or concerns regarding the test conversion output, but in any case no later than the final date for conversion program changes as defined in the installation schedule and calendar.

E. Fiserv EFT will use its best efforts to address and resolve all questions and concerns raised by the Client prior to actual conversion. The Client will notify Fiserv EFT within ten (10) business days after installation date of problems with actual conversion output. After this period, the conversion will be considered complete and accepted by the Client.

## V. DECONVERSION

Upon termination or cancellation of this Agreement, Fiserv EFT agrees to provide magnetic tape copies of the Client's data files in Fiserv EFT's possession at a cost equal to Fiserv EFT's then published rates. In addition, Fiserv EFT and the Client will each assist

the other party in an orderly termination of this Agreement and the transfer of all assets hereof, tangible or intangible, as may be necessary for the orderly nondisruptive business continuation of Fiserv EFT and the Client.

## VI. TERMS AND CONDITIONS

### A. Initial Term

The Initial Term of this Agreement shall commence on the date Client signs this Agreement (Effective Date) and terminate on the last day of the 60th month after the Effective Date, unless earlier terminated in accordance with the terms of this Agreement.

### B. Renewal

Either party may elect not to renew this Agreement at its expiration without penalty, if written notice of non-renewal is given to the other party not less than 180 days prior to the expiration of the Initial Term or any subsequent renewal term. Unless the notice of non-renewal is provided in accordance with this Section VI.B, this Agreement shall automatically be renewed for a renewal term equal to 60 months, commencing on the day after the expiration date of the preceding term.

### C. Fees

1. Fees for use of the Electronic Transaction Services shall be at the rate or amount set forth in Schedules B and C to this Agreement. Fees for use of additional Electronic Transaction Services for which there is no rate indicated on the attached schedules shall be at Fiserv EFT's standard published rate then in effect, or a reasonable rate determined by Fiserv EFT. The quantity of usage of the ATM Services by the Client shall be determined by Fiserv EFT's accounting system.

2. The obligation to pay fees to Fiserv EFT for the use of the Electronic Transaction Services shall commence for the month in which the Effective Date occurs. Fees are due and payable monthly, upon receipt of invoice. Monthly fixed fees will be billed monthly in advance. In the event the Client defaults in the payment of any amount due to Fiserv EFT hereunder beyond the thirtieth day after the same is due, the Client shall pay Fiserv EFT a late charge on all amounts due but unpaid for more than thirty (30) days, such late charge to be calculated at a rate of 1.5 percent per month, and such late charge to be prorated for each day payment by the Client is delayed beyond the thirtieth day. Should it be determined that a disputed invoice was invalid, Fiserv EFT will credit the Client an amount equal to the total of any such invalid fees.

3. Fiserv EFT shall have the right to increase fees for all Electronic Transaction Services upon 90 days prior notice to the Client; however, no fee may be increased for the first twelve (12) months of this Agreement. Price increases after the first 12 months of this Agreement shall not exceed 8.5 percent in total per year; provided, however, that if the change in the Consumer Price Index exceeds 8.5 percent in the 12 month period preceding any anniversary date of this Agreement, Fiserv EFT shall then have the right to increase prices above the 8.5 percent limit, but not to exceed the Consumer Price Index. Notwithstanding the foregoing limitations, Fiserv EFT shall have the right to bill the Client the full amount of any increases in third-party telecommunications costs, Network pass-through fees or other out-of-pocket expenses incurred on behalf of Client as of the same effective date such increases are billed to Fiserv EFT.

4. If applicable, Client shall pay any sales, use and personal property taxes arising out of this Agreement.

5. Special development work will be requested and approved in writing by the Client and performed by Fiserv EFT on a bid and approval basis. Enhancements and modifications made to the system at the Client's request will be made at Fiserv EFT's prevailing development rates. All enhancements and modifications will remain the sole property of Fiserv EFT.

D.    Network Agreement

Fiserv EFT provides access to electronic fund transfer Networks for the purpose of participating in the exchange of transactions on an inter-Network basis. The Client may participate in these Networks subject to the following terms and conditions:

1. If required by the Network(s) selected by the Client, the Client will enter into an agreement with each Network in which Client elects to participate, and will operate within and abide by the operating rules established by each applicable Network, and pay any associated fees imposed by that Network and/or the Network sponsor.

