UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| PEOPLES BANK OF THE SOUTH, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 3:14-1104 |
| | ) | Judge Aleta A. Trauger |
| FISERV SOLUTIONS, INC., | ) | |
| Defendant. | ) | |

# MEMORANDUM

The court conducted a two-day bench trial in this breach of contract action on December 6-7, 2016. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth herein its findings of fact and conclusions of law. For the reasons discussed more fully below, the court will enter judgment in favor of the plaintiff, Peoples Bank of the South, in the amount of $148,700, plus attorney's fees and costs.

# CLAIMS

The Complaint contains the following five counts: Count I alleges that the defendant breached the de-conversion fee schedule in a data processing agreement entered into between the plaintiff bank and a predecessor-in-interest to the defendant (the "Core Services Agreement"); Count II alleges the defendant's breach of a separate, independent contract between the plaintiff and the defendant for electronic fund transfer services (the "EFT Agreement"); Count III alleges the defendant's breach of an oral agreement between the plaintiff and the defendant to modify yet another contract between the plaintiff and a predecessor-in-interest to the defendant for software licensing (the "Licensing Agreement"); Count IV alleges that the defendant collected improper charges from the plaintiff related to an anticipated contract that was never signed by

1

the plaintiff (the nature of which was not clarified in the Complaint but that was referred to at trial as the "Accell Network Charges");[1] and Count V alleges the defendant's breach of the covenant of good faith and fair dealing. (Docket No. 1-1.)

Count II was dismissed by the court following the pre-trial conference on December 2, 2016, due to a binding arbitration clause in the EFT Agreement. (Docket No. 88.)

During opening statements at trial, counsel for the plaintiff withdrew Count III and stated that Count V had been dismissed by the court on Summary Judgment and was no longer at issue.[2]

Thus, the only claims that were tried before the court are Count I for breach of the Core Services Agreement and Count IV for the Accell Network Charges.

## **FINDINGS OF FACT**[3]

**I.    The Core Services Agreement**

David Reynolds, President and CEO of the plaintiff bank, testified that the plaintiff contracted with Financial Data Technology Corporation ("Fi-Data") to provide the plaintiff's data processing, through a series of agreements beginning in 1994. On July 26, 2007, the plaintiff entered into its final written contract with Fi-Data, according to which Fi-Data (as the

---

[1] There appears to have been some confusion in the Complaint between Counts II and IV (particularly with respect to damages sought) but, for simplicity sake, the court refers to the claims at issue as outlined herein, in keeping with the way the plaintiff referenced the claims during the pre-trial conference and at trial.

[2] In fact, the court's Memorandum on Summary Judgment did not dismiss Count V in its entirety but simply held that the duty of good faith and fair dealing could not provide grounds for the plaintiff to recover payments made to the defendants for charges that were legitimately incurred. (Docket No. 44, pp. 6-7.) In any event, Count V of the Complaint did not identify any additional damages to the plaintiff beyond those alleged for breach of the express terms of the contracts at issue, and this claim appears to have been abandoned by the plaintiff at trial.

[3] No official transcript of the bench trial has yet been prepared, and all references to the testimony are from the court's memory and notes.

Processor) would provide data processing services to the plaintiff (as the Customer) for a five-year term, beginning on October 1, 2007 (this is the Core Services Agreement). (Plaintiff's Ex. 1.) The Core Services Agreement contemplates renewal by mutual agreement and states: "In the event Customer wishes to discontinue this Agreement, Customer agrees to provide Processor notice of non-renewal at least one hundred [sic] (180) days prior to the expiration of the term." (*Id*. at § 1.b.) The Core Services Agreement further provides as follows:

> Upon termination of this Agreement, whether for reasons of expiration, non-renewal, or termination under Section 1 of the Agreement, Customer may obtain from Processor relevant data files and records for the purpose of de-conversion to an alternative data processing system by a machine-readable media. Processor hereby agrees to provide reasonable and customary levels of transition assistance if Customer decides to convert to other automation alternatives. Except as provided in Section 3d, the de-conversion activities constitute services that create fees payable to Processor. Such fees are enumerated in Schedule A--De-conversion Fee Schedule.