2. The clearing of transactions and reconciliation of payments will be in accordance with settlement procedures established between Fiserv EFT and the applicable Network.

3. Settlement Account:

a) Client shall establish a demand deposit account at Client's institution, which is accessible by Fiserv EFT (the "Settlement Account"), and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv EFT to perform the settlement procedures set forth herein. Client authorizes Fiserv EFT, at Client's expense, to access the Settlement Account

through the Automated Clearing House ("ACH") or by wire transfer in order to maintain Client's required Settlement Deposit (defined below), or for any purpose described in paragraph VI.D.3 (c) below, and, similarly, for the transfer of funds owing to Client in the Settlement Account. Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv EFT for the above-referenced purposes and shall ensure that Fiserv EFT shall be able to make the withdrawals and transfers required under this Agreement by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv EFT.

b) Client shall maintain on deposit with Fiserv EFT, in an account controlled by Fiserv EFT, an amount of funds (the "Settlement Deposit") equal to the average daily "Net Settlement Position" of the Client multiplied by 4 (four) days. The average daily Net Settlement Position is equal to the net sum of all Network settlement entries debited or credited to Client's Settlement Account during the month, divided by 30 (thirty) days. If the Net Settlement Position is a credit balance, then no Settlement Deposit shall be required. The initial Settlement Deposit will be estimated by Fiserv EFT prior to the Effective Date based on anticipated transaction volumes supplied by Client. Fiserv EFT may adjust the Settlement Deposit from time to time upon prior written notice to Client, based on actual transaction volume history and seasonal factors.

c) Fiserv EFT may use Client's Settlement Account or, if applicable, Client's Settlement Deposit for the following purposes:

(i)     daily settlement of all incoming Network transactions;
(ii)    daily settlement of all fees and assessments charged by the Network (or Network sponsor) to the Client as a participating member institution;
(iii)   settlement of all outgoing Network transactions not more than three (3) business days following receipt by Fiserv EFT of such outgoing transactions from Client; and
(iv)    settlement of all fees and assessments billed by Fiserv EFT to the Client for the use of the Electronic Transaction Services.

E.    Cancellation

The Client may terminate this Agreement at any time after the execution date of this Agreement by providing Fiserv EFT not less than one-hundred eighty (180) days prior written notice of termination, and making payment to Fiserv EFT of a cancellation fee equal to 80 percent of the greater of: (1) the average monthly fees which have been billed by Fiserv EFT during all months prior to the notice of termination, or (2) the "Total Estimate of Monthly Charges" shown on Schedule B attached hereto, multiplied by the number of months remaining in the then-current term after the anticipated deconversion date, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of

termination. The cancellation fee will be due the date of written notification of termination and payable thirty (30) days thereafter.

F.  Post Termination Processing

Fiserv EFT will continue to provide Electronic Transaction Services for the Client beyond the termination date of this Agreement, if necessary; however, the monthly processing fee for Electronic Transaction Services provided after the termination date will be charged at 1.5 times the then-current rate. This extended service is limited to a period of 12 months after the termination date. Any partial month's processing will be prorated for actual days of service provided.

G.  Notice

Any notice under this Agreement shall be delivered in person or sent by United States registered or certified mail, postage prepaid, addressed to the parties and the addresses stated on the signature page of this Agreement or such other addresses as either party may designate by written notice to the other.

H.  Limited Warranties

Fiserv EFT warrants to Client that Fiserv EFT programs will conform as to all substantial operational features, to Fiserv EFT's current published specifications as stated in its current manual and will be free of defects which substantially affect system performance. Fiserv EFT will exercise due care in processing the Client's data, but accepts responsibility only for errors caused solely by the malfunction of Fiserv EFT's hardware or the failure of Fiserv EFT's personnel or programs. Fiserv EFT will correct errors in its hardware or programs at its own expense and within a reasonable time, provided the Client notifies Fiserv EFT of the error within ten (10) business days of receipt of output containing or disclosing the error. Fiserv EFT shall assist the Client in correcting other errors or inconsistencies, provided that Fiserv EFT shall be paid for such assistance at its then-current Hourly Labor Rate. Fiserv EFT shall not be responsible for errors resulting from any other causes, nor shall Fiserv EFT be liable for any delays in processing or in delivery of output, or any inability to provide services required under this Agreement, if such delays or inability are due to failure or unavailability of communications lines or other causes or conditions beyond Fiserv EFT's reasonable control.