(*Id*. at § 3.a-c.) The exception identified in Section 3-d of the Core Service Agreement provides, simply, that the Customer is not required to pay any de-conversion fees if the agreement is terminated as a result of the Processor's breach and is not relevant to this action. (*Id*. at § 3.d.) Finally, the Core Services Agreement states that "[a] party in breach of this Agreement agrees to reimburse the other party for any expenses, including reasonable attorney's fees, that such party incurs in enforcing its remedies for breach of contract under this section." (*Id*. at § 2.)

Schedule A, which is attached to the Core Services Agreement, provides as follows with respect to de-conversion fees:

| | |
|---|---|
| Demand Deposit | $500 plus $.20 per account |
| Savings | $500 plus $.20 per account |
| Certificates | $500 plus $.20 per account |
| IRA's | $500 plus $.20 per account |

      Loans                      $500 plus $.20 per account

      Any additional applications, such as general ledger accounting, etc., will be additional cost of $500. Incidental requests such as standard reports, etc., will be billed at $50 per report.

(*Id*. at p. 11.) Nowhere in the Core Services Agreement – including Schedule A or any other attachment – is there any indication that the de-conversion process must either begin or end within any specified time period in order for Schedule A to apply, or that the customer must provide the processor with the identity of its new provider within any specified period of time in order for Schedule A to govern the de-conversion fees whenever the process begins. This fact was conceded by Jean Ramsey, the President of Fi-Data at the time, who drafted the Core Services Agreement and was the main Fi-Data point of contact for the plaintiff throughout the course of their relationship.

      Both Mr. Reynolds and Ms. Ramsey testified that, in 2011, Fi-Data filed for Chapter 11 bankruptcy relief and, beginning at that point in time, the parties had concerns about maintaining their ongoing relationship. On February 29, 2012, following the bankruptcy court's appointment of an external trustee rather than allowing Fi-Data to proceed with Chapter 11 as a debtor-in-possession, the plaintiff gave written notice to Fi-Data of non-renewal of the Core Services Agreement. (Plaintiff's Ex. 4.) This was within 180 days of the expiration of the contract term on October 1, 2012 and, therefore, the plaintiff provided the defendant with proper notice of non-renewal under the terms of the Core Services Agreements. Mr. Reynolds and Ms. Ramsey both testified that, upon receiving the notice of non-renewal, Ms. Ramsey asked for the plaintiff's patience while Fi-Data went through the bankruptcy process, as she did not want to lose the plaintiff as a customer. Ms. Ramsey specifically testified that she responded to the notice by

fighting to retain the plaintiff's business rather than wanting to begin the de-conversion process right away.

On September 14, 2012, the United States Bankruptcy Court for the Middle District of Tennessee approved (subject to certain modifications not relevant to this action) an Asset Purchase Agreement entered between the defendant – Fiserv Solutions, Inc. – and Fi-Data, by which the defendant purchased certain Fi-Data contracts, including the Core Services Agreement, and became bound by their terms. (Plaintiff's Ex. 2.) After this time, the defendant continued to do business with the plaintiff under the terms of the Core Services Agreement, and Ms. Ramsey, who became an employee of the defendant in connection with the sale and who continued to service the plaintiff's accounts, testified that she hoped the plaintiff would not go forward with the non-renewal but would continue to do business with the defendant. Specifically, Mr. Reynolds and Ms. Ramsey testified that negotiations between the plaintiff and the defendant were ongoing from the time the defendant took over the Core Services Agreement through its expiration on October 1, 2012 and beyond. Ms. Ramsey and Mr. Reynolds also both testified that, between October 1, 2012 and December 31, 2012, the parties continued to do business under the terms of the Core Services Agreement, while these negotiations were ongoing. Ms. Ramsey testified that the defendant was bound by FDIC regulations to continue to service the plaintiff until a new provider was identified and the de-conversion was complete, but Ms. Ramsey's testimony also strongly suggests that the defendant encouraged this ongoing relationship, rather than asking for the new provider to be identified immediately, in the hope of retaining the plaintiff's business.