I.  Disclaimer of Warranties

1. THE WARRANTIES SET FORTH IN VI.H ABOVE ARE LIMITED WARRANTIES, AND ARE THE ONLY WARRANTIES MADE BY FISERV EFT WITH RESPECT TO ELECTRONIC TRANSACTION SERVICES. THE EXPRESS WARRANTIES SET FORTH IN SECTION VI.H OF THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED

WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED AND EXCLUDED BY FISERV EFT.

2. THE EXPRESS WARRANTIES MADE BY THE MANUFACTURERS ARE ASSIGNED BY FISERV EFT TO THE CLIENT IN LIEU OF ALL OBLIGATIONS OR LIABILITIES ON THE PART OF FISERV EFT FOR DAMAGES, INCLUDING, BUT NOT LIMITED TO, COMPENSATORY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE USE OR PERFORMANCE OF THE DATA PROCESSING EQUIPMENT. EXCEPT FOR THE EXPRESS WARRANTIES MADE BY THE MANUFACTURERS OF THE DATA PROCESSING EQUIPMENT PROVIDED BY FISERV EFT UNDER THIS AGREEMENT, FISERV EFT DISCLAIMS ALL WARRANTIES ON ANY DATA PROCESSING EQUIPMENT PURCHASES HEREUNDER, INCLUDING, WITHOUT LIMITATION, ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

J. Limitation on Damages

1. Fiserv EFT's liability, if any, arising out of or in any way related to its performance under this Agreement, including, but not limited to, liability for authorizing or failing to authorize transactions on behalf of the Client's customers, shall be limited to general money damages in an amount not to exceed the total charges paid by the Client hereunder during the two (2) months immediately preceding the date upon which Client's claim for such damages arose. Such general money damages shall be the Client's exclusive remedy. Fiserv EFT shall have no liability for special, consequential, indirect or incidental damages, or any damages or sums paid by the Client to third parties, even if Fiserv EFT has been advised of the possibility of such damages.

2. The Client and Fiserv EFT agree that these damage limitation provisions are reasonable in light of all present and predictable circumstances, including, but not limited to, the amount of fees charged by Fiserv EFT under this Agreement and the possible amount of actual damages to the Client.

K. Indemnities

1. Client shall defend, indemnify and hold Fiserv EFT harmless from any claims, demands, actions or causes of actions, loss or liability, including costs and reasonable attorneys' fees incurred in defending the same brought against Fiserv EFT by any governmental authority, business entity or customer of the Client arising out of a violation of laws and regulations governing the Client's business or arising out of or in any way connected with the Client's conduct or action with respect to this Agreement.

2. Fiserv EFT warrants that all software of which it is the owner that is utilized in the Electronic Transaction Services is free and clear of claims by any third party. Fiserv EFT will defend any suit or proceeding brought against the Client insofar as such suit or proceeding is based on a claim that such software, or any part thereof, constitutes an infringement of any patent or copyright of the United States, if Fiserv EFT is notified promptly in writing of such claim of infringement and given authority, information and assistance to handle the claim and defense of any such suit or proceeding. Fiserv EFT will pay all damages and costs awarded against the Client resulting from the alleged infringement of the software. If the software is found to constitute an infringement, and the use thereof is enjoined, Fiserv EFT shall, at its own expense and at its option, either procure for the Client the right to continue to use the Software, or replace the same with a non-infringing product, or modify the software to make it non-infringing.