Ultimately, the negotiations fell apart and, on December 31, 2012, Mr. Reynolds sent a letter to Ms. Ramsey, informing her that the plaintiff would be transferring its data processing

5

business to Jack Henry. (Defendant's Ex. 21.) Mr. Reynolds testified that part of the reason the negotiations between the parties were unsuccessful is that the plaintiff wanted any new contract entered between the parties to contain the same de-conversion fees as offered in Schedule A under the Core Services Agreement, in the event the relationship did not work out, but the defendant refused. The court finds this testimony credible and also finds that it supports the inference that, during this time, the parties understood that Schedule A would apply to de-conversion of the plaintiff's data, whenever that was to occur, so long as no new contract between the parties was entered into. Otherwise, if there were a window within which Schedule A would apply, the plaintiff would have been dis-incentivized to continue negotiations rather than begin de-conversion immediately. Alternatively, if Schedule A were already inapplicable after the expiration of the Core Services Agreement, the plaintiff would have had no reason *not* to continue with the defendant rather than switching to a new provider.

The defendant's de-conversion of the plaintiff's data officially began after the plaintiff provided notice of its final decision to switch to Jack Henry on December 31, 2012. According to the testimony of all witnesses at trial, the de-conversion process is the process by which a customer's data is transferred to a new data processing provider and is no longer retained by the old provider. Ms. Ramsey testified that, as of December 31, 2012, Schedule A no longer applied to the plaintiff's de-conversion because the Core Services Agreement was no longer in effect. The court finds this interpretation inconsistent with the plain language of the contract as well as the parties' actions.

Mr. Reynolds testified that he believed that Schedule A would control the fees for the de-conversion and that he estimated a cost of roughly $8,000 for the process. According to Mr. Reynolds' testimony, the plaintiff had no more than 20,000 customer accounts when combining

6

all five account types listed on Schedule A (demand deposit, savings, certificate, IRA, and loan accounts). Multiplying these 20,000 accounts times $0.20 per account as indicated on Schedule A totals $4,000. Mr. Reynolds further testified that the plaintiff bank had approximately 6 or 7 additional applications, which would be charged at a rate of $500 each under Schedule A (for a total of no more than $3,500). The court's understanding of Mr. Reynold's $8,000 estimate is that it reflects the total of $4,000 for the individual accounts plus $3,500 for the additional applications plus $500 as a base account charge under Schedule A.

In fact, the court calculates that, with 20,000 individual customer accounts of all five account types, plus 7 additional applications, the de-conversion fees under the plain language of Schedule A would equal $10,000. The court reaches this calculation as follows: $0.20 times 20,000 individual accounts equals $4,000, $500 as a base account charge *per account type* times five account types equals $2,500, 7 additional applications times $500 per additional application equals $3,500, and these sums added together equal $10,000. When asked by the court whether Mr. Reynolds may have inadvertently failed to include the base $500 account charge for *each account type* as provided under Schedule A, the plaintiff's counsel conceded to the court's $10,000 calculation as the appropriate cost of the plaintiff's de-conversion under Schedule A.

Finally, Mr. Reynolds testified that the plaintiff ultimately paid the defendant $158,700 for de-conversion fees under protest. While the defendants placed documents into the record showing that an amount just slightly greater than this was invoiced to the plaintiff for de-conversion, the defendant did not present any evidence refuting that $158,700 was the final amount paid by the plaintiff. Although the plaintiff's evidence on the correct calculation of de-conversion fees under Schedule A was limited to Mr. Reynold's testimony, the court found Mr. Reynold's testimony to be credible, and the defendant entered no evidence to the contrary with

7

respect to the number of customer accounts, nor did it proffer its own calculation of the fees using Schedule A.