L.    Confidentiality of Data

Fiserv EFT and the Client agree and acknowledge that the Confidential Information of each party shall remain the property of such party, and that neither party shall use Confidential Information except in connection with the Electronic Transactions Services provided under this Agreement. The Confidential Information is made available on a limited use basis solely in connection with this Agreement, and neither party will disclose or otherwise make available the Confidential Information,, in whole or in part, but neither party shall bear responsibility for the disclosure, inadvertent or otherwise, of information that is established to be in the public domain, is in such party's possession prior to receipt of the same from the other party, is rightfully obtained from a third party or is disclosed pursuant to judicial or governmental process. Upon termination of this Agreement, all copies of the Confidential Information shall be returned to the owner of the Confidential Information. Fiserv EFT agrees that it will not use any nonpublic personal information about Client's customers in any manner prohibited by Title V of the Gramm-Leach-Bliley Act. Fiserv shall implement and maintain appropriate measures designed to meet the objectives of the guidelines establishing standards for safeguarding non-public Client customer information as adopted by any federal regulatory agencies having jurisdiction over Client's affairs. These measures will include taking appropriate actions to address incidents of unauthorized access to Client's sensitive customer information, including notification to Client as soon as possible of any such incident.

M.    Arbitration

Any dispute or controversy arising out of this Agreement, or its interpretation, shall be submitted to and resolved by arbitration to be held in the City of Portland, Oregon, under the rules then prevailing of the American Arbitration Association. Any award in such arbitration shall be final and binding upon the parties and the judgment thereon may be entered in any court of competent jurisdiction. No suit

or action for breach of this Agreement may be brought in any court prior to the exhaustion of the arbitration proceedings.

N.  Limitations on Actions; Costs and Attorneys' Fees

1. No action, regardless of form, arising out of the transactions under this Agreement may be brought by either party more than one (1) year after the cause of action has accrued.

2. In the event suit, action, litigation or arbitration is instituted to enforce any of the terms of this Agreement, to interpret the terms of this Agreement or to allege a breach of this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable costs and attorneys' fees in arbitration, at trial or on appeal of such suit or action, in addition to all other sums provided by law.

O.  Force Majeure

Fiserv EFT shall not be liable for any failure of its performance under this Agreement if such failure results, whether directly or indirectly, from fire, explosion, strike, freight embargo, act of God, or of the public enemy, war, civil disturbance, act of any government, de jure or de facto, or any agency or official thereof, labor shortage, transportation, contingencies, unusually severe weather, default of manufacturer or supplier as a subcontractor, quarantine or restriction, epidemic, or catastrophe, lack of timely instructions or essential information or events otherwise beyond the control of Fiserv EFT.

P.  Assignment

The Client and Fiserv EFT agree that either party shall have the right to assign this Agreement or any of its duties and obligations hereunder to any third party or successor in interest, provided that any such assignee shall be obligated under this Agreement.

Q.  Governing Law

This Agreement will be governed by the laws of the State of Oregon.

R.  Exclusivity

Client agrees that Fiserv EFT shall be the exclusive provider of the Electronic Transaction Services defined herein. During the term of this Agreement, Client may not enter into any agreement with any other entity to provide the Services (or equivalent services) provided hereunder without the prior written consent of Fiserv EFT.

## VII.   ACCEPTANCE

A.   The Client acknowledges that it has read this Agreement, including all the terms and conditions and agrees to be bound by its terms, and furthermore agrees that it constitutes the entire agreement between the parties and supersedes all prior agreements and proposals, oral and written, and all negotiations, conversations and discussions which may heretofore have taken place between the parties related to the subject matter of this Agreement.  The Client acknowledges that it is free of any contractual obligation which would prevent the Client from entering into this Agreement as of this date or the proposed Effective Date.

B.   The provisions and prices of this Agreement will be binding upon Fiserv EFT and the Client upon acceptance by Fiserv EFT at Portland, Oregon, provided it is signed and dated by the Client and returned to Fiserv EFT at the address listed below by October 25, 2008.

**Fiserv EFT**
**4550 S.W. Macadam Avenue**
**Portland, Oregon 97239**
**Attention:  Contract Administrator**

**CONTRACT ACCEPTANCE:**

PEOPLES BANK OF THE SOUTH

By: _~~Chris M. Cooper AVP~~_
**Authorized Signature**

_Chris M. Cooper_
**Name (please print)**

_AVP + Controller_
**Title**

_9-30-08_
**Date**

**CONTRACT ACCEPTANCE:**

Fiserv Solutions, Inc. d/b/a Fiserv EFT

By: _~~Vincent R. Brennan~~_
**Authorized Signature**

**Vincent R. Brennan**
**Name (please print)**

**Executive Vice President of Client Relations**
**Title**

_10/6/08_
**Date**

-16-

# ADDENDUM

This Electronic Transaction Services Agreement by and between **Fiserv EFT** and **PEOPLES BANK OF THE SOUTH** hereby amended as follows:

1. Page 9, Section VI.A.  **Initial Term**  Revise as follows:

   "The Initial Term of this Agreement shall commence on the date Client signs this Agreement (Effective Date) and terminate on the last day of the **65th month** after the Effective Date, unless earlier terminated in accordance with the terms of this Agreement."