Ms. Ramsey testified that, even if Schedule A were to apply to the de-conversion of the plaintiff's data, it would govern the de-conversion of the basic account types only, and not the de-conversion of data from other data processing services provided by the defendant pursuant to addenda to the Core Service Agreement entered between the plaintiff and Fi-Data. Ms. Ramsey could not, however, explain what the language "additional applications" in Schedule A refers to, aside from a general ledger, though she specifically testified that these additional services added by addendum are not "additional applications" under Schedule A. Meanwhile, she admitted that the addenda did not address de-conversion and that Schedule A remains the only place in the written agreement between the parties where de-conversion fees are listed. Moreover, the court finds Ms. Ramsey's testimony that Schedule A should be read to apply to basic accounts only to be unpersuasive because Ms. Ramsey herself testified that banks have not limited their services to basic accounts since the 1970s or 1980s, but the Core Services Agreement was entered into in 2007 and the addenda were added later. If Ms. Ramsey is correct that Schedule A does not apply to these other services, then the parties' agreement completely fails to account for these clearly contemplated services with respect to de-conversion. Finally, Ms. Ramsey testified that, if she could go back and re-draft the Core Services Agreement, she would change the wording to explain that services like those added by addenda are *not* included in the Schedule A pricing and are not a part of the "additional applications."

Cindy Woodard, a control analyst in charge of software development for the defendant who handled the plaintiff's de-conversion, similarly testified that the "additional applications" language in Schedule A refers only to additional applications that would be stored under the

processor's "main frame," which the additional services added by addendum were not. However, there is no such definition in the contract itself, nor was any evidence presented that the parties discussed this or otherwise reached such an understanding. Moreover, when asked, Ms. Woodard – like Ms. Ramsey – could not fully explain what an additional application would be, if not these additional services added by addendum, nor could she give any examples of additional applications aside from a general ledger, despite the wording of Schedule A clearly indicating that there are others.

Kendra Latish, the Director of Project Management for the defendant, who carried out dozens of de-conversions and provided the pricing the defendant charged for the plaintiff's de-conversion, testified that there are seven types of services that the defendant processes for a bank customer aside from the core accounts enumerated in Schedule A, all of which would require de-conversion: ACH (or automatic deposit for a customer's paychecks), OBB (or online banking, allowing a customer to view balances and make transactions), Source Capture (which allows a customer to deposit a check online), EBPP (or electronic bill payment, which allows a customer to pay bills online), Debit/Credit Card Services, Item Processing (which captures a check image), and Risk (which refers to fraud detection and prevention services). These items are illustrated in Defendant's Ex. 39, a demonstrative. According to Ms. Latish, each of these items would have generated additional de-conversion fees for the plaintiff. It appears from the testimony that these services are, in fact, the type that the plaintiff received from the defendant pursuant to the addenda to the Core Services Agreement and are the same services Mr. Reynolds was referring to when he stated that the plaintiff had six or seven additional applications.

Indeed, the court's reading of the contract would suggest that the words "additional applications" expressly contemplate addenda to the agreement for services beyond the

9

processing of the basic accounts in Schedule A and that Mr. Reynold's testimony that the plaintiff had six or seven such additional applications is consistent with the seven additional services, beyond the core accounts, enumerated in defendant's Exhibit 39. Ultimately, the court is unpersuaded by the testimony of Ms. Ramsey and Ms. Woodard that "additional applications" does not refer to these additional services added by addendum, because this testimony is inconsistent with the plain language of the Core Services Agreement as a whole and the other evidence in the record. For these reasons, the court finds that Schedule A controlled all of the core accounts and the additional services enumerated above and that de-conversion for all of these items is $10,000, as calculated above.

The majority of the defense evidence was focused on explaining why the amounts ultimately charged to the plaintiff for de-conversion were "reasonable," in support of the defendant's position that Schedule A does not apply and, therefore, the only theory under which the plaintiff could recover is one of *quantum meruit*. Specifically, Ms. Latish testified that the process involves many people working outside of business hours on detailed tasks and that the defendant's pricing is not only reasonable but competitive in the market and a reflection of the defendant's dedication to providing a customer with as good of an experience as possible in the hopes they may someday return their data processing business to the defendant. The defense, however, presented no evidence to rebut the plaintiff's position that these charges were *not* made in accordance with Schedule A. To the contrary, Ms. Ramsey, Ms. Latish, and Ms. Woodard all conceded that no calculation of de-conversion fees under Schedule A was ever conducted by the defendant and that they did not know what de-conversion would cost under Schedule A.