Executed on the dates set forth below by the undersigned authorized representatives of the Client and Fiserv EFT.

**CONTRACT ACCEPTANCE:**

**CONTRACT ACCEPTANCE:**

PEOPLES BANK OF THE SOUTH

Fiserv Solutions, Inc. d/b/a Fiserv EFT

By: _____
   **Authorized Signature**

By: _____
   **Authorized Signature**

Chris M. Cooper
**Name (please print)**

**Vincent R. Brennan**
   **Name**

AVP & Controller
**Title**

**Executive Vice President of Client Relations**
   **Title**

9-30-08
**Date**

10/6/08
   **Date**

# Fiserv EFT                                    Schedule A

Institution: _____ The Peoples Bank of the South _____

Contact name: _____ Chris Cooper _____ Phone: _(423)562-4921_

Cards issued:   ☒ ATM      ☒ VCC      ☐ MCD

Authorization:  ☐ PBF      ☐ CAF only      ☒ Host – standin auth: _____

DDA processor: _Fidata_____   ☐ In-house   ☒ Service bureau

ATM driving:    ☒ Yes (how many 4)      ☐ No

| Network Name | Iss | Acq |
|---|---|---|
| ACCEL/EXCHANGE | ☒ | ☒ |
| AFFN | ☐ | ☐ |
| AMEX | N/A | ☐ |
| CIRRUS | ☒ | ☒ |
| CO-OP | ☐ | ☐ |
| CU24 | ☐ | ☐ |
| CUIG | ☐ | ☐ |
| DISCOVER | N/A | ☐ |
| EBT (STATE:        ) | N/A | ☐ |
| INTERLINK | ☐ | ☐ |
| ITS/SHAZAM | ☐ | ☐ |

| Network Name | Iss | Acq |
|---|---|---|
| MASTERCARD | ☐ | ☐ |
| NETS | ☐ | ☐ |
| NYCE | ☐ | ☐ |
| PLUS | ☐ | ☒ |
| PRESTO | ☐ | ☐ |
| PULSE | ☐ | ☐ |
| STAR NORTHEAST (MAC) | ☐ | ☐ |
| STAR SOUTHEAST (HONOR) | ☒ | ☒ |
| STAR WEST | ☐ | ☐ |
| TRANSFUND (EPOC Only) | ☐ | N/A |
| VISA | ☒ | ☐ |