While the court finds Ms. Latish's testimony to be credible with respect to the de-conversion fees charged by the defendant being reasonable, given industry standards and the

amount of work involved, the court also finds this evidence irrelevant in light of the Core Services Agreement and Schedule A. Ms. Woodard testified that the de-conversion charges were determined in part by the options selected by the plaintiff in the de-conversion agreement with the defendant (such as opting to do a test run of the de-conversion before the final run). Ms. Woodard specifically testified that she worked with plaintiff's representative Chris Cooper and went over charges, including optional charges, with him in detail and received his authorization to carry out all parts of the de-conversion process. Indeed, Mr. Cooper signed off on a final de-conversion agreement indicating all of the options selected by the plaintiff. Ms. Woodard testified, however, that all options agreed to by Mr. Cooper were options she recommended as necessary for a successful de-conversion. Ms. Woodard further testified that a successful de-conversion is critical to a plaintiff's ongoing business. Ms. Latish and Ms. Woodard also testified that the optional services selected by Mr. Cooper for the plaintiff's de-conversion are not things they would recommend omitting from de-conversion, because that could lead to inefficiencies and other problems for a bank, such as customers being unable to access their accounts or needing to reset passwords.

Schedule A did not contemplate different fees for different de-conversion options, and the plain language of the Core Services Agreement states that de-conversion includes whatever is reasonable and customary. The court, thus, interprets the Core Services Agreement to render Schedule A applicable for whatever services were necessary to implement a successful and efficient de-conversion process. Ms. Woodard specifically testified that that is precisely what the defendant did for the plaintiff, nothing more and nothing less.

At the point in time that Chris Cooper, acting for the plaintiff, agreed to the various de-conversion options recommended by Ms. Woodard and the associated charges, Ms. Woodard

11

conceded that both parties were aware of the dispute as to whether Schedule A applied, the defendant had refused to release the data and complete the de-conversion process without full payment of their invoices, and the plaintiff ultimately paid the de-conversion fees under express reservation of rights. This is consistent with Mr. Reynolds's recounting that he tried to "play chicken" with the defendant to see if they would release the data without payment, and they would not. Ms. Woodard testified that, at some point in this process, Mr. Reynolds informed her that he estimated the de-conversion should cost $40,000. Ms. Woodard did not, however, provide the context for this calculation, and it appears to have been in the course of negotiations, once the defendant had made clear its refusal to honor Schedule A (and perhaps a way to settle the dispute between the parties short of litigation). The court, therefore, does not find this to be credible evidence that the proper pricing under Schedule A is $40,000, nor to undermine the $10,000 calculation outlined above.

For these reasons, the court finds that the de-conversion agreement the plaintiff entered into with the defendant pursuant to the conversations between Ms. Woodard and Mr. Cooper does not supersede the Core Services Agreement, render Schedule A inapplicable, or otherwise justify any of the fees charged outside of Schedule A. The court finds, to the contrary, that the plaintiff was going along with what needed to be done to have their data successfully de-converted, in light of the defendant's refusal to honor Schedule A.

In sum, the court finds that: 1) the parties were subject to the terms of the Core Services Agreement as a binding contract, pursuant to which Schedule A controlled the pricing for de-conversion of basic account data as well as additional applications, upon the contract's termination, irrespective of when de-conversion began; 2) at the time of de-conversion, the plaintiff had no more than 20,000 core accounts of all five account types listed in Schedule A

and was utilizing 7 additional applications as accounted for in Schedule A pursuant to addenda to the Core Services Agreement (the items enumerated in Defendant's Ex. 39); 3) accordingly, under Schedule A, the total de-conversion should have cost no more than $10,000; 4) the defendant charged the plaintiff a minimum of $158,700, without considering Schedule A at all or making any attempt to calculate the de-conversion pursuant to Schedule A rates, but relying on a wholly separate (if not unreasonable) pricing formula; 5) the defendant refused to complete the plaintiff's de-conversion process without payment, which would have seriously impeded the plaintiff's ability to continue doing business; and 6) as a result, the plaintiff paid the defendant $158,700 under reservation.