Notes/other: _____

Prepared by: _T Johnson_____   Date: _9/26/08_____

| | Quantity | Amount | Total | ICBA Discount |
|---|---|---|---|---|
| **On-line Authorization** | | | | |
| On-Line Interface Maintenance Fee | 1 | $250.00 | $225.00 | -10.00% |
| | | | | |
| **File Storage** | | | | |
| Monthly File Storage Fee | 1 | $150.00 | $135.00 | -10.00% |
| CAF File Data Base Storage Fee | 4,418 | $0.03 | $119.29 | -10.00% |
| | | | | |
| **Transactions** | | | | |
| ATM/POS Monthly Minimum $250 | | | | |
| CVi 14 Day Access | 1 | $0.00 | $0.00 | -10.00% |
| Transaction Fees (Is,Ou,Ac,Si)++ | 16,845 | $0.045 | $682.22 | -10.00% |
| | | | | |
| **Debit Card Transactions** | | | | |
| Monthly Minimum $250.00 | | | | |
| | | | | |
| Visa Check Transaction Authorizations | 15,948 | $0.06 | $861.19 | -10.00% |
| Visa Check Transactions Posted | 14,819 | $0.06 | $800.23 | -10.00% |
| | | | | |
| **Debit Card Back Office Support** | | | | |
| Visa Check Back Office - Per Card Fee | 3,970 | $0.05 | $178.65 | -10.00% |
| Visa Check Back Office - Hot Card Service | 2 | $8.00 | $14.40 | -10.00% |
| Charges for Arbitration, etc. | | Pass-through | | |
| | | | | |
| **Debit Card Activation** | | | | |
| Card Activation Monthly Fee | 1 | $25.00 | $22.50 | -10.00% |
| Card Activation Transactions | 287 | $1.00 | $258.30 | -10.00% |
| | | | | |
| **Neural Networks** | | | | |
| eNFACT Case Mgmt Scoring - per transaction | 31,630 | $0.01 | $284.67 | -10.00% |
| eNFACT Per Case Created | 15 | $2.50 | $33.75 | -10.00% |
| | | | | |
| **Networks** | | | | |
| Exchange Monthly Membership Fee | 1 | $60.00 | $60.00 | |
| Exchange Monthly Membership Credit | 1 | ($60.00) | ($60.00) | |
| ICBA-Cirrus Pass-through Card Fee | 6,185 | $0.005 | $30.93 | |
| ICBA Cirrus Membership Fee | 1 | $50.00 | $50.00 | |
| ICBA Plus Membership Fee | 1 | $50.00 | $50.00 | |
| ICBA Sponsorship Fee | 1 | $15.00 | $15.00 | |
| *(Client is responsible for all Network pass-through fees incurred by Fiserv EFT on Client's behalf.)* | | | | |
| | | | | |
| **Connectivity** | | | | |
| Web Connect Maint Fee | 1 | $50.00 | $50.00 | |
| Web Connect Port Access Fee | 1 | $50.00 | $50.00 | |
| Web Connect Per Security Token Maint Fee | 10 | $5.00 | $50.00 | |
| | | | | |
| File Maintenance | | | | |
| Per PC Input Record Maintenance | 616 | $0.05 | $27.72 | -10.00% |

*Client is subject to Network Operating Rules, Fees, and Settlement Funding Requirements.*

## Schedule B
## Estimate of Monthly Charges
## Peoples Bank of the South

| | Quantity | Amount | Total | ICBA Discount |
|---|---|---|---|---|
| **ATM Monitoring and Support** | | | | |
| Per ATM Driving Fee | 4 | $60.00 | $216.00 | -10.00% |
| A98 Comvelope Support - Per ATM | 1 | $0.83 | $0.75 | -10.00% |
| | | | | |
| **Card Management** | | | | |
| Per Card Record Storage Fee | 4,418 | $0.03 | $119.29 | -10.00% |
| TranBlocker Monthly Fee - Per Bin | 1 | $150.00 | $135.00 | -10.00% |
| | | | | |
| **Surcharging** | | | | |
| Surcharge Transactions | 1,420 | $0.05 | $63.90 | -10.00% |
| | | | | |
| **Business Continuity** | | | | |
| Monthly Transaction Minimum $25.00 | | | | |
| Monthly Business Continuity Fee | 31,653 | $0.00657 | $207.96 | |
| | | | | |
| **SUB-TOTAL ESTIMATE OF MONTHLY CHARGES** | | | $4,681.73 | |
| | | | | |
| **Telecommunications and Equipment** | | | | |
| Telecommunications Equip-Lease/Maint | 2 | $74.75 | $299.00 | |
| Telecommunications - Data Line @ cost plus 10% | 4 | $189.17 | $756.68 | |
| | | | | |
| **TOTAL ESTIMATE OF TELECOM MONTHLY CHARGES** | | | $1,055.68 | |
| | | | | |
| **GRAND TOTAL ESTIMATE OF MONTHLY CHARGES** | | | $5,737.41 | |

*(handwritten: CC 9/30/08)*

| This document prepared on: | 5/13/08 |
|---|---|

*Client is subject to Network Operating Rules, Fees, and Settlement Funding Requirements.*

2013 DEC 17 PM 2:45

WILLIAM F. ARCHER
CLERK & MASTER
FILED

# EXHIBIT FIVE



Copy

P.O. Box 1221 • LaFollette, TN 37766 • Telephone: 423/562-4921 • Fax No: 423/566-2383

# Peoples Bank
## OF THE SOUTH

January 23, 2013

Fiserv EFT
4550 S.W. Macadam Avenue
Portland, Oregon 97239
Attn: Contract Administrator

To Whom It May Concern:

The purpose of this letter is to inform Fiserv EFT of our intent to cancel our contract signed and dated September 30, 2008. We will be converting to the Jack Henry platform on June 7, 2013 and will be utilizing their EFT services. If you have any questions please contact us.