## II.     The Accell Network Charges

Mr. Reynolds testified that the Accell Network Exchange is owned by the defendant and provides services related to credit and debit card transactions, though Mr. Reynolds does not understand the nature of these services or how the plaintiff benefitted from them. He further testified that he was not aware that the plaintiff was purchasing these services from the defendant until the plaintiff received an invoice from the defendant for the early termination of an agreement between the parties for the defendant to provide these services and for the de-conversion fees associated with ending this service. Because Mr. Reynolds was not aware of the services and because the defendant initially mistakenly represented that there had been a contract between the parties for these services, Mr. Reynolds challenged the propriety of the Accell Network Charges. Mr. Reynolds testified, however, that the de-conversion fees associated with the Accell Network are wholly unrelated to de-conversion under the Core Services Agreement and are not governed by Schedule A. Mr. Reynolds also conceded that the plaintiff did, in fact, use the Accell Network beginning at least as early as 2003 and through the time of the events

13

giving rise to this dispute. This testimony was confirmed by Ms. Ramsey, who testified that the Accell Network services had always been provided by the defendant and had never been offered by Fi-Data, even at the time that Fi-Data was providing other services to the plaintiff pursuant to the Core Services Agreement. According to Ms. Ramsey's testimony, the Accell Network was responsible for processing merchant purchases made on debit or credit cards issued by the plaintiff, and the costs of this processing were charged primarily to merchants and passed back in part to the plaintiff. Ms. Ramsey testified that the Accell Network services were of value to the plaintiff and a necessary part of its business and that the de-conversion fees charged by the defendant for this service were reasonable.

Though not explicitly elicited through testimony, the parties appear to agree that the Accell Network charges were ultimately paid in full by the plaintiff. The plaintiff also testified that the defendant's counsel offered him a check refunding the early termination fee, a fact that was confirmed by defense counsel at argument. In fact, counsel for the defendant conceded at argument that there was never a signed agreement for these services and, thus, the early termination fee was improper. Counsel for the defendant further stated on the record the defendant's willingness to refund this amount to the plaintiff. The court finds credible the defense testimony that the plaintiff did in fact receive reasonable services associated with the Accell Network and that the amounts charged for de-conversion related to these services were also reasonable and not otherwise governed by any contractual agreement. The plaintiff offers no evidence to the contrary, other than that Mr. Reynolds was not personally aware of the nature of the services or the propriety of the charges.

## CONCLUSIONS OF LAW

Under Tennessee law,

14

> [t]he interpretation of a contract is a question of law . . . . *Allstate Ins. Co. v. Tarrant*, 363 S.W. 3d 508, 526-27 (Tenn. 2012.) The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting a contract, we first look to the ordinary meaning of the language in the contract and determine whether the language is ambiguous. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011); *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). If the contract language is clear and unambiguous, 'the literal interpretation of the language controls the outcome of the contract disputes,' and we must enforce the contract as written. *Planters Gin Co.*, 78 S.W.3d at 890; *see Union Reality Co., Ltd. v. Family Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007) (citing I*nt'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2000). If the language at issue is ambiguous – that is, if the meaning is uncertain and susceptible to more than one reasonable interpretation – the ambiguity is generally construed against the drafter of the contract." *See Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

*White v. Empire Express, Inc.*, 395 S.W. 696, 714-15 (Tenn. Ct. App. 2012)

The Core Services Agreement is a straightforward contract between the parties setting forth the pricing for de-conversion in Schedule A in the event that the contract is terminated or not renewed for any reason, with no additional requirements in order for Schedule A to apply. The contract sets forth the de-conversion pricing for both the core services and any "additional applications." The court finds that the contract itself is unambiguous and that Schedule A clearly applies to the de-conversion of the plaintiff's data. The defendant argues that Schedule A does not apply because the plaintiff terminated the contract and neither identified its subsequent provider nor allowed the de-conversion process to begin during the 180-day period following notice of non-renewal or immediately upon the contract's expiration. According to the defendant, the plaintiff is attempting to "have its cake and eat it too" by ending its obligations under the contract while still binding the defendant to the terms of Schedule A. This interpretation is in clear contradiction to the plain language of the Core Services Agreement, which states that Schedule A applies "upon termination," irrespective of the reason for