Sincerely,

David Reynolds, President
Peoples Bank of the South

DR/cc

*Mailed Certified to FiservEFT 1/24/13*
*Mailed Copy to Jean Ramsey @ Fidelity/Fiserv 1/24/13*
*201 Jordan Rd*
*Franklin TN 37067*

# IN THE GENERAL SESSIONS COURT OF GREENE COUNTY, TENNESSEE

**CREDIT ACCEPTANCE CORPORATION**  \*

    **Plaintiff(s),**  \*

**vs.**  \*  Civil Action File No. : **13V934**

**JIMMY SULLIVAN**  \*

    **Defendant(s).**  \*

---

## POST JUDGMENT SUBPOENA FOR PRODUCTION OF DOCUMENTS TO NON-PARTY

COPY

TO:    JIMMY SULLIVAN        Wells Fargo Bank, N.A.
1711 BEAR HOLLOW RD      c/o Corporation Service Co.
GREENEVILLE, TN 37745-2321   2908 Poston Ave
                                        Nashville TN 37203
                                        \*\*\*Serve by Davidson County Sheriff\*\*\*

      **YOU ARE HEREBY COMMANDED** to produce at the law offices of David L. Mendelson, Mendelson Law Firm, 799 Estate Place, Memphis, TN 38120, on the 11th day of February, 2014 at 5:00 P.M. those documents identified in Exhibit "A" attached hereto, which are in your possession and control. Alternatively, you may comply with the herein Subpoena by providing legible and complete copies of the identified documents and mailing them to counsel for Plaintiff by the 11th day of February, 2014.

      A copy of the subpoena has been served upon the customer in accordance to Tennessee Code Annotated Section 45-10-106.

      **HEREIN FAIL NOT, UNDER PENALTY OF LAW.**

      **WITNESS** my hand and seal of this Court this 16 day of Dec , 2013.

*Pam Venerable by M. Bailey*

**CLERK, GENERAL SESSIONS COURT OF GREENE COUNTY**

### State of Tennessee

Came to hand and executed as commanded on _____
                         This ___ day of _____ 2013.

                         By: _____
                         SHERIFF

## EXHIBIT "A"

All inquiries concern DEFENDANT <u>JIMMY SULLIVAN</u> , SS# ***-**-7322.

1.    Please produce legible copies of the last two (2) payments made by or on behalf of DEFENDANT on any obligation to you or your company.

2.    Please produce the personal financial statement submitted by DEFENDANT.

3.    Produce the credit application, credit card and/or loan application on file in the name of the DEFENDANT.

4.    *Do Not Produce Anything Else* .

If your company is a bank or other financial institution, please also see #5 below.

5.    Please produce copies of the most recent monthly banking statement rendered for each demand deposit account to which DEFENDANT, is a signatory or account holder.

### NOTICE TO RECIPIENTS OF SUBPOENA

JIMMY SULLIVAN                    Wells Fargo Bank, N.A.
1711 BEAR HOLLOW RD              c/o Corporation Service Co.
GREENEVILLE, TN 37745-2321       2908 Poston Ave
                                 Nashville TN 37203

We obtained your name from a credit bureau, the tax assessors office or from other sources indicating that you have 1) done business with, 2) extended credit to or considered doing so, 3) or for some other reason are conducting business with the defendant listed on the subpoena.

It is not necessary for you to actually appear at my office if you would rather comply with this subpoena by mailing or faxing your response to my office. It is OK to send your response by regular mail. (If your response is over five (5) pages, please mail rather than fax.) **If you should have any questions, please call us at (901)763-2500. Our fax number is (901)763-2525.**

We obtained your name from a credit report. While you may not have extended credit to the defendant we would appreciate any application that you may have kept on file. If you do not have any such document, please <u>check here</u> ☑ and return this to our office so that we can note your response on our records. This will be sufficient compliance. Our mailing address is

Mendelson Law Firm
P.O. Box 17235
799 Estate Place
Memphis, Tennessee 38187-0235