15

termination and, therefore, necessarily contemplates the application of Schedule A *after* the other contract terms no longer apply. Indeed, it is only when the contract ends that de-conversion becomes necessary or possible, because de-conversion results in the transfer of the customer's data to a new provider and the inability of the former provider to continue to provide de-conversion services. As for limiting the application of Schedule A to any particular time period, that is simply not a term of the Core Services Agreement itself, nor is there any evidence that the parties contemplated such an interpretation. Moreover, as discussed above, the application of Schedule A to the defendant's de-conversion of the plaintiff's data, regardless of when this de-conversion took place, is consistent with the parties' actions in 2012.

To the extent that there is any ambiguity in the Core Services Agreement with respect to the meaning of "additional applications," the agreement was drafted by a predecessor-in-interest to the defendant, which had an opportunity to use different wording if it did not intend for "additional applications" to include the types of additional services that the plaintiff procured pursuant to addenda. The defendant then knowingly acquired the Core Services Agreement, having an opportunity to conduct its own due diligence into the wording of the agreement. The court must now resolve any disputes about the meaning of the agreement in favor of the plaintiff.

Finally, with respect to Count I arising from the Core Services Agreement, the plaintiff has presented unchallenged evidence that there were 20,000 accounts and 7 additional applications. Accordingly, the court holds that the plaintiff is entitled to recovery in the amount of $148,700 (the amount actually paid for de-conversion less the $10,000 that should have been charged under Schedule A as calculated above).[4] Because there is no evidence in the record as to

---

[4] The court's Memorandum on Summary Judgment limited the amount of de-conversion fees recoverable by the plaintiff, due to concessions by the plaintiff in the record, without wholly clarifying to which agreements (and which corresponding counts) these fees were related. After

when the plaintiff paid the defendant the $158,700 for de-conversion fees, no prejudgment interest will be awarded.

The court is not wholly unsympathetic to the defendant's well-supported position that $158,700 better reflects the reasonable value of the difficult de-conversion process that the defendant performed on the plaintiff's behalf. This does not, however, materially affect the question at issue here, which is what the parties agreed to in the executed Core Services Agreement. Nor does the defendant's position take into account the potential intangible benefits Fi-Data received by entering into the Core Services Agreement as drafted and becoming a long-term provider of the plaintiff, or the benefits to the defendant of acquiring Fi-Data's business, regardless of being thus bound by an agreement that under-valued the de-conversion process.

With respect to the Accell Network Charges, counsel for the defendant conceded at argument that there was no contract and that the defendant will return to the plaintiff the early termination fee charged under the mistaken belief that a contract had been executed. There is, therefore, no dispute as to this early termination fee for the court to resolve. Additionally, because the court finds that the defendant provided services to the plaintiff through the Accell Network and charged what it believed to be a reasonable amount for de-conversion (absent any controlling contractual price), and because the plaintiff, which bears the burden of proof at trial, has offered no evidence that it was charged for services not received, charged at a rate

---

a thorough review of the record, the court notes that, with the exception of $5,500 for de-conversion under the Core Services Agreement, these concessions relate to Count II, which has now been dismissed and, therefore, these limitations of damages (for $2,050 and $2,575) have no bearing on the court's final judgment in this action. The $5,500 conceded by the plaintiff as the minimum rightful de-conversion charges under the Core Services Agreement is consistent with testimony presented by the plaintiff at trial and is reflected in the court's final judgement, which includes the greater total of $10,000 as the rightful de-conversion charges to be deduced from the $158,700 paid in reaching the final damages calculation.

17

inconsistent with any applicable contract, or charged an unreasonable amount, the court finds that the plaintiff is not entitled to any recovery under Count IV.

## **CONCLUSION**

For the foregoing reasons, the court will enter judgment in favor of the plaintiff in the amount of $148,700 plus attorney's fees and costs.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge